1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4    * * * * * * * * * * * * * *
                                *
5    UNITED STATES OF AMERICA,   *      CRIMINAL NO.:  14-0291-KD
                                *
6    VS.                         *      JUNE 1, 2015
                                *      COURTROOM 5A
7    KIMBERLY SMITH HASTIE and   *      U.S. FEDERAL COURTHOUSE
     RAMONA McARDLE YEAGER,       *      MOBILE, ALABAMA
8                                *
          Defendants.            *
9    * * * * * * * * * * * * * *

10

11         DAY 5 OF JURY TRIAL PROCEEDINGS

12         BEFORE THE HON. KRISTI K. DuBOSE

13            UNITED STATES DISTRICT JUDGE

14                  <u>APPEARANCES</u>

15   FOR THE GOVERNMENT:       Gregory A. Bordenkircher, Esquire
                               Sinan Kalayoglu, Esquire
16                             Lillian Stewart, Esquire
                               Assistant U.S. Attorneys
17                             U.S. Attorney's Office
                               63 S. Royal Street, Suite 600
18                             Mobile, Alabama  36602

19   FOR THE DEFENDANT,
     KIMBERLY SMITH HASTIE:    Neil L. Hanley, Esquire
20                             N. Stewart Hanley, Esquire
                               Attorneys at Law
21                             158 Congress Street
                               Mobile, Alabama  36602

22

23   FOR THE DEFENDANT,
     RAMONA McARDLE YEAGER:    Dennis J. Knizley, Esquire
24                             Attorney at Law
                               7 N. Lawrence Street
25                             Mobile, Alabama  36602

1    <u>APPEARANCES-Continued</u>.

2    ALSO FOR RAMONA McARDLE YEAGER:

                        Jason B. Darley, Esquire
3                       Darley & McGough
                        Attorneys at Law
4                       1751 Dauphin Street
                        Mobile, Alabama  36604

5

6    COURT REPORTER:        Mary Frances Giattina, CCR, RDR, CRR
                            Official Court Reporter
7                           P. O. Box 3021
                            Mobile, Alabama  36652-3021
8                           (251) 690-3003

9          Proceedings reported by machine stenography.

10            Transcript produced by computer.

11                      * * * * *

12                      I N D E X

13   WITNESS:              EXAMINATION:              PAGE:

14   1.   Chad Tucker        Cont'd Direct-Mr. Bordenkircher  971
                            Cross-Mr. N. Hanley             989
15                          Redirect-Mr. Bordenkircher     1038

16   2    FBI Special Agent Katheryn Scott
                            Direct-Mr. Bordenkircher       1052
17                          Cross-Mr. N. Hanley            1097
                            Cross-Mr. Knizley              1100
18                          Redirect-Mr. Bordenkircher     1102

19   Government Rests                                      1108

20   3.   David Sessions    Direct-Mr. N. Hanley           1126
                            Cross-Mr. Bordenkircher        1141
21                          Redirect-Mr. N. Hanley         1157

22   4.   Julia Margaret Wilcox
                            Direct-Mr. N. Hanley           1160
23                          Cross-Mr. Bordenkircher        1169

24   5.   Jonathan Gray     Direct-Mr. N. Hanley           1189
                            Cross-Mr. Kalayoglu            1225
25                          Redirect-Mr. N. Hanley         1265

```
 1                        E X H I B I T S

 2         (All exhibits were premarked unless otherwise noted.)

 3     EXHIBIT:                          MARKED:          RECEIVED:

 4     Government's Exhibit 47                               1092
       Government's Exhibit 56                               1077
 5     Government's Exhibit 57                               1078
       Government's Exhibit 66                                972
 6     Government's Exhibit 92                               1095
       Government's Exhibit 104                               972
 7     Government's Exhibit 107                               976
       Government's Exhibit 121                               973
 8     Government's Exhibit 122                               976
       Government's Exhibit 127                              1108
 9     Government's Exhibit 130-A                            1074
       Government's Exhibit 143                              1252
10     Government's Exhibit 145                               983
       Government's Exhibit 148, pg. 8                       1264
11     Government's Exhibit 156-A                             985
       Government's Exhibit 212                              1182
12
       Defendant's Exhibit 1-D                              1018
13     Defendant's Exhibit 6                                1005
       Defendant's Exhibits 7-A and 7-B                     1008
14     Defendant's Exhibit 7-C                              1010
       Defendant's Exhibit 8                                1011
15     Defendant's Exhibit 9                                1015
       Defendant's Exhibit 10                               1015
16     Defendant's Exhibit 12                               1017
       Defendant's Exhibit 14                               1017
17     Defendant's Exhibit 17                               1017
       Defendant's Exhibits 28-C, 29-D, 30-F and 31         1028
18     Defendant's Exhibits 33 and 34                       1027
       Defendant's Exhibit 56                               1035
19     Defendant's Exhibit 77                               1136
       Defendant's Exhibit 112                              1267
20     Defendant's Exhibit 140                               996

21

22

23

24

25
```

1          (June 1, 2015, 8:05 a.m.)  (In open court.)

2          (All parties present in court with counsel.)

3          (Jury present.)

4              THE COURT:  All right.  Please be seated.  Thank you

5      very much for being timely this morning.

6          Call your next witness.

7              MR. BORDENKIRCHER:  Mr. Tucker.

8              THE COURT:  Okay.  That's right.  Mr. Tucker.  I'm

9      sorry.

10                         CHAD TUCKER,

11         having previously been sworn, testified as follows:

12             THE CLERK:  Mr. Tucker, you're still under oath.

13             THE WITNESS:  Yes, ma'am.

14                    CONTINUED DIRECT EXAMINATION

15     BY MR. BORDENKIRCHER:

16     Q.   Good morning, Mr. Tucker.

17     A.   Good morning.

18     Q.   Yesterday -- or Friday we were going through some of your

19     invoices that you received from your company.  Do you remember

20     that?

21     A.   I do.

22     Q.   And I'd like to show you what's been marked as

23     Government's Exhibit Number 66 (indicating), and that's an

24     invoice to Ramona Yeager for invoice receipt 225.  Do you see

25     that?

1   A.   I do.

2   Q.   And it has two pages, and the second page is the February

3   retainer.  Do you see that?

4   A.   I do.

5   Q.   Was that a business record of your company?

6   A.   It was.

7   Q.   Kept in the ordinary course of your company's business?

8   A.   Yes.

9            MR. BORDENKIRCHER:  I'd enter Government's

10  Exhibit Number 66.

11           MR. N. HANLEY:  No objection.

12           THE COURT:  It's admitted.

13       (Government's Exhibit 66 was received in evidence.)

14  BY MR. BORDENKIRCHER:

15  Q.   Then I'd like to show you what is an e-mail is

16  Government's Exhibit Number 104.  It's an e-mail from the

17  Defendant Hastie to your company (indicating).  Do you

18  recognize that, please, sir?

19  A.   I do.

20           THE COURT:  Any objection?

21           MR. N. HANLEY:  No, ma'am.

22           THE COURT:  It's admitted.

23       (Government's Exhibit 104 was received in evidence.)

24  BY MR. BORDENKIRCHER:

25  Q.   And then on the back side is Facts on Combining the

1  License Commission and Revenue (indicating).  Do you see that,

2  sir?

3  A.   I do.

4  Q.   We had talked about the publicity piece or the PowerPoint

5  presentation that you had put out.  Is this referring to her

6  notes that she sent to you to put in there?

7  A.   Yes.

8  Q.   So if you go to the second page here (indicating), that's

9  information that you received from the Defendant; is that

10  correct?

11  A.   Yes, I believe so, yes.

12  Q.   And then another e-mail (indicating), Government's

13  Exhibit Number 121.

14          THE COURT:  Any objection?

15          MR. N. HANLEY:  No, ma'am.

16          THE COURT:  It's admitted.

17      (Government's Exhibit 121 was received in evidence.)

18  BY MR. BORDENKIRCHER:

19  Q.   And looking at 121, that's where you're having -- you and

20  your company are having conversations with the Defendant about

21  variations, getting closer to finishing off the newsletter?

22  A.   Yes, that's correct.

23  Q.   Did you have -- how many -- was it one meeting and you

24  didn't meet with her, or were there numerous meetings and

25  numerous variations of this newsletter?  How engaged was the

1   Defendant in this newsletter?

2   A.   She was engaged with a couple members of my team for some

3   period of time.  It would have been multiple meetings, yes.

4   Q.   Then I'd like to show you what has been marked and

5   admitted into evidence as Government's Exhibit Number 173

6   (indicating), which is an e-mail from the Defendant to Marilyn

7   Wood.  Do you know who Marilyn Wood is, please, sir?

8   A.   I do.

9   Q.   And who is she, please, sir?

10  A.   The Revenue Commissioner of Mobile.

11  Q.   Okay.  Can you read where it says, "First," then it says,

12  "I apologize," can you read that, please, sir?

13  A.   "First, I apologize that some of the information in the

14  newsletter was incorrect as Chad Tucker's ad agency did it and

15  sent it out before my office had proofed it.  We use a mailing

16  service, and the information was sent directly to them.  In

17  fact, they met with me -- they met with my office this week to

18  totally revamp it."

19       How far would you like me to read?

20  Q.   Just keep going to the end of that paragraph, please,

21  sir.

22  A.   "I did not mean to imply in any way that you were not

23  running your office efficiently.  From everything I have seen

24  and from everyone else I have spoken to, all agree the Revenue

25  Commission runs very efficiently.  I will have them take out

1    the part totally about changing the appeals process.  It was

2    definitely not meant that it was not running good now.  I'll

3    explain what we told Wes, Chad's employee, when I talk to you.

4    Totally misrepresented.  I think the part that you said, you

5    said License Commissioner will hold both offices until

6    October 2015, they were trying to say, very poorly, I might

7    add, that because there is such a delay in taking office,

8    there won't be anyone running for my office, so there isn't a

9    conflict."

10   Q.   All the information that you received from the

11   newsletter, did it come from you or did it come from the

12   Defendant?

13   A.   It came from the Defendant.

14   Q.   Did you send that out without proofreading it?

15   A.   No.

16   Q.   Did you send it out without her going over it multiple

17   times?

18   A.   No.

19   Q.   Is that what she said in that e-mail true or false?

20   A.   That's not true.

21   Q.   I show you what's been marked as Government's Exhibit

22   Number 122 (indicating).  It's from you to Kim Hastie.

23          MR. BORDENKIRCHER:  Any objection to that?

24          MR. N. HANLEY:  Not -- I'd like to see the other

25   pages.

1            THE REPORTER:  I'm sorry, can't hear you.

2            MR. N. HANLEY:  No objections.

3            THE COURT:  It's admitted.

4        (Government's Exhibit 122 was received in evidence.)

5   BY MR. BORDENKIRCHER:

6   Q.   You see that e-mail is from you to Defendant Hastie?

7   A.   Yes.

8   Q.   And on that, are you again discussing the newsletter?

9   A.   Yes.  It appears to be, yes.

10  Q.   Now, did you ever discuss with the Defendant Hastie

11  preparing for an interview with the Lagniappe?

12  A.   I did.

13  Q.   I'd like to show you what's marked as Government's

14  Exhibit Number 107 (indicating).  Do you recognize that,

15  please, sir?

16  A.   I do.

17  Q.   And what is that, please, sir?

18  A.   A document that I prepared in July in preparation for an

19  interview that I was expecting to happen.

20            MR. BORDENKIRCHER:  I'd enter Government's Exhibit

21  Number 107.

22            MR. N. HANLEY:  No objection.

23            THE COURT:  It's admitted.

24        (Government's Exhibit 107 was received in evidence.)

25  BY MR. BORDENKIRCHER:

CHAD TUCKER - CONT'D DIRECT BY MR.  BORDENKIRCHER          977

1    Q.   Now, you had discussed in one of your earlier, I think it

2    was on January 13th of 2014 in a campaign rollout, talking to

3    the media.  Is this the type of document you prepared for the

4    Defendant Hastie pursuant to your retainer?

5    A.   This document?

6    Q.   Yes.

7    A.   Yes.

8    Q.   And what is it, and what was the purpose of it, please,

9    sir?

10   A.   Well, you know, obviously, we expected there to be

11   questions about the merger.  We knew there were -- there were

12   questions from the Lagniappe, which is what this was prepared

13   for specifically, but this would apply to any interview.

14        These were questions that I anticipated being asked based

15   on conversations I had with various members of the news media,

16   so I put this document together to prepare Ms. Hastie for that

17   interview.

18   Q.   And did you work on that with Victor Crawford?

19   A.   No.

20   Q.   That was something that you did?

21   A.   This document, yes.

22   Q.   Now, are there general rules of the road along with this

23   Government's Exhibit Number 107 where you kind of listed out

24   some -- is it potential questions and then potential answers?

25   A.   Well, if you can put it back on there.  Yeah, thank you.

1    Initially, I prepared the questions based off of what I
2    believed -- perceived to be questions that would be asked of
3    Ms. Hastie.  I then met with Ms. Hastie to discuss the
4    questions that I had generated and to develop the answers.  I
5    then went back and, you know, prepared the answers based off
6    what she and I had discussed in her office.
7    Q.   And was Victor Crawford a part of any of that?
8    A.   No.
9    Q.   Was it -- working with the computer any part of that?
10   A.   No.
11   Q.   Was that of any redoing the computer system at the
12   License Commission?
13   A.   No.
14   Q.   This was a -- helping you do public relations for the
15   Defendant prior to being interviewed; would that be fair to
16   say?
17   A.   That's exactly what I was doing.
18   Q.   Now, do you have any general rules when you're advising a
19   politician on a political interview with the newspaper before
20   they do it?
21   A.   Not a bunch of rules, but --
22         MR. N. HANLEY:  Your Honor, I object to what -- the
23   general rules when advising somebody.  It's irrelevant.
24         THE COURT:  Sustained.
25   BY MR. BORDENKIRCHER:

1    Q.   Did you tell her any -- did you advise her about things

2    she should say or not say or whether she should be truthful or

3    not truthful?

4    A.   We didn't have a conversation regarding truth.  We had a

5    conversation -- so here's how this document, the answers were

6    created.  She and I sat in her office.  I went over questions

7    1, 2, 3, all the way down to the bottom and asked her the

8    questions as if I were the reporter asking them because I

9    needed to know the answers so that I could help her develop

10   her response to each one of them.

11        So I'm not sure that I'm answering your question but,

12   obviously, the content needs to be accurate, and that's what

13   she and I were working towards.

14   Q.   Okay.  Now, did she, in fact, do the Lagniappe article or

15   interview?  Was she interviewed by the Lagniappe?

16   A.   She did at some point after this.  I'm not sure exactly

17   when but, yes, she did.

18   Q.   What I'd like to do is play the portions of that

19   interview and have you listen to them.

20            MR. N. HANLEY:  Judge, I'm going to object to

21   playing it again.  It's been played several times.

22            THE COURT:  Do you have a specific question about

23   the interview?

24            MR. BORDENKIRCHER:  I do.

25            THE COURT:  What is it?

1          MR. BORDENKIRCHER:  It's -- I don't want to do a

2     speaking.  Do you want me to just go ahead and say what it is?

3          THE COURT:  Yes, please.  I'm just trying to figure

4     out why the relevancy of playing that over again.

5     BY MR. BORDENKIRCHER:

6     Q.   Did you -- did you hear Ms. Hastie make representations?

7          THE COURT:  No, this is just argumentative.  Unless

8     you have a specific question about the interview, you can wait

9     until your closing to make those arguments.

10    BY MR. BORDENKIRCHER:

11    Q.   Did you have conversations with Ms. Hastie before the

12    initial interview and then after she had been interviewed?

13    A.   I did.

14    Q.   Tell me about the conversation you had with her

15    immediately after her first interview with the Lagniappe.

16    A.   She called me after she spoke to the Lagniappe and was

17    fairly upset after the interview.  It did not go well.

18    Q.   Did she tell you any representations she had made about

19    paying Jon Gray?

20    A.   She did.

21    Q.   What did she say?

22    A.   She said she had messed up.

23    Q.   More specifically, what did she say?

24    A.   She said she had messed up and that she had told them

25    that she had not paid Mr. Gray when, in fact, she had.

1   Q.   So she admitted that she had lied to the press?

2   A.   She told me that she had told them inaccurately that she

3   had not paid Jon Gray when, in fact, she had, yes.

4   Q.   So after she admitted that she had lied to a reporter,

5   what, if anything, did you tell her to do?

6   A.   Told her to call them back and correct it.  She did.

7   Q.   Do you know who Jon Gray is?

8   A.   I do.

9   Q.   And do you know what he was doing for the Defendant

10  Hastie?

11  A.   I didn't at the time in too much detail.  I do now.

12  Q.   And what was he doing for her?

13         MR. N. HANLEY:  Judge, I object if it's hearsay,

14  what he heard.

15         THE COURT:  Do you know what he was doing for her?

16  How do you know that?

17         THE WITNESS:  I know what he was doing specifically

18  after the investigation began and things became public, but I

19  did not know at the time.

20         THE COURT:  Okay.  Next question?

21  BY MR. BORDENKIRCHER:

22  Q.   Do you know what kind of -- at that time, do you know

23  what kind of work Jon Gray did?

24  A.   I do.

25  Q.   What was it?

1    A.   We do very similar work.  He has a marketing agency.  He

2    also does political campaigns as well.

3    Q.   He's not a computer technician, as far as you know?

4    A.   Yeah.  I'm not -- I don't have any information about

5    that.

6    Q.   And did you ever have a meeting with you, Jon Gray, Joe

7    Ruffer, and the Defendant over lunch to discuss the politics

8    of the merger?

9    A.   We did, yes.

10   Q.   And tell me who was there and where was that?

11   A.   Ms. Hastie, Mr. Gray, Mr. Ruffer and, I believe, myself,

12   I believe that was it, and we was at a restaurant, maybe --

13   I'm not sure.  Maybe Felix's, I think.

14   Q.   And what was the topic of discussion?

15   A.   It ranged from the proposed legislation to the merger

16   itself to just the politics of the, you know, of the issue and

17   strategies on pushing that forward effectively.

18   Q.   Did the Defendant Hastie want you to work with and push

19   for the legislation of the merger of the office?

20   A.   I mean, there were a lot of discussions about pushing

21   that through and having it be successful.  I don't remember

22   her -- I don't remember ever being officially tasked with

23   pushing the legislation other than what we were doing to push

24   it publicly.  But yes, to -- as far as the PR and marketing of

25   that issue, yes, we were tasked with doing that.

1   Q.   Do you know if Mr. Gray was tasked with the legislative

2   part of that?

3   A.   Yes.

4   Q.   So he was involved with the bill and lobbying up in

5   Montgomery for it?

6   A.   Yes.

7   Q.   Do you know if Mr. Gray was ever involved with the

8   newsletter that was put out?

9   A.   I don't know -- I don't think he was.  I'm not sure.  I

10  don't think so.

11  Q.   So his goal was more as the lobbyist and the bill writer?

12  A.   That's my understanding, yes.

13  Q.   I'd like to show you what's been marked as Government's

14  Exhibit Number 145 (indicating).  Do you see that, please,

15  sir?

16  A.   I do.

17  Q.   And is that a business record of Strateco, or your

18  company?

19  A.   Yes, it is.

20       MR. BORDENKIRCHER:  I would enter Government's

21  Exhibit Number 145.

22       MR. N. HANLEY:  No objection.

23       THE COURT:  It's admitted.

24       (Government's Exhibit 145 was received in evidence.)

25  BY MR. BORDENKIRCHER:

1   Q.   And that is concerning invoice 309; is that correct?

2   A.   Yes.

3   Q.   And that covered July 10th, 2014?

4   A.   That's correct.

5          MR. BORDENKIRCHER:  Just one second, Your Honor.

6        (Brief pause.)

7   BY MR. BORDENKIRCHER:

8   Q.   Do you know if you ever paid -- were you ever paid by the

9   Defendant Hastie for that invoice?

10  A.   No, we were not.

11  Q.   Did you see the WKRG interview of the Defendant Hastie

12  with regard to the e-mail blast and the Sandy Stimpson

13  campaign?

14  A.   I did.

15  Q.   Did you see -- do you remember her stating that she had

16  nothing to do with that?

17  A.   I did.

18  Q.   Was that the truth?

19  A.   No.

20  Q.   She provided those e-mails to the Sandy Stimpson campaign

21  --

22          MR. N. HANLEY:  Object to him leading his witness,

23  Your Honor.

24          THE COURT:  Sustained.  Don't answer the question.

25  BY MR. BORDENKIRCHER:

1    Q.   Was that the truth?

2              THE COURT:  Asked and answered.  Move on.

3    BY MR. BORDENKIRCHER:

4    Q.   Now, Mr. Tucker, in July, were you interviewed by the FBI

5    regarding this issue?

6    A.   I was.

7    Q.   And did they come to your office?

8    A.   They did.

9    Q.   And did you voluntarily agree to talk to them?

10   A.   I did.

11   Q.   And at their request, did you make a phone call to the

12   Defendant Hastie?

13   A.   No.  She called me while they were in my office.

14   Q.   And was that taped?

15   A.   Yes.

16             MR. BORDENKIRCHER:  Okay.  Your Honor, I'd like to

17   play that tape.

18        What exhibit number is it?

19             THE CLERK:  Exhibit Number 156-A.

20             MR. BORDENKIRCHER:  I'd like to play 156-A.

21             THE COURT:  Okay.  It's admitted.  Go ahead.

22        (Government's Exhibit 156-A was received in evidence.)

23        (The CD was played and transcribed as follows:)

24      "MS. HASTIE:  Hello.  Hold on.

25       MR. TUCKER:  Hey.

1        MS. HASTIE:  Hey.

2        MR. TUCKER:  Hey.

3        MS. HASTIE:  Did you talk to him?

4        MR. TUCKER:  Yeah.  It don't look good.  It looks like --

5    it looks like -- it looks like it's all in an effort to hide

6    paying me is what it looks like, which means --

7        MS. HASTIE:  But how did their --

8    (unintelligible) -- bill go through the county --

9    (unintelligible)?

10       MR. TUCKER:  I don't know, I mean, but -- but I mean, I

11   guess I'm mad.  I'm not saying I'm mad at you, but why was Jon

12   paid differently?  Why hide my payments and not hide Jon's?

13   It's, like, now Chad is going to look like he was trying to

14   hide something, and Jon --

15       MS. HASTIE:  Okay.  I already explained that to you.

16   What happened was whenever we started paying you initially a

17   long time ago, I didn't have the $1.25 fund that I paid Jon

18   out of.  I only just got that.  So when we first start paying

19   you, because you were going to work on the website, in my

20   mind, all that was computer stuff.  So I asked Victor if he

21   would pay for it.  It all still comes out of my budget.  So

22   it's still -- I'm paying it still, just paying it through

23   Victor.  I just had Victor pay it so that I didn't have a

24   separate account and go to the County Commission.  You know,

25   maybe I should have done it different.  Okay.  But why?

1   But --

2       MR. TUCKER:  And I'm not accusing you of anything, Kim.

3   I'm just, I'm having a really bad day.  But why?  Why care if

4   the County Commission knows?  I don't care if the County

5   Commission knows that I'm working for you.  I mean, that's

6   what I do for a living --

7       MS. HASTIE:  (Unintelligible) -- this is always a pain in

8   the rear, so we just set it up that way so that it would be

9   easier.  That was the whole reason.

10      MR. TUCKER:  I mean, this whole thing about control --

11      MS. HASTIE:  (Unintelligible) -- big deal.  He did,

12  didn't he?

13      MR. TUCKER:  Do what?

14      MS. HASTIE:  (Unintelligible.)

15      MR. TUCKER:  What did you say?

16      MS. HASTIE:  (Inaudible) -- $2,500.  Yeah.  Okay.  I'm

17  just talking.  Yeah, see, the bill -- (inaudible) -- but we

18  still have it in the -- with the thing.  Okay.  We had -- and

19  your bill is attached to Victor's bill, and it's got Strateco,

20  $2,500, on his bill.  So it isn't like that we were hiding it

21  from anybody.  I mean --

22      MR. TUCKER:  I never -- here's the other thing that I'm

23  being asked, okay, and this freaks me out, it's because it's,

24  like, Victor was threatened to pay me, like, he didn't want to

25  pay me.  And that --

 1          MS. HASTIE:  I know --

 2          MR. TUCKER:  That -- (unintelligible) --

 3          MS. HASTIE:  I guess he -- (unintelligible) -- but if he

 4     was threatened, then why didn't he just say no?

 5          MR. TUCKER:  Well, because he was uncanny is what I'm

 6     being told.

 7          MS. HASTIE:  I did not do that.

 8          MR. TUCKER:  Well --

 9          MS. HASTIE:  Well, I mean, you know, I guess he doesn't

10     but, I mean, and this is so freaking innocent too.  So, you

11     know, Jon Gray, I'm tired of agreeing with him.  I think it's

12     from Merceria.  I think it's Merceria and Shirley and Victor,

13     all three.

14          MR. TUCKER:  I got to go.  I got Wes in here panicking

15     and everybody is panicking, and I've got to go calm

16     everybody's nerves down.  I'll call you back.

17          MS. HASTIE:  Okay.  All right.  Bye."

18     BY MR. BORDENKIRCHER:

19     Q.   The person that was referred to Merceria, do you know who

20     she's referring to?

21     A.   Commissioner Ludgood, Mobile County Commissioner.

22               MR. BORDENKIRCHER:  Okay.  Pass the witness, Your

23     Honor.

24               MR. N. HANLEY:  Judge, I got here early and pulled

25     some exhibits and put them on my table and --

1        MR. KNIZLEY:  I handed them back to the Government.

2        MR. N. HANLEY:  You handed them back to the

3   Government.

4        (Off the record discussion.)

5        MR. N. HANLEY:  Judge, I can start while they are

6   doing that, but I specifically came early to do that.

7        THE COURT:  Okay.  Well, go ahead and get --

8        MR. KNIZLEY:  It's my fault, Your Honor.  I picked

9   them up and gave them back to the Government.

10       THE COURT:  All right.  Well, let's get started.

11       MR. N. HANLEY:  Okay.

12                    CROSS EXAMINATION

13  BY MR. N. HANLEY:

14  Q.   Mr. Tucker, I'm Neil Hanley.  I don't think we've ever

15  met; correct?

16  A.   We have not.

17  Q.   You've had an opportunity -- or the Government has had an

18  opportunity to go through all these exhibits with you and to

19  interview you; correct?

20  A.   That's correct.

21  Q.   Okay.  But I have not; right?

22  A.   That's correct.

23  Q.   My request to interview you prior to trial was declined;

24  correct?

25  A.   By my attorney, yes.

1    Q.    Right, right.  So I have not had a chance to talk to you

2    nor to show you any exhibits I may?

3    A.    That's correct.

4    Q.    Now, my understanding, Mr. Tucker, is you've got a law

5    enforcement background?

6    A.    I do.

7    Q.    And would you tell me a little bit about that?

8    A.    What would you like to know?

9    Q.    I'd like to know what your experience in law enforcement

10   was and when and where.

11   A.    I went to the police academy in 1990.  It was 20 years

12   ago this past March.  I spent a total of about 15 years in law

13   enforcement.

14   Q.    With who?

15   A.    I left the Sheriff's Office under the rank of Major.  I

16   was the assistant to the current sheriff.  Later, I was the

17   chief administrator of the District Attorney's Office, working

18   for Ms. Rich.

19   Q.    Okay.  But you also worked at another department besides

20   the Sheriff's Department; correct?

21   A.    Yes.  I'm sorry.  In 1994, I went to -- I was -- the

22   Citronelle Police Department sent me to the police academy in

23   1994.

24   Q.    And then you went to work -- or you worked for a while

25   for the District Attorney of Mobile County?

1    A.   Yes.  That's where I ended my career.

2    Q.   As a law enforcement officer?

3    A.   No, not as a law enforcement officer, but it was in law

4    enforcement.  I was just covering my law enforcement career

5    with you.

6    Q.   And did you do any public relations work in the District

7    Attorney's Office?

8    A.   That was not my primary job but, yes, I'm sure I did.

9    Q.   Did you then work for Mobile County Sheriff Sam Cochran?

10   A.   Yes.  Yes, uh-huh.

11   Q.   Did you work -- did you do any PR for Sam Cochran?

12   A.   Yes.  It was not my primary job, but I did, yes.

13   Q.   Do you continue to do PR work for Sam Cochran?

14   A.   No.  He has a PR staff.

15   Q.   Okay.  Well, would it be fair to say that you're a

16   law-and-order type of guy?

17   A.   I would hope so, yes.

18   Q.   Okay.  And would it be fair to say that you try to keep

19   up on all the laws concerning your business and campaigns and

20   that type of thing?

21   A.   We try to, yes.

22   Q.   Well, that's very important, isn't it?

23   A.   It is.

24   Q.   Okay.  And you try to adhere to the law, do everything

25   you can possibly do?

1    A.   We do.

2    Q.   Now, have you represented other public officials

3    besides -- or other public departments besides the License

4    Commissioner?

5    A.   Yes.

6    Q.   Okay.  Can you tell me who they are?

7    A.   The Sheriff's Office in Mobile, the Mobile County Water

8    Board, and the License Commission, I guess, would be the three

9    that we've worked for.

10   Q.   You do work for Mobile County Sheriff's Department?

11   A.   Currently, yes, we do.

12   Q.   Okay.  And what do you do for the Mobile County Sheriff's

13   Department?

14   A.   We manage all of their social media.

15   Q.   And how long have you been doing that?

16   A.   I'm not exactly sure; probably a year-and-a-half, maybe a

17   year, year-and-a-half.

18   Q.   And do you get paid?

19   A.   We do.

20   Q.   And do you get paid with public funds from the --

21   A.   The check comes from the Sheriff's Office, yes.

22   Q.   And that work you do is perfectly legitimate; correct?

23   A.   As far as I know, yes.

24   Q.   Well, as you said on your direct examination, it's to

25   educate the people; correct?

1    A.    They have a specific initiative that they use social

2    media for.

3    Q.    And what is that?

4    A.    It's a law enforcement function.

5    Q.    And is that political?

6    A.    They are using Facebook and Twitter to put out

7    information about crimes, to seek input to solve crimes.

8    Q.    Okay.

9    A.    But it's to educate the public about crimes, yes.

10   Q.    Or to educate the public; correct?

11   A.    That's correct.

12   Q.    And it's the same thing that a newsletter will do, it's

13   used to educate the public; correct?

14   A.    Any instrument used to put out information would be to

15   educate the public, yes.

16   Q.    Okay.  Now, what is social media?

17   A.    You know, it's -- most people think of it as Facebook,

18   but it's online tools used such as Facebook, Twitter,

19   Instagram, Snapchat.  Anything used to engage in a

20   conversation with the public, you can either engage in that

21   conversation person-to-person or from a group or organization

22   such as the License Commission or the Sheriff's Office to

23   communicate with the public.  But it's all done -- excuse

24   me -- it's all done over the internet.

25   Q.    And it's all done by computers; correct?

1    A.   Or smartphones.

2    Q.   Or smartphones.  Okay.  And this is a perfect -- and this

3    is what you do; correct?

4    A.   So our business is marketing and PR, but we specialize in

5    social media.  We apply social media strategy to fairly every

6    client we have, business, corporate, or government.

7    Q.   And it is totally proper work to be performed for a

8    public office, isn't it?

9    A.   I hope so, yes.

10   Q.   Well, you not only know your business, you know other

11   people's -- the people that are in this type of business;

12   correct?

13   A.   Oh, yeah, sure.

14   Q.   And there's a lot of people like you that are doing

15   social media and newsletters for public officials?

16   A.   That's correct, yes.

17   Q.   Correct?

18   A.   Yes.

19   Q.   Have you seen Bradley Byrne's newsletter?

20   A.   I have.

21        (Off the record discussion.)

22            MR. N. HANLEY:  May I approach?

23            THE COURT:  Okay.

24   BY MR. N. HANLEY:

25   Q.   Who's Bradley Byrne?

1    A.   He's a congressman from the Southern District.

2    Q.   I'd like to show you what's been marked for

3    identification purposes as Defendant's Exhibit 140

4    (indicating).  Are you familiar that that's his newsletter?

5    A.   It appears to be, yes.

6    Q.   Okay.  And do you know who pays for this newsletter?

7    A.   I do not, sir.  It should say if it's a political

8    government document.

9              MR. N. HANLEY:  Okay.  I would offer 140, Your

10   Honor.

11             MR. BORDENKIRCHER:  I don't think he has any

12   knowledge of the underlying document, Your Honor.  Improper

13   foundation with that witness because he didn't produce it,

14   write it, doesn't know where it came from, doesn't know who

15   paid for it.

16             THE COURT:  Sustained.

17   BY MR. N. HANLEY:

18   Q.   Is this a true and accurate depiction -- or is this

19   actually the newsletter that Bradley -- that U.S.

20   Representative Bradley Byrne puts out?

21   A.   It appears to be to me, yes.

22   Q.   Have you seen it before?

23   A.   I get it in the mail.

24   Q.   You get it -- you actually get it at home?

25   A.   Yeah.  That's why I recognized it, yes.

1    Q.   Okay.  You want to just take a -- did you read it when

2    you got it at home?

3    A.   Don't tell him I didn't.  No, I didn't read it.

4    Q.   Does this appear to be the newsletter that you got?

5    A.   It appears to be, yes.

6             MR. N. HANLEY:  We would offer it.

7             MR. BORDENKIRCHER:  No objection, Your Honor.

8             THE COURT:  It's admitted.

9        (Defendant's Exhibit 140 was received in evidence.)

10   BY MR. N. HANLEY:

11   Q.   All right.  This is the document that you just

12   identified, Mr. Tucker (indicating)?

13   A.   Yes, sir.

14   Q.   And it is Congressman Bradley Byrne.  This is the front

15   page of that document; correct (indicating)?

16   A.   It appears to be, yes.

17   Q.   And on the inside pages, it has various things that he's

18   working on (indicating).  He is educating the public about his

19   priorities; correct?

20   A.   Yes.  It's what it looks like.

21   Q.   Including his priorities; correct?

22   A.   Yes.

23   Q.   Is this political?

24   A.   By definition, I would say it was political, yes.

25   Q.   And on the next page, he also continues a discussion of

1   repealing Obamacare and what he's got -- what he's doing or

2   what's ahead for him; correct?

3   A.   Yes.  It's what it looks like.

4   Q.   And then over here up in the top -- well, he continues to

5   inform about the constituent services (indicating), correct,

6   that are available?

7   A.   Yes.

8   Q.   And then what does it say up there in the top left-hand

9   corner (indicating)?

10   A.   "U.S. House of Representatives, Washington, D.C., Public

11   Document-Official Business.  This mailing was prepared,

12   published, and mailed at taxpayer expense."

13   Q.   Read that last sentence, and please slow down.  You

14   talk even faster than I do.

15   A.   I apologize.  "This mailing was prepared, published, and

16   mailed at taxpayer expense."

17   Q.   This is a proper use of taxpayer money; is it not?

18   A.   I mean, I can't -- I don't know what his rules are,

19   but . . . .

20   Q.   And then there's a little flap that has a little

21   perforation on it (indicating).  Let me see if I can . . . .

22        It's a little flap that says that he wants to hear from

23   you.  And it's a little -- and then he's got a bunch of

24   questions down there; does he not?

25   A.   He does.

1    Q.    And what he's asking his constituents to do is to give

2    him some input on issues; correct?

3    A.    That's what it appears to, yes.

4    Q.    He wants to know what matters most to his constituentss;

5    right?

6    A.    Yes.

7    Q.    And what he's asking is to answer these questions, put

8    your name, telephone number, answer these questions and send

9    it to him so he can figure out what his constituentss want?

10   A.    Yes.

11   Q.    Of course, on the other side of the form is a little

12   card -- or the other side of it is basically a little postcard

13   that you can send in?

14   A.    Yes.

15   Q.    Just as you had put a little -- the same thing you had

16   put on the ballot initiative; correct?

17   A.    Yes.  We put that on there to get the feedback.

18   Q.    And there's nothing wrong with that, is there?

19   A.    Well, I mean, I had a strategy, and the strategy was to

20   educate the public and then get the feedback for her, yes.

21   Q.    That was your idea?

22   A.    Yes.

23   Q.    Now, digital marketing, what is digital marketing?

24   A.    It's anything -- any marketing effort that takes place in

25   the digital world on the internet.

1   Q.   Once again, that would involve a computer or a

2   smartphone?

3   A.   To view it, yes, that's correct, uh-huh.

4   Q.   So in social media, you have Twitter, you have Facebook,

5   you have web pages -- would that be considered social media

6   also?

7   A.   It would only be social if there was an engagement.  So,

8   say, a blog could be considered social, so that would fit the

9   description.

10  Q.   And, of course, all of that requires a computer or a

11  smartphone?

12  A.   Yes.

13  Q.   So a -- most of your work is going to involve computers

14  or smartphones; right?

15  A.   My work?

16  Q.   Yes.

17  A.   Yeah.  All of our work pretty much does.

18  Q.   All of your work is computer-related; correct?

19  A.   Yes.

20  Q.   Now, you pretty much wear -- what percentage of your

21  business is corporate-related or --

22  A.   It changes.  At one point, it was probably 80 percent,

23  but today it varies quarter by quarter.

24  Q.   Well, you have corporate and political clients; correct?

25  A.   That's correct.

1   Q.   And then on occasion, you run a political campaign, a

2   race?

3   A.   During the election cycles, yes.

4   Q.   During the election cycles.  And, of course, what you do

5   for a public official as far as market and social media is far

6   different than what you do when you're running a campaign?

7   A.   Other -- they can be two very different things, yes.

8   They're similar traits, but they can be different, yes, of

9   course.

10  Q.   Certainly, the way you get paid is different.  When you

11  are -- when you are helping the License Commissioner or the

12  Water Board or Sam -- or the Sheriff's Department in their

13  marketing or their PR work, the public pays you.  It's

14  taxpayer money?

15  A.   Yes.

16  Q.   When you are running a political campaign, you get paid

17  from the campaign war chest?

18  A.   That's correct.

19  Q.   And you know you can't be paid with public funds to run a

20  political race; right?

21  A.   That's correct.

22  Q.   You can't do it and you wouldn't do it, would you?

23  A.   No.

24  Q.   Now, the memo that you wrote . . . .

25       (Brief pause.)

1   Q.   I'd like to show you what's been marked as Government's

2   Exhibit 103 (indicating).  It's already been -- in evidence.

3   And I believe this is what has been described as a campaign

4   launch; correct?

5   A.   Yes, that's correct.

6   Q.   Now, you talk about a media release, Facebook page, and

7   questions from the media; correct?

8   A.   Yes.

9   Q.   And then you come up with some fact sheets and meetings

10  and various other things; correct?

11  A.   Correct.

12  Q.   Now, you were not paid for this (indicating)?

13  A.   Can you put it back on the board?  I don't remember the

14  date.

15  Q.   The date is January 13th, 2014.

16  A.   No, I was not.

17  Q.   And this was done in anticipation of Kim running?

18  A.   For Revenue Commissioner, yes.

19  Q.   Right.  But she didn't get any opposition?

20  A.   That's correct.

21  Q.   Okay.  So this document was not -- you did not get paid

22  out of public funds.  You didn't get paid at all to prepare

23  this document?

24  A.   No, I did not.

25  Q.   Now, you just said that all your work is

1    computer-related; correct?

2    A.   Yeah.   I mean, we prepare our -- the things that we

3    prepare for a client are done with a computer, yes.

4    Q.   That would be Facebook; correct?

5    A.   Facebook, designing things.

6    Q.   Website; correct?

7    A.   Uh-huh.

8    Q.   Graphic design; correct?

9    A.   Correct.

10   Q.   Did the graphic design have anything to do with the

11   newsletter?  Did somebody have to design that?

12   A.   Yes.  That was designed by a designer.

13   Q.   And who was that?

14   A.   Sheldon Hall.

15   Q.   Twitter?

16   A.   I don't think we did Twitter for her.

17   Q.   But it all involves -- it's all computer-related?

18   A.   Sure.

19   Q.   So in 2012 when you were running a company called

20   Mobi-Media, Kim retained you?

21   A.   She did.

22   Q.   Now, at that time, there was no political campaign going

23   on, was there?

24   A.   That's correct.

25   Q.   And what did she want you to do?

1   A.   She initially approached me because she was trying to

2   push people from the lobby to online renewals because it would

3   have sped up the process.  So she asked me to develop some

4   strategies internally that she could push out to her customers

5   to convince them to go online.  They just -- they had reviewed

6   it, and they just weren't going online.

7   Q.   Okay.  And what else did you do for her?

8   A.   She had me in on various meetings regarding the office.

9   I even sat on a budget meeting at one point.  She -- we

10  developed a newsletter at that time that I don't think ever

11  went out.  And I don't specifically remember other than that,

12  but there were other things we worked on PR-wise and then the

13  lobby.  The advertising that we tried to do on the TV's, that

14  type of stuff we worked on.

15  Q.   Mr. Tucker, I'd like to show you a two-page document

16  that's been marked for identification purposes as Defendant's

17  Exhibit 6 (indicating).

18           MR. BORDENKIRCHER:  I'm going to object because

19  there's an attachment to that that was not --

20           THE REPORTER:  That was not what, sir?

21           MR. BORDENKIRCHER:  An attachment to the e-mail that

22  was written by a third party that contains hearsay.  So I

23  object on that ground, Your Honor.

24           MR. N. HANLEY:  Judge, I would submit that Mr.

25  Tucker was forwarded this e-mail.

1          THE COURT:  Ask him the questions that try to

2    establish --

3          MR. N. HANLEY:  Okay.

4    BY MR. N. HANLEY:

5    Q.   I'm going to show you actually the second page of this

6    document and the bottom of that page (indicating) and ask if

7    that appears to be your e-mail to Kim Hastie?

8    A.   It appears to be, yes.

9    Q.   And in that, did you have a discussion about working with

10   Victor Crawford?

11   A.   I did.

12   Q.   And the date of the e-mail?

13   A.   July 26, 2012.

14   Q.   And if I could show you the front page (indicating).  Can

15   you read that, Mr. Tucker?

16   A.   Which would you like me to read?

17   Q.   Just go ahead and familiarize yourself with it.

18   A.   Okay.  (Witness complies.)

19   Q.   Does this appear to be discussing a website?

20   A.   It does.

21   Q.   And it's somebody that is actually sending a rough draft

22   to APL Software?

23   A.   Yes.

24   Q.   And that's Victor Crawford?

25   A.   Yes.

1  Q.   And then is there a -- and then on the back is where you

2  talk about working with Mr. Crawford?

3  A.   Yes.

4          MR. N. HANLEY:  I would offer 6, Judge.

5          MR. BORDENKIRCHER:  If he redacts the -- there's

6  parts of that that were -- if he redacted the hearsay out of

7  it in the middle part of the e-mail, I wouldn't have a problem

8  with that.  But there's a middle part of the e-mail between

9  two third parties and --

10         THE COURT:  Are you talking about the from Michelle

11  to Victor part?

12         MR. BORDENKIRCHER:  Yeah.

13         THE COURT:  He's not offering that for the truth of

14  anything asserted, so it's not hearsay.  Do you have any other

15  objection?

16         MR. BORDENKIRCHER:  I believe he is offering it for

17  the truth of the matter asserted, Your Honor.

18         THE COURT:  The e-mail between Michelle and Victor?

19         MR. BORDENKIRCHER:  Yes, Your Honor.

20         THE COURT:  Overruled.  It's admitted.

21     (Defendant's Exhibit 6 was received in evidence.)

22  BY MR. N. HANLEY:

23  Q.   The front part of this Gmail is from a person named

24  Michelle Ritter; is that right?

25  A.   Yes, it appears to be.

1    Q.   Well, the top of it shows that there is an e-mail from

2    Kim Hastie to you; correct?

3    A.   I can't see that, but I think I saw it earlier.  Yes, it

4    does.

5    Q.   And was she forwarding you this e-mail from Michelle

6    Ritter (indicating)?

7    A.   Yes.

8    Q.   Okay.  Now -- and this e-mail was from Michelle Ritter to

9    APL, which is Victor Crawford; correct?

10   A.   Correct.

11   Q.   Please read to me what she e-mails Mr. Crawford.

12   A.   "Attached are the very rough draft of the layout for the

13   site and the estimate.  The estimate includes all development,

14   the addition of PHP to your current server (we don't see any

15   need for you to buy new equipment.)  You can add the PHP

16   yourself and we can take off the estimate or we can come in

17   and set it up, get it fully functional for hosting the site,

18   and then leave it with you.  Please --"

19   Q.   It goes on the second page (indicating).

20   A.   "Part of our expertise is in user experience.  The

21   natural flow of information will be addressed in the

22   development, so I don't expect any of the navigation I have on

23   the layout to stay the same.  We will also be adding

24   analytics, maps, and other mobile functionality as part of the

25   development."

1   Q.   And then you e-mailed Kim.  Would you read that
2   (indicating)?
3   A.   "I thought I had responded to this, but I don't see where
4   I have.  If I did, I apologize for the duplicate.  This looks
5   good.  I like the format.  I can work with Victor any time on
6   content as soon as he is at that point."
7   Q.   Now, what does that mean, that you can work with Victor
8   as soon as he's at that point?
9   A.   I was referring to the fact if that project moved
10  forward, I would have helped develop the content for the
11  website.
12  Q.   So that's what you do, you develop content; correct?
13  A.   That's correct.
14  Q.   What would Victor be doing concerning that website?
15  A.   I'm not sure because there was a third party vendor
16  involved, and I never understood -- I don't remember the
17  relationship between Victor and that vendor.  It's my -- if my
18  recollection serves me correct, I believe that vendor was a
19  web developer.
20  Q.   But, in effect, you said that you could work with Victor
21  on it?
22  A.   Yes.  I met with Victor once.  I think it was the meeting
23  that I had with Victor.  It was about this.
24  Q.   And this was in July of 2012 during your retainer period?
25  A.   Yes, that's correct.

1   Q.   With Mobi-Media with the License Commissioner's Office?

2   A.   That's correct.

3   Q.   I show you what's been marked for identification purposes

4   as Defendant's Exhibit 7-A (indicating) and ask if that

5   appears to be a document from you?

6   A.   It does.

7   Q.   On August 7th, 2012?

8   A.   It does.

9   Q.   And does that accurately depict the message between you

10  and Ramona Yeager?

11  A.   It appears to, yes.

12  Q.   And then 7-B (indicating), would that be the attachment?

13  A.   Yes.

14          MR. N. HANLEY:  I would offer 7-A and 7-B.

15          MR. BORDENKIRCHER:  No objection.

16          THE COURT:  Admitted.

17      (Defendant's Exhibits 7-A and 7-B were received in

18       evidence.)

19  BY MR. N. HANLEY:

20  Q.   What was this concerning?  What did this e-mail concern?

21  What was this discussion about?

22  A.   I don't remember.  That was -- I remember NAIC, but I

23  don't remember --

24  Q.   Was it in connection with the work you were doing for the

25  License Commissioner at that time?

1    A.   I remember NAIC.  I just don't remember what it was

2    regarding or why I was asking that question.

3    A.   I think it had something to do with the first newsletter

4    that I drafted.

5    Q.   Okay.  This same one that we just went over, Number 7-A

6    (indicating), has a P.S.:  "I left some treats in the office.

7    Don't let them all walk off before you have had some;"

8    correct?

9    A.   (No audible response.)

10   Q.   You had been to the office?

11   A.   Had I been to the office?  Yeah.

12   Q.   You had been to the office?

13   A.   Yeah.

14   Q.   Let me show you what's been marked for identification

15   purposes as 7-C (indicating).  Does that appear to be a

16   responding letter from Ramona?

17   A.   Yes.

18   Q.   To Chad?

19   A.   It does.

20   Q.   With an attachment with the NAIC number?

21   A.   That's correct, yes.

22   Q.   Does this accurately reflect the correspondence you had

23   with her?

24   A.   It does.

25   Q.   And on the back is an actual law?

1   A.   Yes.

2              MR. N. HANLEY:  Judge, I was going to just put the

3   first two pages in so the jury can see --

4              THE COURT:  Is there an objection to 7-C?

5              MR. BORDENKIRCHER:  Not for the first two pages,

6   Your Honor.

7              THE COURT:  All right.  So the e-mail and then the

8   first two pages of the bill are admitted.

9        (Defendant's Exhibit 7-C was received in evidence.)

10  BY MR. N. HANLEY:

11  Q.   And once again, this concerned information that was going

12  to go on the newsletter; correct?

13  A.   Yes.  It was about the mandatory liability insurance law.

14  Q.   And once again, it was educating the public?

15  A.   Yes.  She -- so this was one of the topics that she

16  wanted in that initial newsletter because she was -- there

17  were a lot of questions coming into the office, and she wanted

18  to, you know, to clear up this -- it was a new thing, so she

19  was trying to educate them.

20  Q.   The mandatory insurance was a new thing?

21  A.   Yeah.  That's what the NAIC was about.  I couldn't

22  remember that earlier.  I apologize.

23  Q.   And she was attempting to educate the public on that?

24  A.   That's correct.

25  Q.   Which would be an important service, wouldn't it?

1    A.   I'm sorry?

2    Q.   Which would be an important service to the public?

3    A.   Yes.

4    Q.   And you were helping in that one?

5    A.   I was.

6    Q.   And that was in August of 2012; correct?

7    A.   Yes.

8    Q.   I'd like to show you a document that's been marked for

9    identification as Defendant's Exhibit 8 (indicating).  And

10   I'll ask you if you recognize it, at least this first page, as

11   an e-mail from you to Kim?

12   A.   Yes.

13   Q.   I'd like to ask if you recognize the other pages

14   (indicating)?

15   A.   I do.

16   Q.   What all are these other pages (indicating)?

17   A.   That is a -- that's the newsletter that I put together in

18   2012.

19            MR. N. HANLEY:  I would offer Defendant's Exhibit 8.

20            MR. BORDENKIRCHER:  No objection, Your Honor.

21            THE COURT:  It's admitted.

22        (Defendant's Exhibit 8 was received in evidence.)

23   BY MR. N. HANLEY:

24   Q.   All right.  Y'all called it "Tag Talk"?

25   A.   Yeah.  I do better work today than I did in 2012.

1   Q.   And this was the first page of it?  It's August 2012

2   (indicating)?

3   A.   Yes.

4   Q.   And of course, once again, has the -- trying to get

5   people to renew online; correct?

6   A.   Yes.  That was the agenda there.

7   Q.   And it was very important because renewing online saves

8   hours and hours of walk-in work, does it?

9   A.   That's what she told me, yes.

10  Q.   The theory?  Therefore saving a lot of money for the

11  Mobile County License Commission Office?

12  A.   Well, I mean, when she approached me, she said she needed

13  to push people from the lobby to online renewals because it

14  would speed up the process in the lobby, and that was the

15  agenda.

16  Q.   Looks like we maybe had a little Sharon --

17          THE REPORTER:  I'm sorry, sir?

18          MR. N. HANLEY:  I'm sorry.

19  BY MR. N. HANLEY:

20  Q.   We have a little employee spotlight here (indicating)?

21  A.   (No audible response.)

22  Q.   No, no, it's not.  What is Sharon?  "Meet Sharon"?  Who

23  is Sharon?

24  A.   Can you drop it down a little bit?

25  Q.   I can (indicating).

1   A.   Oh, Sharon is the computer, the system that tells you

2   that you're next, that calls out your -- it's a female voice,

3   so someone named her -- or I don't know, I may have come up

4   with that, I don't remember, but it's the computer system that

5   calls your number.

6   Q.   And then she asked to renew online and win a prize

7   (indicating)?

8   A.   Yeah.  I'm not sure -- yes.

9   Q.   How was this generated?  How was this newsletter

10  generated?

11  A.   On my computer.

12  Q.   Is this -- what would you call this (indicating)?  What

13  would you call the creation of this?  Is this graphic design?

14  A.   That's correct.

15  Q.   We do have an employee spotlight on this page

16  (indicating).

17  A.   It's a terrible picture of me.

18  Q.   Joe Schmo?  This was just a draft, wasn't it?

19  A.   Yeah.  That was just a place filler I used to show where

20  the employee spotlight would go.

21  Q.   Okay.  This is where you were going to do employee of the

22  month?

23  A.   That's correct.

24  Q.   Okay.  And Joe Schmo is, in fact, Chad Tucker?

25  A.   I don't have a miniature mouse collection.  Yes, that's

1   me.

2   Q.    And once again, there is a section for providing proof of

3   insurance (indicating); correct?

4   A.    That's correct.

5   Q.    And on the bottom, there is some information on the

6   year-to-date activity and the June activity and the amount of

7   transactions and the amount of money (indicating); correct?

8   A.    That's correct.

9   Q.    And lastly, there's some sort of group photo

10  (indicating); correct?

11  A.    Yes.  That was just a place filler.

12  Q.    So your company, this was part of what you were doing,

13  money you were earning in 2012?

14  A.    Yes.  Well, as part of that, the strategy was to help her

15  develop ways to push people online, and this was one of the

16  tools that we wanted to -- that I proposed that we use to do

17  that.

18  Q.    And did you propose the newsletter?

19  A.    I believe I did.  I believe so, yes.

20  Q.    I'm going to show you . . . .

21        (Brief pause.)

22  Q.    And once again, I'd like to show you what has been marked

23  for identification purposes as Defendant's Exhibit 9

24  (indicating).  And is that, in fact, another e-mail during

25  this period of time from yourself to Kim Hastie?

1    A.   It appears to be, yes.

2             THE COURT:   Any objection?

3             MR. BORDENKIRCHER:   No objection, Your Honor.

4             THE COURT:   It's admitted.

5        (Defendant's Exhibit 9 was received in evidence.)

6    BY MR. N. HANLEY:

7    Q.   And once again, this is another iteration of the

8    newsletter, basically?

9    A.   Yes.

10   Q.   And then during this period of time, I'd like to show you

11   what's been marked as . . . .

12       (Brief pause.)

13            THE COURT:   We need to speed this up.  Can you go

14   ahead and just give him the documents so he can be looking at

15   them while you're asking questions?  You need --

16            MR. BORDENKIRCHER:   No objection to the next one,

17   Your Honor.

18            THE COURT:   To 10?  All right.  It's admitted.

19       (Defendant's Exhibit 10 was received in evidence.)

20   BY MR. N. HANLEY:

21   Q.   Once again, during this period of time, does this appear

22   to be a letter from Kim to you -- or an e-mail from Kim to you

23   (indicating)?

24   A.   It is.

25   Q.   And Kim responds to you what?

1    A.    She said:  "I love it.  Especially Joe Schmo . . . . good

2    looking fellow."

3    Q.    And then I'd like to show you what's been marked as

4    Defendant's Exhibit 11 (indicating).

5              THE COURT:  No objection?

6              MR. BORDENKIRCHER:  No objection, Your Honor.

7              THE COURT:  It's admitted.

8         (Defendant's Exhibit 11 was received in evidence.)

9    BY MR. N. HANLEY:

10   Q.    And "FW:", it says, "hummingbird ideas and websites"?

11   A.    Yes.

12   Q.    Let me show you -- what is this e-mail about

13   (indicating)?

14   A.    These were website designs that they had received before

15   I was retained --

16   Q.    Okay.

17   A.    -- that she was sharing with me.

18   Q.    And is this when you were working on the web -- working

19   on the website for them?

20   A.    Well, I never worked on the website, but we had discussed

21   working on the website, yes.  So, basically, that was to catch

22   me up.

23   Q.    On what the website looked like?

24   A.    On what -- they were design ideas that had been submitted

25   to the office, and she was showing me those.

1        (Off the record discussion.)

2            MR. N. HANLEY:  There's been no objection to Number

3    12.

4            THE COURT:  It's admitted.

5        (Defendant's Exhibit 12 was received in evidence.)

6    BY MR. N. HANLEY:

7    Q.   Does this appear to be some more e-mails concerning your

8    work at the License Commissioner's Office (indicating)?

9    A.   Yes.  This is -- yes.

10           MR. N. HANLEY:  And 14, there's been no objection

11   to.

12           THE COURT:  It's admitted.

13       (Defendant's Exhibit 14 was received in evidence.)

14   BY MR. N. HANLEY:

15   Q.   Does this appear to be another e-mail concerning

16   preparation of work you were doing at the License Commissioner

17   (indicating)?

18   A.   That's correct.

19   Q.   I show you 17.

20           THE COURT:  Any objection?

21           MR. N. HANLEY:  No objection.

22           THE COURT:  It's admitted.

23       (Defendant's Exhibit 17 was received in evidence.)

24   BY MR. N. HANLEY:

25   Q.   You were talking about a brochure (indicating).  Do you

1    recall the renewal brochure that you created for Kim in 2012?

2    A.   I do, yeah.

3    Q.   I'd like to show you --

4         MR. N. HANLEY:  No objection to -- to Exhibit 1-D.

5    There's been no objection.

6         THE COURT:  It's admitted.

7         (Defendant's Exhibit 1-D was received in evidence.)

8    BY MR. N. HANLEY:

9    Q.   Do you remember designing that (indicating)?

10   A.   I do now, yes.

11   Q.   Prior to you designing this (indicating) and you creating

12   this, every person in Mobile County that had a car was sent

13   separate notices; correct?  Do you remember that?

14   A.   I think so, yes.

15   Q.   From just a little postcard at one time to maybe a little

16   --

17   A.   That's right.  Yeah, it was a combination of two

18   documents into one, I think.

19   Q.   And you created -- and you created this document; correct

20   (indicating)?

21   A.   I did.

22   Q.   And this amounted to a very valuable public service,

23   didn't it?

24   A.   That's not for me to decide, but I think it was good,

25   yes.

1    Q.    Are you proud of it?

2    A.    (No audible response.)

3    Q.    Well, it's still being used to this day?

4    A.    Yes.

5    Q.    Are you proud of creating this?

6    A.    I would do things differently today but, yes, I'm proud

7    of the document.

8    Q.    And what happened because of this document is that if a

9    person owned two or three vehicles, as in this one -- I'll

10   show you this one, and let me show you the second page

11   (indicating).  So in this case, this person had four vehicles;

12   right?

13   A.    That's right.

14   Q.    And there was perforations on these; correct?

15   A.    When they were printed, yes.

16   Q.    When they were printed.  And so you could send this one

17   document to a family having four vehicles, correct, instead of

18   four different documents?

19   A.    Yes.

20   Q.    And they could tear them out, fill it out, and send it

21   back in the mail and renew their license?

22   A.    Yes.

23   Q.    And it also contained pertinent information; did it not?

24   A.    What do you mean?

25   Q.    Well, it gave --

1   A.   Are you talking about the informational section?

2   Q.   It gave the hours of operation of all the offices;

3   correct?

4   A.   Yes.

5   Q.   With the addresses?

6   A.   Yes.

7   Q.   With the contact information?

8   A.   Yes.

9   Q.   The contact information on various departments, including

10  boats, motor vehicles, that kind of thing?

11  A.   Yes.

12  Q.   Fax numbers?

13  A.   Yes.

14  Q.   And it gave, once again, new insurance requirements?

15  A.   Yes.

16  Q.   So people would not come down there if there had been a

17  -- or if they had to put their insurance information on their

18  card that they sent back or if they came to the office, they

19  would have to bring that information; correct?

20  A.   Correct.

21  Q.   And was this designed by the computer?

22  A.   Yes.  I put that together.

23       (Brief pause.)

24  Q.   Mr. Tucker, I'd like to show you what has been introduced

25  into evidence as Government's Exhibit 59 (indicating).

1   A.   Yes.

2   Q.   And this was your e-mail in which you sent your invoice

3   for 2012; correct?

4   A.   Correct.

5   Q.   And inside that exhibit is your actual invoice; is it

6   not?

7   A.   Yes.

8   Q.   Now, Mr. Tucker, is there anything false about that

9   invoice?

10  A.   I can't see it.  Take it up to the top, please.

11  Q.   I'm talking about the content.  The $10,000, $500, is

12  there anything false about that or fraudulent about that?

13  A.   Not that I'm aware of, no.

14  Q.   Did you cheat anybody by submitting that income -- that

15  invoice to the Mobile County License Commission?

16  A.   Not that I'm aware of.

17  Q.   Did you steal anything by submitting that invoice to the

18  Mobile County License Commission?

19  A.   No.

20  Q.   Did you trick anybody by submitting this invoice to the

21  Mobile County License Commission?

22  A.   No.

23  Q.   Did you -- was it fair work for fair pay?

24  A.   Yes.

25  Q.   Did you earn your money?

1   A.   Yes.

2   Q.   Was it appropriate work that you did?

3   A.   Yes.

4   Q.   And it was appropriate work for the License Commission at

5   that time; correct?

6   A.   Yes.

7   Q.   And there was no political campaign going on at that

8   time?

9   A.   No, there was not.

10  Q.   And you were acting as a public relations marketing

11  consultant; correct?

12  A.   Yes.

13  Q.   The work was done; correct?

14  A.   That's correct.

15  Q.   And I think you said when the FBI agents came to your

16  office and asked you about paying for Victor that you thought

17  there was some sort of budgetary situation?

18  A.   I don't remember what I said.

19  Q.   Did you know that they were recording you?

20  A.   I do now.

21  Q.   You didn't then?

22  A.   (No audible response.).

23  Q.   Now, in your -- you left, and then in 2014 sometime, Kim

24  asked you once again to come and do some work for her?

25  A.   Correct.

1    Q.   And she basically wanted you to follow up on the

2    newsletter that you had started?

3    A.   Yeah.  When she approached me, it was about -- initially

4    it was about running for Revenue Commissioner.  She assumed at

5    that time she would have opposition.  And then the

6    conversation transitioned into merging the two offices

7    together and then working for the office to push that, yeah,

8    and PR and marketing.

9    Q.   It was just not the newsletter, there was other things

10   she wanted you to work on; correct?

11   A.   Yes.

12   Q.   And what was that?

13   A.   I mean, she talked about PR and marketing in general, but

14   it was -- we started on the effort to merge the two offices,

15   and that's what we worked on, I guess, until our relationship

16   ended in June.

17   Q.   Now, there was no political campaign going on at that

18   time with Kim?

19   A.   No.  She did not have opposition.

20   Q.   She didn't have opposition.  Did y'all talk about

21   Facebook?

22   A.   We did.

23   Q.   Did your company work on Facebook?

24   A.   They did.

25   Q.   Did you talk about a website?

1    A.   (No audible response.)

2    Q.   Upgrading the website?

3    A.   I don't remember her having that conversation with me

4    personally, no.

5    Q.   Well, the person who was actually the point man in this

6    200 and -- 2014 situation was Wes Gunter?

7    A.   That's correct.

8    Q.   He had the -- more contact with Kim than you did?

9    A.   He worked on -- his job is to put this stuff together.

10   So, yes, he dealt with her on a more regular basis than I did.

11   Q.   And he's the one that billed?

12   A.   He sent the invoices.

13   Q.   Sent out the bills?

14   A.   That's correct.

15   Q.   He was the one that was mostly communicating with Kim and

16   with her staff about the content of the newsletter; correct?

17   A.   That's correct.  I had some initial meetings, and then it

18   was --

19   Q.   Was basically Wes?

20   A.   In the meat of it, yes.

21   Q.   And he was involved with the nuts and bolts of it;

22   correct?

23   A.   Sir?

24   Q.   He was involved with actually communicating with the

25   office, with the License Commissioner Office?

1    A.   Yes.

2    Q.   He was sending most of the e-mails; correct?

3    A.   His job was to work with the client to put the -- to take

4    the information back to our team and make sure that it was put

5    together and met the client's needs, yes.

6    Q.   And he's a marketing guy; correct?

7    A.   He's a marketing guy, yes.

8    Q.   Okay.  He doesn't do politics?

9    A.   No, he does not do politics.

10   Q.   And you understand -- or do you understand that after the

11   first couple invoices came in that Kim Hastie said on the

12   invoices, "I want more detail"?

13   A.   I was told that, yes.

14   Q.   "I want more specifics"?

15   A.   I was told that, yes.

16   Q.   As a matter of fact, she wanted to make the invoices more

17   accurate, more -- reflect what was actually done; correct?

18   A.   I was told by my folks that she requested more detail in

19   the invoices.

20   Q.   The e-mail was -- I mean, I'm sorry -- the newsletter was

21   initially your idea?

22   A.   The newsletter?

23   Q.   Yeah.

24   A.   Yes.

25   Q.   And then when this new newsletter came out, you got the

1    idea to put in the part where they would send back their

2    ideas, whether they were for the merging of the office,

3    whether they were against the merging of the office; correct?

4    A.    Yes.  That was a part of the strategy, yes.

5    Q.    And as you said on direct examination, that if you got a

6    negative response, you would probably tell her to drop the

7    idea?

8    A.    Yeah, and/or tweak the message if we thought it was a --

9    if we thought it would help.  Our job was to take her message

10   in merging two offices and help her sell that to the public

11   and that -- so that we would use that information and either

12   tweak the message or tell her, you know, hey, this is --

13   Q.    Not a popular idea?

14   A.    -- not a popular idea.

15         (Brief pause.)

16   Q.    Mr. Tucker, I'd like to show you what's been marked as

17   Defendant's Exhibit 33 (indicating) and ask you if you

18   recognize it?

19   A.    I do.

20   Q.    And what is that?

21   A.    It appears to be at least some version of the newsletter

22   that we worked on.

23   Q.    And I'd like to show you what's been marked without

24   objection as Defendant's Exhibit 34 (indicating).

25             THE COURT:  Is 33 and 34 not objected to?

1          MR. BORDENKIRCHER:  No, Your Honor.

2          THE COURT:  All right.  They're admitted.

3       (Defendant's Exhibits 33 and 34 were received in

4        evidence.)

5    BY MR. N. HANLEY:

6    Q.   And these are the newsletters (indicating) that were

7    produced by you?

8    A.   It appears to be, yes.

9    Q.   Would you like to look at them any closer?

10   A.   No, no.

11         THE COURT:  What year was this?

12         THE WITNESS:  That looks like the 2014.

13   BY MR. N. HANLEY:

14   Q.   Those are -- that is a newsletter that was produced by

15   you in 2014; correct?

16   A.   Yes.

17   Q.   This is a newsletter that was produced by you in 2014

18   (indicating)?

19   A.   It appears to be some variation, yes.

20   Q.   Now, did you do these on the computer?

21   A.   My graphics designer did, yes.

22   Q.   And what was his name again?

23   A.   Sheldon Hall.

24   Q.   I'm going to show you what has been marked as --

25         MR. N. HANLEY:  Did you show him these?  Any

1   objection to this?

2         (Off the record discussion.)

3              THE COURT:  What number?

4              MR. N. HANLEY:  29 -- 28-C, 29-D, 30-F, 31.

5              THE COURT:  Any objection?

6              MR. BORDENKIRCHER:  No.  I've already looked at

7   them, Your Honor.

8              THE COURT:  They're admitted.

9         (Defendant's Exhibits 28-C, 29-D, 30-F, and 31 were

10          received in evidence.)

11             THE COURT:  28-C, 29, 30-F, and 31?

12             MR. N. HANLEY:  29-D.

13             THE COURT:  29-D.  Okay.

14             MR. N. HANLEY:  29-D.

15  BY MR. N. HANLEY:

16  Q.   Does this appear to be your March -- I mean,

17  February 2014 bill (indicating)?

18  A.   Yes, it does.

19  Q.   And the description of the items done, do you see that

20  (indicating)?

21  A.   I do.

22  Q.   Were those items done?

23  A.   Yes, they were.

24  Q.   Is the description of items -- item description correct

25  and accurate?

1   A.   I think it's a fair description, yes.

2   Q.   Is there anything false about this invoice?

3   A.   No.

4   Q.   Is there anything fraudulent about this invoice?

5   A.   No.

6   Q.   Did you trick anybody by submitting this invoice?

7   A.   I did not, no.

8   Q.   Did you steal any money from anybody by submitting this

9   invoice?

10  A.   No.

11  Q.   Was the work done?

12  A.   It was done or was in the process, yes.

13  Q.   This is fair work for a fair price?

14  A.   Yes.

15  Q.   I show you what's been marked into evidence as 29-D

16  (indicating) and ask if this appears to be your March bill?

17  A.   Yes, it does.

18  Q.   $2,500?

19  A.   Yes.

20  Q.   Do you see the item description (indicating)?

21  A.   I do.

22  Q.   Were those items done -- is it a true and accurate

23  description?

24  A.   It is.

25  Q.   Were those items done, performed?

1    A.   They were done or were in the process of being done, yes.

2    Q.   Is there anything false about this invoice?

3    A.   No.

4    Q.   Is there anything fraudulent about this invoice?

5    A.   No.

6    Q.   Did you trick anybody by submitting this invoice?

7    A.   I did not, no.

8    Q.   Did you steal anything from anybody by submitting this

9    invoice?

10   A.   No.

11   Q.   Was it fair work for fair pay?

12   A.   It was.

13   Q.   Did you earn that money?

14   A.   Yes, we did.

15   Q.   You laughed.  Did you do maybe more work than the $2,500?

16   A.   Yes.

17   Q.   You did?

18   A.   Yes -- no.  You asked me value, fair work for fair pay.

19   It was work -- I mean, she got a deal, in my opinion, but --

20   Q.   You did a lot more than $2,500 worth?

21   A.   Well, there's a lot of time that goes -- that went into

22   this is what I'm trying to say.

23   Q.   Well, that's what I'm talking about.  If you had been

24   charging hourly, you would have been charging a much greater

25   fee than this; correct?

1  A.    Absolutely.

2  Q.    Every month, you did it; correct?

3  A.    I can't say every month.  I don't know the accounting of

4  every month, but this was a -- you asked me -- you said fair

5  work for fair pay.  I was answering that question, yes.  I

6  think this was very fair, to say the least.

7  Q.    You said she got a deal?

8  A.    Yes, that's correct.

9  Q.    And if you were charging her by the office -- by the

10 hour, it would have been much more than this; correct?

11 A.    Yes.

12 Q.    I show you what's been marked for -- marked into evidence

13 as Defendant's Exhibit 30-F (indicating).  And does this

14 appear to be your April bill?

15 A.    It does.

16 Q.    And do you see the item description (indicating)?

17 A.    I do.

18 Q.    Is this an accurate description of the work done?

19 A.    It appears to be.  I'm not familiar with some of the

20 language in this one, but it appears to be, yes.

21 Q.    Was the work done?

22 A.    There are just items in this description that I just

23 personally was not familiar with, so I'm not as comfortable

24 answering that question.  I'm not saying they weren't; I just

25 don't -- I'm not familiar with the last part of that

1    description.

2    Q.   Is this invoice false?

3    A.   Not that I'm aware of, no.

4    Q.   Is it fraudulent?

5    A.   Not that I'm aware of, no.

6    Q.   Did you trick anybody by submitting this?

7    A.   No.

8    Q.   Did you steal any money from anybody by submitting this?

9    A.   No.

10   Q.   Was it fair work for a fair pay?

11   A.   Yes.

12   Q.   Once again?

13   A.   Once again.

14   Q.   I want to show you what's been marked into evidence as

15   Defendant's Exhibit 31 (indicating).  Does that appear to be

16   your June bill?

17   A.   It does.

18   Q.   And do you see the description (indicating)?

19   A.   I do.

20   Q.   Performed (indicating)?  Is it an accurate description?

21   A.   It appears to be, yes.

22   Q.   Is there anything false about this invoice?

23   A.   Not that I'm aware of, no.

24   Q.   Is there anything fraudulent about this invoice?

25   A.   No.

1  Q.   Did you trick anybody by submitting this invoice?

2  A.   No.

3  Q.   Did you steal any money from anybody --

4  A.   No.

5  Q.   -- by submitting this invoice?

6  A.   No.

7  Q.   Once again, was it fair work for fair pay?

8  A.   Yes.

9  Q.   And on the whole, she got a deal?

10 A.   Yes.

11 Q.   You showed us -- now, you got paid for February, March,

12 April, and May; correct?

13 A.   I believe that's correct, yes.

14 Q.   So that's a total of $10,000?

15 A.   Yes.

16 Q.   Okay.  When did you cease working there?

17 A.   June.

18 Q.   Okay.  Now, you weren't aware that Kim was unhappy with

19 that first newsletter that went out?

20 A.   Unhappy?

21 Q.   Unhappy, very unhappy?

22 A.   There were multiple revisions made at her request, yes,

23 sir.

24 Q.   She was very unhappy about some of the facts in that one;

25 correct?

1    A.   I don't remember what she was -- what the specific

2    complaints were, but there were four or five revisions made at

3    her request.

4    Q.   Well, for instance, the timeline that was on that first

5    one that got Marilyn so upset was incorrect, wasn't it?

6    A.   There were four or five revisions made of the

7    newsletters.  I don't remember --

8    Q.   I'm talking about after that first newsletter went out,

9    that Kim was upset that there was inaccuracies in there;

10   correct?  Do you know that?

11   A.   I know what she said in the paper, yes.  I'm not

12   following you.

13   Q.   Did she not tell your people, Strateco, that she was

14   unhappy with that first newsletter because it had

15   inaccurate -- an inaccurate timeline, it had inaccurate facts

16   in there?

17   A.   She had -- she made four or five revisions of the

18   newsletter, Mr. Hanley.  We had plenty of opportunities to

19   change whatever she wanted changed.  When that newsletter went

20   out, it went out under her approval.  It was an inaccurate

21   statement to say that she had not approved the newsletter as

22   it went out.

23   Q.   Are you aware . . . .

24        (Off the record discussion.)

25   Q.   Let me show you what's been marked as identification

1    purposes as Defendant's Exhibit 56 (indicating).

2              THE COURT:  Any objection?

3              MR. BORDENKIRCHER:  If he's familiar with it, Your

4    Honor.  He's not one of the listed parties on it.  If he's

5    familiar with it, no objection.  If he's not, I would object.

6    BY MR. N. HANLEY:

7    Q.   Is that a Strateco document?  Is it a Strateco e-mail

8    from Wesley Gunter to Kim?

9    A.   Yes.

10             MR. N. HANLEY:  Okay.  I would offer it, Your Honor.

11             MR. BORDENKIRCHER:  Improper foundation --

12             THE COURT:  Sustained.

13   BY MR. N. HANLEY:

14   Q.   Are you familiar with it?

15   A.   I'm familiar with the content and -- with the general

16   content of the e-mail, yes.

17             MR. N. HANLEY:  I would offer it.

18             MR. BORDENKIRCHER:  No objection.

19             THE COURT:  It's admitted.

20        (Defendant's Exhibit 56 was received in evidence.)

21   BY MR. N. HANLEY:

22   Q.   Now, it's an e-mail from Wes Gunter to Kim; right?

23   A.   That's correct.

24   Q.   Dated May 30th, 2014; correct?

25   A.   That's correct.

1    Q.   It appears it's right about the time the first newsletter

2    is going out; correct?

3    A.   Yes.

4    Q.   And read that e-mail.

5    A.   It says:  "Good morning, Kim.  Chad brought in the

6    changes to me this morning, all which make sense to me.  I'm

7    concerned that if we make any revisions to the printing --"

8             THE REPORTER:  I'm sorry --

9             THE WITNESS:  I'm sorry.  I apologize.

10   BY MR. N. HANLEY:

11   Q.   That's all right.  I'm the same way.  Could you start

12   over again?

13   A.   Yes.  "Good morning, Kim.  Chad brought in the changes to

14   me this morning, all which make sense to me.  I am concerned

15   that if we make any revisions to the printing now that the

16   piece will be significantly delayed.

17        "The contact at Pinnacle literally gave me five minutes

18   to provide her with the final file to rush print.  I took the

19   changes that we made yesterday as final.  I will see if they

20   can do anything to make the revisions but, if not, we will

21   certainly have the revised version for next month.

22        "Also, I didn't realize that Katie was having a hard time

23   getting in touch with me, but I sent her my cell, so there

24   should not be an issue moving forward.

25        "Thanks, Wes."

1   Q.   So, obviously, Kim was not happy with the first version

2   that went through; correct?  She wanted changes made?

3   A.   You and I are not on the same page with this.  What I'm

4   trying to say is there were five revisions -- I say five.

5   There were four or five revisions of the newsletter throughout

6   this process.  The dispute that's talked about, I can't verify

7   what -- at what point who said what and who wanted to change

8   what detail.  But some of these facts were in the original

9   version of the newsletter, not in the last version of the

10  newsletter.  So something that was requested to be changed at

11  the last second, I don't know what that references to in that

12  particular e-mail.

13  Q.   All right.

14  A.   The point I'm trying to make is that there were multiple

15  opportunities to change anything inside the newsletter for a

16  period of months.

17  Q.   Now, your employment, your company's employment with the

18  License Commissioner ended in June; correct?

19  A.   I believe so, yes.

20  Q.   In Government's Exhibit 107 and where you are prepping --

21  when you prepared the Lagniappe interview preparation, you

22  weren't working for the License Commissioner anymore; correct?

23  A.   No.  I think I was.

24  Q.   Well, you just said you quit in June?

25  A.   Well, I said I believe so.  My agreement was terminated

1   after all of this started.  I don't remember the date that

2   that happened.  It's possible.  I just don't remember the

3   exact dates.

4            MR. N. HANLEY:  That's all.

5            THE COURT:  Mr. Knizley, do you have any questions?

6            MR. KNIZLEY:  No questions.

7            THE COURT:  Mr. Bordenkircher?

8            MR. BORDENKIRCHER:  Yes, Your Honor.

9                    REDIRECT EXAMINATION

10  BY MR. BORDENKIRCHER:

11  Q.   Good morning, Mr. Tucker.

12  A.   Good morning.

13  Q.   I'd like to go over a few things that Defense Counsel

14  went over with you.  Do you mind?

15  A.   Sure.  Do I really have a choice?

16  Q.   Well --

17            THE COURT:  Don't --

18            THE WITNESS:  I'm sorry.

19            THE COURT:  Go ahead.

20  BY MR. BORDENKIRCHER:

21  Q.   First, Defendant's Exhibit 140, do you see that

22  (indicating)?

23  A.   Yes.

24  Q.   Now, you had mentioned that certain political documents

25  can come out through various sources and can be paid through

1    them by various sources; is that correct?

2    A.   Yes, that's correct.

3    Q.   So sometimes a campaign can run and pay for things?

4    A.   Sure.

5    Q.   And then are you aware that Congress has a specific law

6    allowing "X" amount for each congressman to send out a

7    newsletter?

8    A.   No.  And I testified to that.  I don't know what the

9    rules are with that newsletter or his office.

10   Q.   Okay.  And so when it says here (indicating),

11   specifically says it's a public document; is that correct?

12   A.   Yes.

13   Q.   And do you know if APL Software paid for that?

14   A.   No.

15   Q.   Or Bienville Rock paid for that?

16   A.   No.

17   Q.   There's no -- but there's no -- nothing hidden right

18   there, is there?

19   A.   No, sir.

20   Q.   With Mr. Byrne?

21   A.   No, sir.

22   Q.   Now, Defense Counsel asked you whether you have a

23   computer.  Do you have a computer?

24   A.   I do.

25   Q.   Do you consider everything you do on your computer

1  computer work, or does it aid you in your work?
2  A.   I'm sorry, what was the last part?
3  Q.   Do you consider everything you do on your computer -- if
4  you write a letter to me on your computer, is that computer
5  work?
6  A.   Yeah.  Not working on the computer, but work that is --
7  that I use the computer for.
8  Q.   And isn't that part of modern day life today?
9  A.   Yes.
10  Q.   Everyone has got a computer?
11  A.   Yes.
12  Q.   So if you text your wife, hey, what's for dinner, is that
13  computer work or are you texting your wife?
14  A.   I'm using the device to do the work, yes.
15  Q.   Okay.  I think -- I believe Defense Counsel asked you
16  about working with Victor Crawford.  Do you remember that?
17  A.   Yes.
18  Q.   And specifically, he showed you Defendant's Exhibit 6
19  (indicating).  Do you remember that?
20  A.   I do.
21  Q.   And he started to ask you about this Michelle Ritter and
22  her conversation with Victor Crawford?
23  A.   Yes.
24  Q.   Were you a party to that?
25  A.   No.

1    Q.   Were you a party to Victor Crawford hiring a

2    subcontractor?

3    A.   No.

4    Q.   In fact, who did you contract with in 2012?

5    A.   Ms. Hastie hired me.

6    Q.   Victor didn't hire you?

7    A.   No.

8    Q.   So if Victor was -- Crawford was hiring a subcontractor

9    to do something he wanted to do, are you any part of that?

10   A.   I was not a part of that relationship, no.

11   Q.   And you basically had one meeting with him; is that

12   correct?

13            MR. N. HANLEY:  Object to him leading, Your Honor.

14            THE COURT:  Sustained.

15   BY MR. BORDENKIRCHER:

16   Q.   Now, Defense Counsel showed you Defendant's Exhibit 1-D

17   (indicating).  Do you remember that?

18   A.   Yes.

19            MR. BORDENKIRCHER:  May I approach the witness, Your

20   Honor?

21            THE COURT:  Okay.

22   BY MR. BORDENKIRCHER:

23   Q.   Now, looking at it first (indicating), can you tell me

24   what part of that Victor Crawford did?

25   A.   I'm not aware of -- I'm not aware of any work that he did

1   on this.

2   Q.   Would you view that as -- there's another page

3   (indicating).  Excuse me.  Have you seen the back page where

4   it's, like, actually got a -- where you could type in your

5   renewal for a tag?

6   A.   Yes.

7   Q.   So I think you just said Victor Crawford didn't work on

8   any of that; is that correct?

9   A.   I'm not aware of any, not with me.

10  Q.   Not with you.  And is there anything overtly political in

11  that brochure?

12  A.   I don't see anything overtly political, no.

13  Q.   Is there anything where Kim Hastie is asking to combine

14  the Revenue and the License Commission?

15  A.   No, sir.

16  Q.   Is there anything in there where she's saying, I need a

17  raise, and pass a bill for me?

18  A.   No, sir.

19  Q.   In fact, when you were working that, were you working

20  that as a marketing campaign to push her political agenda, or

21  were you working that to instruct the taxpayers of Mobile

22  County?

23  A.   You're talking about this piece here (indicating)?

24  Q.   Yes, sir.

25  A.   This was for -- this was changing the process of the

1    office is what this was doing, changing the way that people

2    renewed their tags, some of it.  I mean, there's obviously

3    some where -- there's an education about the mandatory

4    insurance law.

5    Q.    Which is important?

6    A.    Yes.

7    Q.    Now, I'd like to show you what -- Defendant showed you

8    Government -- the Defense Exhibits 33 and 34 (indicating).

9    I'm referring to the -- keep those up here.  I'm referring to

10   33 (indicating) and 34 (indicating).  With regard to 33, what

11   was the purpose of the back page of that brochure?

12   A.    The back page of this was all about educating the public

13   about this proposal to merge the two offices together.  And it

14   was intended to be, you know, educational, to bring them up to

15   speed as to what she was proposing.

16   Q.    And that was why she hired you, isn't that correct?

17   A.    That was the first task we were given, yes.

18   Q.    To -- that she wanted to combine it, and she wanted to

19   turn public opinion so she could combine the offices and --

20          MR. N. HANLEY:  I object to him leading his witness,

21   Your Honor.

22          THE COURT:  Sustained.

23   BY MR. BORDENKIRCHER:

24   Q.    Tell us again why in that first meeting you had with Jon

25   Gray and Kim Hastie and Ruffer, what was the purpose that you

1   were hired for?

2   A.   Well, we discussed it actually before that meeting, but

3   originally it was because she was going to run for Revenue

4   Commissioner, and I was going to help her with that race.

5        Once we began to work in the office, it was, you know,

6   she was unopposed, and she had this plan to combine the two

7   offices together.  She brought me up to speed on that as to

8   why she wanted to do it and then, you know -- so I helped her

9   come up with ways to push that out to the public, to educate

10  them and to persuade them to, you know, to support the

11  decision and then to get the feedback.

12       And so I initially put together this -- initially put

13  together a presentation for her to use to meet with people,

14  and then we put this together to go out to all the renewal

15  notices to the public.

16  Q.   So -- and then looking at 34 right next to it

17  (indicating), is that the same purpose?

18  A.   No.  They have different -- I would say they have

19  different purposes.

20  Q.   Now, the ones in 2014 have a different purpose than the

21  ones in 2012, don't they?

22  A.   Yes.

23  Q.   Now, Defense Counsel asked you whether you've done

24  informational brochures for the Sheriff's Department; is that

25  correct?

1   A.    That's correct.

2   Q.    And I think you started to answer, but you were cut off.

3   Who pays you for the work you did for the Sheriff?

4   A.    The Sheriff's Office.

5   Q.    So the Sheriff writes you a check?

6   A.    His office does, yes.

7   Q.    He doesn't have Bienville Rock pay you?

8   A.    No.

9   Q.    Or APL?

10  A.    No.

11  Q.    Or did he -- has he ever asked you to go to a third party

12  vendor that you don't know?

13  A.    No.

14  Q.    Is that the same with the Mobile Water Board?

15  A.    Yes.

16  Q.    They pay you?

17  A.    They did, yes.

18  Q.    Now, Defense Counsel showed you invoice 225.  Do you

19  remember that, please, sir?

20  A.    I do.

21  Q.    And he asked you if there was anything wrong that you

22  actually -- your company actually did the work?

23  A.    Yes.

24  Q.    And you did do the work; is that correct?

25  A.    Correct.

1    Q.    Did you do the work for Bienville Rock Software?

2    A.    No.

3    Q.    Who did you do the work for?

4    A.    For the License Commission.

5    Q.    Who hired you?

6    A.    Ms. Hastie.

7    Q.    Who paid you?

8    A.    Bienville Rock.

9    Q.    Now, did you have any part -- you did your work, fair

10   value for fair work, and then you initially submitted your

11   bill to Kim Hastie, didn't you?

12   A.    We did, yes.

13   Q.    And what did she tell you to do?

14   A.    She asked us to submit the invoices directly to Bienville

15   Rock.

16   Q.    That's different than the Sheriff does, isn't it?

17   A.    It's different, yes.

18   Q.    And do you know or not know how your bill was submitted

19   to the Mobile County License Commission, from the Mobile

20   County License Commission to the Mobile County Commission?

21   A.    No, I do not.

22   Q.    Were you any part of that?

23   A.    No, sir.

24   Q.    So it was at the Defendant's behest that you changed the

25   from-to; is that correct?

1  A.   That's correct.

2  Q.   So if back when we looked at the thing with Michelle

3  Ritter and there was a third party, would you expect -- would

4  you have been expected to pay Michelle Ritter for work that

5  Victor Crawford was doing?

6          MR. N. HANLEY:  I'm going to object to the question

7  since I don't understand it --

8          THE REPORTER:  Sorry?

9          MR. N. HANLEY:  I'm going to object to it, Your

10 Honor.

11         MR. BORDENKIRCHER:  I'll rephrase it, Your Honor.

12         THE COURT:  Okay.

13 BY MR. BORDENKIRCHER:

14 Q.   Do you remember back in 2012 when there was an e-mail

15 where Victor Crawford was meeting with a proposed

16 subcontractor, Michelle Ritter?

17 A.   Yes.

18 Q.   That you weren't any part of that?

19 A.   That's correct.

20 Q.   Now, would you expect Michelle Ritter to have paid you

21 for your work done in 2012?

22 A.   No.

23 Q.   Who told you to bill -- send your bill for 2012, the work

24 that you actually did, to APL Software?

25         MR. N. HANLEY:  Asked and answered, Judge.

```
 1            THE COURT:  Sustained.  Move on, please.
 2   BY MR. BORDENKIRCHER:
 3   Q.  So --
 4            THE COURT:  How much longer do you need to wrap this
 5   up?
 6            MR. BORDENKIRCHER:  Maybe if we could take a break,
 7   and then I might could finish up in maybe 15 minutes with a
 8   little organization.
 9            THE COURT:  All right.  Let's take a 15-minute
10   break.
11       (Proceedings adjourned for a brief recess from 10:10 a.m.
12        to 10:25 a.m., then resumed.)
13       (Jury present.)
14            THE COURT:  All right.  Please be seated.
15            MR. BORDENKIRCHER:  May I begin, Your Honor?
16                  CONTINUED REDIRECT EXAMINATION
17   BY MR. BORDENKIRCHER:
18   Q.  Mr. Tucker, Defense Counsel asked you about Government's
19   Exhibit Number 59 (indicating), which was a series of e-mails,
20   do you see that, with regard to invoice 103?
21   A.  Yes, sir.
22   Q.  And who is that invoice on this e-mail made out to?
23   A.  Mobile County License Commissioner.
24   Q.  And that's for the work that you did for the Defendant;
25   is that correct?
```

1    A.   Yes.

2    Q.   And then Defense Counsel showed you the last page of

3    that, 268, but he just showed you the top part of that.  You

4    don't dispute that you actually did the work there, do you?

5    A.   No, sir.

6    Q.   Or that you were instructed by Kim Hastie to get your

7    money from somebody else?

8    A.   You ask me do I dispute that?

9    Q.   Yes.

10   A.   No, sir, I don't dispute that.

11   Q.   But if we pull the bill down a little bit, in fact, it

12   actually shows that, doesn't it (indicating)?

13   A.   Yes, it does.

14   Q.   So the original bill was to the License Commissioner, but

15   on her request, you changed it to APL; is that correct?

16   A.   Yes, sir.

17   Q.   Even though you never did any work for APL?

18   A.   I did not.

19   Q.   And then Defense Counsel showed you 29-D (indicating).

20   Do you remember that?

21   A.   I do.

22   Q.   And he asked you about this (indicating), whether you had

23   actually done work?

24   A.   Correct.

25   Q.   And you did, didn't you?

1  A.   We did.

2  Q.   Okay.  In fact, you were asking for customer feedback; is

3  that correct?

4  A.   Yes.

5  Q.   Polling the people to see if they were in favor of

6  something?

7  A.   It was the survey section on the newsletter, yes.

8  Q.   But if we move it down a little bit (indicating), who is

9  actually receiving the bill?

10  A.   Bienville Rock.

11  Q.   So if someone saw this bill, they would think you were --

12  it's from your company to Bienville Rock?

13  A.   That's correct.

14  Q.   That you did work for Bienville Rock?

15  A.   Yes.

16       MR. N. HANLEY:  Object to him leading, Your Honor.

17       THE COURT:  Sustained.

18  BY MR. BORDENKIRCHER:

19  Q.   Is that true?  Did you do work for Bienville Rock?

20  A.   We did not.

21  Q.   And Defendant -- Defense Counsel also showed you 30-F.

22  Do you remember that?

23  A.   I do.

24  Q.   And he asked if you did some of this work.  Do you

25  remember that (indicating)?

1    A.    Yes.

2    Q.    You had questions about this part right here

3    (indicating), ". . . building a database of content, engaging

4    the target audience"?

5    A.    I'm just not sure -- I'm not sure what that meant.  I'm

6    just not familiar with it.  That one specific building a

7    database, unless it's referencing the Facebook page, I'm just

8    not sure what that meant.

9    Q.    Is that something that the Defendant came up with?

10   A.    I just have -- I just don't remember what that specific

11   line meant.

12   Q.    Okay.  And once again, who's the bill to?

13   A.    Bienville Rock.

14   Q.    And is that the same for Defendant's Exhibit 31

15   (indicating)?  Who's the bill to?

16   A.    Bienville Rock.

17   Q.    And Defendant's Exhibit 32 (indicating)?

18   A.    Bienville Rock.

19          MR. BORDENKIRCHER:  I'm finished with the witness,

20   Your Honor.

21          THE COURT:  Thank you, sir.  You're excused.

22          MR. BORDENKIRCHER:  We call Katheryn Scott.

23                    KATHERYN SCOTT,

24       having first been sworn, testified as follows:

25                  DIRECT EXAMINATION

1  BY MR. BORDENKIRCHER:

2  Q.  State your name for the record, please, ma'am.

3  A.  Katheryn Scott.

4  Q.  And are you employed?

5  A.  I am.

6  Q.  Who are you employed with, please, ma'am?

7  A.  The FBI as a forensic accountant.

8  Q.  Can you give us a brief description of your educational

9  and work history before coming to the FBI, please?

10  A.  Yes, sir.  I have a Bachelor of Arts in accounting,

11  business administration.  I have a Master of Science in

12  economic crime management, which is like fraud investigation.

13  I have worked for 35 years in corporate America doing

14  accounting, information systems, human resources, strategic

15  planning.

16      And then I retired from a major global chemical company

17  after 32 years, started my own forensic auditing business for

18  several years, and then I joined the FBI five years ago.

19  Q.  And since you joined the FBI, what have you been doing,

20  please, ma'am?

21  A.  I work on the white collar crime and public corruption

22  squad.

23  Q.  And are you a forensic accountant that's assigned to this

24  case?

25  A.  I am.

1  Q.   And have you reviewed all of the bank accounts for the

2  Mobile County License Commission?

3  A.   I have.

4  Q.   And the Defendant's campaign accounts?

5  A.   I have.

6  Q.   I'd like to show you what's been marked as Government's

7  Exhibit Number 60 (indicating).  Do you recognize this,

8  please, ma'am?

9  A.   I do.

10 Q.   And what is it, please?

11 A.   It is the check from the Mobile County Commission paying

12 APL Software Engineering in 2012.

13 Q.   And are there multiple pages attached to that?

14 A.   Yes, sir.

15 Q.   Does it actually include APL Software Engineers' billing?

16 A.   It does.

17       MR. BORDENKIRCHER:  I'd enter Government's Exhibit

18 Number 60, Your Honor.

19       THE CLERK:  Did you say 60?

20       MR. BORDENKIRCHER:  60.

21       THE CLERK:  It's already been admitted.

22       MR. BORDENKIRCHER:  All right.  Thank you.

23 BY MR. BORDENKIRCHER:

24 Q.   Now, did you -- in reviewing the records, the business

25 records of Mobile County License Commission and the invoicing

1   and payment, were you able to determine what this check paid?

2   A.   The APL invoice would have the documentation attached

3   that would show what Victor Crawford's company was billing for

4   in terms of the hours and the rate.  And then there was a

5   $10,500 charge included on his invoice, and there was no

6   document attached to the back of this exhibit.

7   Q.   So when you reviewed this check and then the APL

8   Software, do you see that (indicating)?

9   A.   Yes, sir.

10  Q.   Where it says "Web and Social Media Expenses"?

11  A.   Yes, sir.

12  Q.   There was no individual invoice from Mobi-Media on there?

13  A.   No, sir, not attached to the back of this.

14  Q.   So the only sign that any work had been done would be

15  this one line (indicating); is that correct?

16  A.   Yes, sir.

17  Q.   Now, are you familiar with Strateco invoice 225?

18  A.   Yes, sir.

19  Q.   And have you reviewed all the invoices and the various

20  invoice iterations?

21  A.   Yes, sir.

22  Q.   I'd like to show you what's been previously marked as

23  Government's Exhibit Number 66-A (indicating).  Are you

24  familiar with this, please?

25  A.   I am.

1   Q.   And how so?

2   A.   I prepared it.

3   Q.   And what is it, please?

4   A.   It is a summary of the activity relating to invoice 225,

5   the dates, the from, the to, and the bill to and descriptions.

6              MR. BORDENKIRCHER:  I would enter Government's

7   Exhibit Number 66-A.

8              MR. N. HANLEY:  Judge, I would object to it.

9              THE COURT:  Sustained.  You can use it for

10  demonstrative.

11             MR. BORDENKIRCHER:  Okay.  Thank you, Your Honor.

12  BY MR. BORDENKIRCHER:

13  Q.   For demonstrative purposes only, can you take a look at

14  this and, starting with here (indicating), can you run us

15  through the -- what each line shows?

16  A.   Yes.  On February 21st, 2014, there was an -- the e-mail

17  with an invoice attached from Wesley Gunter to Victor Crawford

18  with a bill to saying "Mobile County License Commission," and

19  the item description was "Kim Hastie Consulting Retainer."

20  And that is shown in our Exhibits Number 63 and 183.

21       The next line is on March 14th, 2014.  Victor Crawford

22  wrote a check number 236 to Strateco, and that's our

23  Exhibit 64.

24       On the next line, April 23rd, 2014, there was an e-mail

25  with an attachment from Wesley Gunter to Kim Hastie with the

1    bill to saying "Bienville Rock," and the e-mail quote said,

2    "Here is a Feb. copy for your records."  And that's our

3    Exhibit Number 65.

4          On May 2nd, Victor Crawford submitted his bill, APL,

5    invoice LC201404, and attached to his invoice, it included

6    Strateco bill 225.  And the description on that Strateco

7    invoice was "Strateco Consulting Retainer," and that's our

8    Exhibit 78.

9          On May 9th, 2014, Wesley Gunter sent an e-mail with an

10   attachment to Ramona Yeager.  Again, the bill to was Bienville

11   Rock, and the item description was changed to "Social Media

12   Management and Digital Marketing."  And that was our

13   Exhibit 66.

14         On May 19th, 2014, Kim Hastie and Ramona Yeager approved

15   APL invoice LC201404 for $37,531.25 and submitted that to the

16   Mobile County Commission.  And the description attached to the

17   Strateco invoice that went to the Mobile County Commission was

18   "Social Media Management and Digital Marketing."  That's our

19   Exhibit 79.

20         On May 20th, 2014, there was an e-mail with attachment

21   from Wes Gunter to Kim Hastie and Ramona Yeager with the bill

22   to Bienville Rock, and that's the description of "Digital

23   Marketing and Social Media Management."

24         "Service performed during period:  Design and develop

25   handout for the License Commission, focusing on the evolution

1    of the organization over the last five years; initial market

2    research for Facebook creation."  And that's our Exhibit 75.

3    Q.   So 66 was from Gunter to Defendant Yeager; is that

4    correct?

5    A.   Yes, sir.

6    Q.   And then later on, on the 19th, Hastie -- Defendant

7    Hastie and Defendant Yeager both signed that; is that correct?

8    A.   Yes, sir.

9    Q.   And then on the 20th, from the Gunter, it's to Hastie and

10   Yeager; is that correct?

11   A.   Yes, sir.

12   Q.   So the bill was actually paid in March, and then it

13   finally reaches -- a final description on May 20 of 2014?

14   A.   Yes, sir.

15   Q.   Did you do a side-by-side comparison of all the bills?

16   A.   I did.

17            MR. BORDENKIRCHER:  For demonstrative purposes only,

18   Your Honor, I'd like to show 66-B.

19            THE COURT:  Okay.

20   BY MR. BORDENKIRCHER:

21   Q.   Now, Ms. Scott, can you walk us through this, starting

22   with version one?

23   A.   Yes.  That's the one that was dated February 21st, 2014,

24   the initial one that went to Victor Crawford.  And the item

25   description here is "Kim Hastie Consulting Retainer."

1          The second version, April 23rd, 2014, that's here is when

2     it changed to "Strateco Consulting Retainer and Bienville Rock

3     Software."  And this is the invoice version that was included

4     with Victor Crawford's bill to Mobile County License

5     Commission.

6     Q.    I'm sorry, which one?

7     A.    Version two.

8     Q.    Okay.

9     A.    The next one -- come down just a bit.

10    Q.    Sorry.

11    A.    That version is from May 9th, 2014.  The description was

12    changed to digital media management -- or "Social Media

13    Management and Digital Marketing," and again to Bienville

14    Rock, and then the final version on May 20th to Bienville Rock

15    with a more detailed description.

16    Q.    Okay.  Did you do a similar review of invoice 234?

17    A.    I did.

18          MR. BORDENKIRCHER:  For demonstrative purposes, I'd

19    like to show Exhibit 67-A, Your Honor.

20          THE COURT:  Okay.

21    BY MR. BORDENKIRCHER:

22    Q.    Can you walk us through this one, please, ma'am?

23    A.    Yes, sir.  On March 24th, 2014, Wes Gunter sent to Victor

24    Crawford the first billing, and it was billed to Mobile County

25    License Commission.  And the item description was "Kim Hastie

1    Consulting Retainer."  On -- and that's our Exhibit 67.

2          On April 8th, 2014, Wes Gunter sent Kim Hastie an e-mail.

3    Again, the bill to was Mobile County License Commission.  And

4    it started off with:  "Victor, this is just a reminder."  But

5    it went to Kim Hastie, not to Victor Crawford.  And that's our

6    Exhibit 67-C.

7          On April 23rd, 2014, Wes Gunter sent Kim Hastie a new

8    version of the invoice with it billed to Bienville Rock.  The

9    item description had changed to "Strateco Consulting

10   Retainer."  That's our Exhibit 67-D.

11         On May 2nd, 2014, Victor Crawford submitted his invoice,

12   which is LC201404, to the Mobile County License Commission,

13   and that included a Strateco invoice for 234 with the

14   description of "Kim Hastie Consulting Retainer."  That's our

15   Exhibit 78.

16         On May 9th, 2014, Wes Gunter sent to Ramona Yeager the

17   invoice version of "Social Media Management and Digital

18   Marketing" with a bill to Bienville Rock.  That's our

19   Exhibit 67-E.

20         On May 19th, 2014, Kim Hastie and Ramona Yeager approved

21   the APL invoice LC201404.  It contained both the prior invoice

22   we spoke about, invoice 225, as well as this one, 234.

23         And when it was sent to the Mobile County Commission, it

24   included a Strateco invoice description of "Social Media

25   Management and Digital Marketing."  That's Exhibit 79.

1          On May 20th, 2014, Wes Gunter sent to Kim Hastie and

2     Ramona Yeager the final version of the invoice with the bill

3     to Bienville Rock and a more detailed description.  And that's

4     our Exhibit 75.

5     Q.   Okay.  And for demonstrative purposes, 77-F (indicating),

6     is that a similar comparison of all four bills?

7     A.   It is.

8     Q.   And just -- can you briefly just walk us through that?

9          MR. KNIZLEY:  I would object.  This is a cumulative

10    repeating of the evidence that's already before the jury.

11         THE COURT:  She did just testify to all this.

12         MR. BORDENKIRCHER:  Well, this shows side by side

13    the variation versus just her testimony.  All these exhibits

14    are in evidence, Your Honor.

15         MR. KNIZLEY:  Your Honor --

16         THE COURT:  Sustained.  It is relevant, but it's

17    cumulative.

18         When was invoice 225 paid?

19         THE WITNESS:  I'd have to see the exhibit.

20    March 14th.

21         THE COURT:  Do you know when 234 was paid?

22         THE WITNESS:  It would have been after Victor

23    Crawford came to the FBI.

24         THE COURT:  Okay.

25         THE WITNESS:  So it would have been mid to late

1   April.

2           THE COURT:  All right.  Thank you.

3   BY MR. BORDENKIRCHER:

4   Q.   I'd like to show you what's been previously entered in as

5   Government's Exhibit 78 (indicating).  Do you recognize that,

6   ma'am?

7   A.   I do.

8   Q.   And was there a demarcation made on that document so the

9   FBI could know what was turned over and what was not?

10  A.   There is.

11  Q.   Can you explain that, please, ma'am?

12  A.   There's a mark at the end of this line right here

13  (indicating) to indicate that it's the version that Victor

14  Crawford had prepared to turn over to the Mobile County

15  License Commission and had submitted to the FBI.

16  Q.   And was that maintained by the FBI?

17  A.   It was.

18  Q.   And is this a true and accurate copy of what was

19  retained?

20  A.   It is.

21  Q.   Now, did you do a comparison with regard to Stratego

22  invoices 225 and 234 where they were attached to the APL

23  invoice, or was something different turned over to the Mobile

24  County Commission?

25  A.   Something different was turned over to the Mobile County

1    Commission.

2    Q.    Let me show you Government's Exhibit Number 79.  Let me

3    hand you both of these, Number 78 and Number 79 (indicating).

4    Can you look at that and then please tell the jury the

5    difference between the two items.

6          (Brief pause.)

7    A.    On Exhibit 78, which is the APL bill submitted to the

8    License Commission, it included Strateco invoice 225 with an

9    item description of "Strateco Consulting Retainer."

10   Q.    I'm sorry.  Number 78, APL invoice?

11   A.    Yes.

12   Q.    Tell me again what it has.

13   A.    "Strateco Consulting Retainer."

14   Q.    Okay.

15   A.    And on Exhibit 79, it says "Social Media Management and

16   Digital Marketing."  And then invoice 234 in Exhibit 78, which

17   is the APL invoice to the License Commission, the item

18   description is "Kim Hastie Consulting Retainer."

19         (Off the record discussion.)

20   A.    And in Exhibit 79, the invoice that was turned over to

21   the Mobile County Commission, the description says "Social

22   Media Management and Digital Marketing."

23   Q.    So the APL invoice, 78, that was turned over to Mobile

24   County License Commission that was kept by the FBI, is

25   different than was actually turned over to the Mobile County

1   Commission?

2   A.   Yes, sir.

3   Q.   In fact, I think you testified the descriptions changed?

4   A.   Yes, sir.

5   Q.   Now, Ms. Scott, did you do a review of invoice 250?

6   A.   I did.

7   Q.   Let me show you for demonstrative purposes what's

8   Government's Exhibit Number 71-A (indicating).  Do you

9   recognize that, please, ma'am?

10  A.   I do.

11  Q.   What is that, please?

12  A.   It is --

13          MR. KNIZLEY:  Your Honor, same objection.  And she's

14  simply repeating what other evidence -- it's cumulative,

15  cumulative, and 602, not within her personal knowledge.

16          THE COURT:  It's overruled.  You can use it for

17  demonstrative purposes.

18  BY MR. BORDENKIRCHER:

19  Q.   You may continue, please, ma'am.

20  A.   Okay.  It's a summary of the activity for invoice 250

21  from Strateco.  On April 21st, 2014, the invoice e-mail and

22  invoice attachment from Wes Gunter to Victor Crawford had a

23  bill to of Mobile County License Commission with an item

24  description of "Kim Hastie Consulting Retainer."  It's our

25  Exhibit 78.

1        On April 22nd, 2014, Kim Hastie sent an e-mail to Wesley

2   Gunter, and it said, "I need for you to change something on

3   the invoice, and I've been out of the office, so call me

4   tomorrow so we can move it forward."  That is our Exhibit 69.

5        On April 23rd, 2014, Wes Gunter sent an e-mail to Kim

6   Hastie with the invoice attached, having a bill to of

7   Bienville Rock, and the item description changed to "Strateco

8   Consulting Retainer."  That's our Exhibit 70.

9        On April 29th, 2014, Wes Gunter sent Kim Hastie an e-mail

10  and asking, "Were the changes to the invoices acceptable?  Do

11  I need to touch base with Victor regarding payment?"  And

12  that's our Exhibit 73.

13       On May 9th, 2014, Wes Gunter sent to Ramona Yeager a new

14  revised version of the invoice.  It was billed to Bienville

15  Rock, and the item description changed to "Digital Marketing

16  and Social Media Management."  And that's our Exhibit 71.

17       On May 20th, 2014, Wes Gunter sent an e-mail with a

18  revised version to Kim Hastie and Ramona Yeager.  The bill to

19  remained at the Bienville Rock.  The description was "Digital

20  Marketing and Social Media Management."

21       "Service performed during period:  Designed and created

22  the second and third options for the License Commission's

23  Outreach Program.  The marketing piece will be both print and

24  digital with monthly distribution.

25       "Published Facebook page and began building a database of

1    content to engage the target audience."  That is our

2    Exhibit 75.

3         On June 9th, 2014, Victor Crawford submitted his invoice

4    to the Mobile County License Commission.  It said -- invoice

5    number LC201404.  It should be 05.  Submitted with Strateco

6    invoice.  And the description was "Digital Marketing and

7    Social Media Management."  That's our Exhibit 80.

8         And on June 10th, Kim Hastie and Ramona Yeager sent the

9    approved APL invoice to the Mobile County Commission, and

10   there was no Strateco invoice attached.

11   Q.   So with regard to Government's Exhibit Number 80

12   (indicating), did the FBI do the same procedure to see what

13   was turned over from Victor Crawford to the Defendants on this

14   invoice?

15   A.   We did.

16   Q.   And that's the mark there (indicating); is that correct?

17   A.   Yes, the mark right there.

18   Q.   And was there an invoice in there for Strateco's work?

19   A.   There was.

20   Q.   Now, did you review the bill that went to Mobile County

21   Commission?

22   A.   I did.

23   Q.   Government's Exhibit Number 81?

24   A.   Yes, sir.

25   Q.   Number 80, APL, there is a bill in there?

1    A.    There is.

2    Q.    And that went to Mobile County License Commission?

3    A.    Yes, sir.

4    Q.    And 81 is what, again?

5    A.    It is the check with the APL invoice that was submitted

6    by the License Commission to the Mobile County Commission for

7    payment.

8    Q.    Is there a -- is 80 different than 81?

9    A.    It is.

10    Q.    How?

11    A.    The Strateco invoice is missing.

12    Q.    So there was an invoice here (indicating), but in this --

13    in 81 that was turned over to the Mobile County Commission,

14    there's no invoice?

15    A.    Correct.

16          MR. BORDENKIRCHER:  Just one second, Your Honor.

17          (Brief pause.)

18          MR. BORDENKIRCHER:  Melanie, is 75 in?

19          THE CLERK:  Yes.

20    BY MR. BORDENKIRCHER:

21    Q.    Ms. Scott, do you see that (indicating)?

22    A.    I do.

23    Q.    And what is that, please, ma'am?

24    A.    It is an e-mail from Wes Gunter at Strateco to Kim Hastie

25    and Ramona Yeager and Chad Tucker containing the final

1   versions of invoice number 225, 234, and 250 on May 20 of

2   2014.

3   Q.   I'd like to show you for demonstrative purposes United

4   States would submit is 72-C.  Do you see that, ma'am

5   (indicating)?

6   A.   I do.

7   Q.   Is that the same type of summary that you did on the

8   previous bills?

9   A.   It is.

10  Q.   Can you walk us through that, please, ma'am?

11  A.   On June 13th, 2014, Wes Gunter sent an e-mail to Kim

12  Hastie with an invoice attached that was the bill to Bienville

13  Rock with a description of "Digital Marketing and Social Media

14  Management."

15       "Service performed during the period:  Designed and

16  created the fourth option for the License Commission's

17  Outreach Program.  The marketing piece was distributed to

18  Pinnacle Systems to insert with June tag renewal notices."

19  That's our Exhibit 72-A.  On the same date, Wes Gunter sent

20  Victor Crawford the same invoice attachment and description.

21  That's our Exhibit 72.

22       On July 1st, 2014, Victor Crawford submitted to the

23  Mobile County License Commission his APL invoice, LC201406,

24  with Strateco invoice 294 attached.  And that's our

25  Exhibit 82.

1          On July 1st, Kim Hastie and Ramona Yeager sent the

2    approved APL invoice LC201406 to the Mobile County Commission.

3    It did not include the Strateco invoice 294 that was attached.

4    And that's our Exhibit 83.

5          And on July 1st, 2014, Wes Gunter sent Victor Crawford an

6    e-mail that said:  "Just checking on this invoice.  Let me

7    know if you have any questions."  That's our Exhibit 72-B.

8    Q.   And with regard to Government's Exhibit Number 82, are

9    you familiar with that?

10   A.   I am.

11   Q.   And are you familiar with Government's Exhibit Number 83?

12   A.   I am.

13   Q.   Is there a difference between 82 and 83?

14   A.   Yes.  The APL invoice attached to the check that came

15   from Mobile County Commission does not include Strateco

16   invoice 294.

17   Q.   So 82 is the one that was checked by the FBI?

18   A.   Yes.

19   Q.   And that's APL to who?

20   A.   Mobile County License Commission.

21   Q.   Submitted to?

22   A.   Kim Hastie and Ramona Yeager.

23   Q.   And is there an invoice in there?

24   A.   There is.

25   Q.   Okay.  What is it for?

1   A.   It's for Strateco with the detailed description, Strateco

2   294.

3   Q.   Now, 83, the bill went from the Mobile County License

4   Commission to the MCC.  Is it different than 82?

5   A.   It is.

6   Q.   In what way, please, ma'am?

7   A.   It does not contain Strateco invoice 294 attached to the

8   APL bill.

9   Q.   I'd like to show you what's been marked previously as

10  Government's Exhibit Number 76 (indicating).  Do you see that,

11  ma'am?

12  A.   Yes, sir.

13  Q.   What is that, please?

14  A.   It is a snapshot of the website which is for Strateco

15  billing.

16  Q.   And when was that taken, please?

17  A.   April 17th, 2014.

18  Q.   And is this a fair and accurate representation that you

19  pulled off the website at that time --

20          THE REPORTER:  I'm sorry, I didn't hear you.

21          MR. BORDENKIRCHER:  I'm sorry.

22  BY MR. BORDENKIRCHER:

23  Q.   Is that a fair and accurate representation of what you

24  pulled off the website at that time?

25  A.   It is.

1          MR. BORDENKIRCHER:  I'd enter Government's Exhibit

2    Number 76.

3          MR. N. HANLEY:  Judge, I object to it.  It's

4    hearsay.

5          THE COURT:  Sustained.

6    BY MR. BORDENKIRCHER:

7    Q.    Did you do a snapshot of Strateco website, Government's

8    Exhibit 77?

9    A.    I did.

10   Q.    And what date did you do that, please, ma'am?

11   A.    July 6th, 2014.

12   Q.    Are you familiar with Government's Exhibit Number 49

13   (indicating)?

14   A.    Yes, sir.

15   Q.    What is that, please, ma'am?

16   A.    It's House Bill 117, which was turned into Act 2013-292,

17   and it was for the motor vehicle fee increase.

18   Q.    And did you review -- pursuant to that Act, did you

19   review the records of the Mobile County License Commissioner

20   motor vehicle fund activity of the $1.25 fund?

21   A.    I did.

22   Q.    And did you do a forensic analysis of the bank account?

23   A.    I did.

24   Q.    What did that entail, please, ma'am?

25   A.    It entailed taking the bank statements, converting the

1    activity for every deposit and every check into an Excel

2    spreadsheet, reviewing the images of the deposits and the

3    checks to make sure that you have the payor or the payee on

4    any memo lines, and all of that is included in the Excel

5    spreadsheet through the signatories with the -- and the like.

6    Q.   And prior to the search warrant, who were the signatories

7    on that account, please, ma'am?

8    A.   Kim Hastie and Ramona Yeager.

9    Q.   So Mr. Stork, the comptroller, was not on that -- didn't

10   have signature authority on that; is that correct?

11   A.   No.  He may have had it as well.

12   Q.   Okay.  I'd like to show you -- did you do an analysis of

13   the records coming in and out of that account for 2013 up

14   until early 2015?

15   A.   Yes, sir.

16   Q.   I'd like to show you what's been marked as Government's

17   Exhibit Number 130-A (indicating).  What is this, please?

18   A.   It is the summary of all the bank activity that I

19   described from the Excel spreadsheet, and then it totals it by

20   quarter and payor and payee.

21   Q.   And did you do a review of that account to see the funds

22   that were expended from there?

23   A.   I did.

24        MR. BORDENKIRCHER:  Your Honor, I'd enter

25   Government's Exhibit Number 130-A.

1           MR. KNIZLEY:  The prosecutor provided a number of

2    documents this morning, but that was not one included in it,

3    and we haven't had any opportunity to take a look at it.

4           MR. BORDENKIRCHER:  I provided that a couple days --

5    last week.  I'm sorry?

6           THE COURT:  Okay.  We'll take it up later if he

7    hasn't had a chance to look at it.

8       (Brief pause.)

9           MR. BORDENKIRCHER:  May I approach, Your Honor?

10           THE COURT:  Okay.

11       (Sidebar conference, on the record:)

12           MR. BORDENKIRCHER:  The underlying documents for the

13    summary were turned over approximately six months ago.

14           THE COURT:  When did you give him the summary?

15           MR. BORDENKIRCHER:  Last week, Your Honor.

16           MR. KNIZLEY:  I don't recall seeing the summary.

17    I'm not sure what you did.

18           MR. BORDENKIRCHER:  The close of Tuesday.

19           MR. N. HANLEY:  I also have not seen it.  It could

20    be my fault, but Stewart has not seen it, and Dennis doesn't

21    remember seeing it.

22           THE COURT:  Are you contesting that all of it is

23    inaccurate?

24           MR. KNIZLEY:  I don't know exactly where he's going

25    with it.  I may not have any problem with it.

 1              MR. N. HANLEY:  We're going to have some relevancy

 2   grounds.

 3              THE COURT:  What's your relevancy objection?

 4              MR. N. HANLEY:  Highlighted the Mobile Bar

 5   Association, Mobile County and, of course, these other

 6   entries.  I mean, if he could suggest what his relevance is of

 7   these other entries, they may be relevant, but SHI

 8   International Corporation, Spectronics.

 9              THE COURT:  Is this all the payors -- I mean, payees

10   on this account, or did you pull some out?

11              MR. BORDENKIRCHER:  I think that's all of them.  I

12   think what she did was -- and Ms. Scott provided them.

13         (In open court.)

14              THE COURT:  Ms. Scott?

15              THE WITNESS:  Yes.

16              THE COURT:  Your 130-A, is that all the payees from

17   that account?

18              THE WITNESS:  Yes, ma'am.

19              THE COURT:  Okay.  So you didn't leave anybody out?

20              THE WITNESS:  No, ma'am.

21              THE COURT:  So this is a complete summary of those

22   bank records?

23              THE COURT:  Yes, ma'am.

24         (Continued sidebar conference, on the record:)

25              THE COURT:  Okay.  This would be -- let me start

1    over.  This would be admissible under 1006.

2              MR. KNIZLEY:  Yes, ma'am.

3              THE COURT:  What's your other objection?  And a

4    summary record of all the bank accounts.

5              MR. KNIZLEY:  I'm saying it would be then the

6    relevancy to the issues before the Court, what do the

7    entries -- how are they relevant to the issues before the

8    Court?

9              THE COURT:  Charging how the money was spent out of

10   the $1.25 fund, and now this is a summary of the records

11   showing how the money was spent out of the $1.25 fund.

12             MR. BORDENKIRCHER:  Yeah.

13             MR. KNIZLEY:  I don't have any objection to it.

14        (Brief pause.)

15             MR. N. HANLEY:  I don't have an objection.

16             THE COURT:  It's admitted.

17        (In open court.)

18        (Government's Exhibit 130-A was received in evidence.)

19   BY MR. BORDENKIRCHER:

20   Q.   Now, ma'am, can you tell us what this is, please

21   (indicating)?

22   A.   It is a summary of all the bank records, the checks and

23   the deposits, and then it is summarized by quarter providing

24   totals by quarter and grand total of the activity since the

25   motor vehicle funds were opened through, I believe, it's

1    January or February 2015.

2    Q.   And the payor/payee, can you explain that, please, ma'am?

3    A.   Yes.  Payor would be the name that's on the check that

4    came in as a deposit, and the payee would be the name that the

5    check is made payable to.  And that data was taken from the

6    images provided with the bank statements.

7    Q.   And is this a fair and accurate representation of that?

8    A.   It is.

9    Q.   There was a check for a hundred dollars to the Mobile Bar

10   Association; is that correct?

11   A.   Yes, sir.

12   Q.   Then there was a check written to Strategy, Inc., for

13   $10,000?

14   A.   Yes, sir.

15   Q.   BestBuy?

16   A.   Yes, sir.

17   Q.   Big Lots?

18   A.   Yes, sir.

19   Q.   What is this, the Kim Hastie License Commission

20   Miscellaneous Account 2137 (indicating)?  Are you familiar

21   with that, please?

22   A.   Yes, sir.  There are two motor vehicle fund accounts at

23   BBVA Compass Bank, and this is a summary of both of those

24   accounts.  To open up one of them, the License Commission

25   Miscellaneous Account at Regions Bank ending in 2137 provided

1    a hundred dollar of funds to open the account.

2    Q.    Okay.  I'd like to show you what's been marked as

3    Government's Exhibit Number 56 (indicating).  Do you know what

4    that is, please, ma'am?

5    A.    Yes.

6    Q.    What is that, please, ma'am?

7    A.    It is the bank statement ending in 8360 for June 2014.

8    Q.    The second page, please, ma'am (indicating)?

9    A.    It is the check that the License Commission wrote out of

10   the motor vehicle fund to Strategy, Inc., on May 29th of 2014,

11   check number 2500, for $10,000 to pay invoice 2106.

12   Q.    So that's showing it was actually deposited in the BBVA

13   Compass account?

14   A.    Not deposited.  It was withdrawn.

15   Q.    Withdrawn.  And where does BBVA -- is their banking

16   headquarters?

17   A.    I believe it's Minnesota.

18   Q.    And all the checks come and go through Minnesota; is that

19   correct?

20   A.    Yes, sir.

21   Q.    And 57 (indicating), what is that, please, ma'am?

22   A.    Drop it down.  It is the bank statement ending in 8360

23   for August 2014 for the motor vehicle fund.

24          THE COURT:  None of this has been admitted; do you

25   know that?  Did you know 56 and 57 have not been admitted?

1          MR. BORDENKIRCHER:  Yes.  I'm going to get to those,

2    Your Honor.

3          THE COURT:  Is there an objection to 56 and 57?

4          MR. KNIZLEY:  56, no, Judge.  If you'll let me

5    finish with 57, I'm on the second page, Judge.  56 --

6          THE REPORTER:  I'm sorry, I didn't hear you, Mr.

7    Knizley.

8          MR. N. HANLEY:  No, ma'am.

9          THE COURT:  56 is admitted.

10       (Government's Exhibit 56 was received in evidence.)

11   BY MR. BORDENKIRCHER:

12   Q.   And 57 is a picture of the deposit slip; is that correct?

13   A.   Yes, sir.

14         MR. KNIZLEY:  No objection.

15         THE COURT:  Mr. Hanley?

16         MR. N. HANLEY:  I don't --

17       (Off the record discussion.)

18         MR. N. HANLEY:  Judge, I'm going to object --

19         THE COURT:  You have to speak up, please.  Just tell

20   me what your objection is.

21         MR. N. HANLEY:  My objection is the second page, a

22   $10,000 check being --

23         THE COURT:  What's your objection?

24         MR. N. HANLEY:  Oh, oh, I'm sorry, Judge.  I

25   withdraw it.

1          THE COURT:  All right.  It's admitted.

2          (Government's Exhibit 57 was received in evidence.)

3   BY MR. BORDENKIRCHER:

4   Q.   Now, looking at Government's Exhibit Number 57, do you

5   recognize that, please, ma'am (indicating)?

6   A.   I do.

7   Q.   And what is that, please?

8   A.   That is bank statement ending in 8360, BBVA Compass Bank,

9   for the motor vehicle fund for August 2014.

10  Q.   And does it show that the -- there is a deposit made?

11  A.   It does.

12  Q.   And is that on the second page, is that the deposit slip?

13  A.   It is.

14  Q.   In what amount, please?

15  A.   $10,000 on August 12th, 2014.

16  Q.   And is this -- on the final page, is that the check that

17  was deposited (indicating)?

18  A.   Yes.  It is a check from Strategy, Inc., number 2373,

19  dated July 26, 2014, to the Mobile County License Commissioner

20  for $10,000.

21  Q.   Can you read what it says under the "for" line?

22  A.   "Return of fees from wrong account for billing 2014 on

23  $1.25 fund."

24  Q.   Do you recognize what Government's Exhibit Number 140 is

25  (indicating)?

1    A.   I do.

2    Q.   And what is that, please, ma'am?

3    A.   It is a copy of the check.  And behind it would be the

4    bank statement for a check written to the Mobile Bar

5    Association for $100 on May 15th, 2014, to pay D. Tyler

6    Pritchett 2014 -- I can't read -- something dues.

7    Q.   Okay.  And do you know who Tyler Pritchett is, please,

8    ma'am?

9    A.   Yes, sir.  He is the attorney for the Mobile County

10   License Commission.

11   Q.   And this is a check written from the $1.25 account; is

12   that correct?

13   A.   Yes, sir.

14        MR. BORDENKIRCHER:  I'd enter Government's Exhibit

15   Number 140, Your Honor.

16        MR. N. HANLEY:  Judge, it's irrelevant.

17        THE COURT:  Sustained as to relevancy.

18        MR. BORDENKIRCHER:  It's a payment out of the $1.25

19   fund, Your Honor.

20        THE COURT:  I understand.  There's no charge about

21   that.

22   BY MR. BORDENKIRCHER:

23   Q.   I'd like to show you what's been marked as Government's

24   Exhibit Number 127 (indicating).  Do you recognize that,

25   please, ma'am?

1    A.   I do.

2    Q.   And what is that, please?

3    A.   It is the hotel folio, which is, like, if you go to stay

4    at a hotel and it shows your charges, for the Mobile County

5    License Commission's 2013 Christmas party.  And behind it

6    would be the payment receipts.

7    Q.   Do you recognize this document, ma'am?

8    A.   Yes, I do.

9    Q.   Is it a fair and accurate representation of the records

10   received from the Ashbury Hotel and Suites?

11   A.   Yes.

12            MR. BORDENKIRCHER:  I'd enter Government's Exhibit

13   Number 127.

14            MR. N. HANLEY:  I object to it.  It's hearsay, no

15   proper predicate, improper foundation.

16            MR. BORDENKIRCHER:  We have a stipulation as to the

17   authenticity, Your Honor --

18            THE REPORTER:  I'm sorry.  Say that again?

19            THE COURT:  Okay.  So the authenticity has been

20   stipulated to.  You're objecting to the relevancy?

21            MR. N. HANLEY:  Yes.

22            THE COURT:  And it's 127?

23            MR. BORDENKIRCHER:  127, Your Honor.

24            MR. N. HANLEY:  And that it's hearsay.

25            THE COURT:  My 127 is a quite lengthy document,

1   maybe 30 pages.  Is that what you're showing?

2          MR. BORDENKIRCHER:  Yes, Your Honor.  Should I

3   approach and show you?

4          THE COURT:  No.  I've got the whole thing here.  And

5   he's stipulating to the authenticity but not that they are

6   business records kept in the normal course of business such

7   that it would be a hearsay exception.  There's no stipulation

8   to that; correct?

9          MR. BORDENKIRCHER:  That's correct.  There's a

10  stipulation of authenticity.

11         THE COURT:  Right.  And his objection is hearsay,

12  and you haven't established the hearsay exception, so I

13  sustain.

14  BY MR. BORDENKIRCHER:

15  Q.   Ms. Scott, have you done a review of Government's Exhibit

16  Number 127?

17  A.   I have.

18  Q.   And that was received pursuant to a Grand Jury subpoena?

19  A.   Yes, sir.

20  Q.   Did you review the financial records that were received

21  from the Mobile County License Commission Miscellaneous Fund?

22  A.   I did.

23  Q.   And did you also review deposits that went in and out of

24  the Ashbury Hotel and Suites?

25  A.   I did.

1    Q.    And is there a listing for a Victor Crawford in those?

2    A.    There is.

3    Q.    And there are descriptions of businesses as -- let me

4    show you Government's Exhibit Number 145 that's been listed

5    and admitted into evidence.  You see that, ma'am (indicating)?

6    A.    I do.

7    Q.    Did you review Government's Exhibit Number 45 and then

8    review the Ashbury Hotel and Suites records?

9    A.    I did.

10   Q.    Looking at Government's Exhibit Number 145 where they

11   list the businesses for the party donors, do you see Victor

12   Crawford's name on there?

13            THE COURT:  On Government's Exhibit 145?

14            MR. BORDENKIRCHER:  45.

15            THE COURT:  45.

16            MR. BORDENKIRCHER:  I'm sorry if I misspoke, Your

17   Honor.

18            THE COURT:  Okay.  Your question was?  I'm sorry.

19   BY MR. BORDENKIRCHER:

20   Q.    On 45, do you see Victor Crawford's name on there,

21   please, ma'am?

22   A.    No, sir.

23   Q.    Now, did you review -- after looking at this, did you

24   review the business records of Ashbury Hotel and Suites?

25   A.    I did.

1    Q.   And are these vendors listed in the Ashbury Hotel and
2    Suites' records?
3              MR. N. HANLEY:  I object to her giving details about
4    an exhibit or a proposed exhibit that's not in evidence.
5              THE COURT:  Sustained.  You're talking about 127,
6    right?  Did she review 127?
7              MR. BORDENKIRCHER:  That's right, Your Honor.
8              THE COURT:  Yeah.  Sustained.
9              MR. BORDENKIRCHER:  May we approach, Your Honor?
10             THE COURT:  No.  Keep going, please.
11             MR. BORDENKIRCHER:  Okay.
12   BY MR. BORDENKIRCHER:
13   Q.   Did you do a review of the records for the Christmas
14   party of 2013 that you obtained from the Mobile County License
15   Commission?
16   A.   I did.
17   Q.   And did you look at the source of funds from the Mobile
18   County License Commission and then the bank records that were
19   attached to that?
20   A.   I did.
21   Q.   And were you able to determine how much money the Mobile
22   County License Commission deposited, how much was from the
23   donors's list, cash, and from Mr. Crawford?
24   A.   Yes, sir.
25   Q.   I'd like to show you what's been marked as Government's

1    Exhibit Number 209.  Do you recognize that, please, ma'am

2    (indicating)?

3    A.   I do.

4    Q.   And what is that, please?

5    A.   On the right in a table, it shows the beginning bank

6    balance for account at Regions Bank for 3171.  It's the

7    Employee Miscellaneous Account, and it shows the activity for

8    2013.  On the left, it describes the Ashbury Hotel and Suites'

9    bill total and the source of funds used to pay that bill.

10            MR. BORDENKIRCHER:  And I'd enter Government's

11   Exhibit Number 209 for demonstrative purposes, Your Honor.

12            MR. KNIZLEY:  You said --  did you say "introduce"?

13            MR. BORDENKIRCHER:  For demonstrative purposes.

14            MR. KNIZLEY:  I'm going to object to any

15   introduction.  This is utilization.

16            THE COURT:  Any objection, Mr. Hanley?

17            MR. N. HANLEY:  Yes.  It's hearsay, Judge.

18            THE COURT:  I know it's hearsay.

19            MR. KNIZLEY:  Judge, it's obvious he's not offering

20   it into evidence; correct?

21            THE COURT:  Right.

22            MR. BORDENKIRCHER:  I'm not offering it into

23   evidence; for demonstrative purposes.

24            THE COURT:  He just wants to use it so his witness

25   can refer to it as she testifies.

1          MR. N. HANLEY:  All right.  No objection.

2    BY MR. BORDENKIRCHER:

3    Q.   Can you tell us in your financial review of the records

4    of Mobile County License Commission and the business records

5    of Ashbury Suites, what is this right along here, please,

6    ma'am (indicating)?

7    A.   It describes that the Ashbury Hotel and Suites bill was

8    $3,954.05 for the Christmas party of 2013, which equated to

9    $34.68 a person, and that the source of funds for payment,

10   $1,400 of it came from the Mobile County License Commission

11   Employee Miscellaneous Account as shown in the table to the

12   right (indicating); that $1,450 of it came from companies on

13   the donors' list; that cash, $908.05, paid towards the bill;

14   and then Victor Crawford's check of a hundred and ninety-six

15   dollars.

16   Q.   Are you familiar with that specific check from Mr.

17   Crawford?

18   A.   I am.

19   Q.   And have you also done some of the same analysis for

20   earlier Christmas parties?

21   A.   I have.

22   Q.   And was money taken from the MCLC for other Christmas

23   parties?

24   A.   Yes.

25   Q.   Was there a Christmas party on December 9th, 2011?

1    A.    Yes.

2    Q.    I'd like to show you what's been marked as Government's

3    Exhibit Number 95 (indicating).  What account is that from?

4    A.    That is from the Employee Miscellaneous Account ending in

5    3171.

6    Q.    The records that we've previously discussed?

7    A.    Yes, sir.

8    Q.    And is that an exact copy of that check?

9    A.    It is.

10        MR. BORDENKIRCHER:  I'd enter Government's Exhibit

11   Number 95.

12        MR. N. HANLEY:  Judge, I'm not sure of the

13   relevance.  I object on relevance grounds.

14        THE COURT:  This is a check from Mobile County

15   License Commission for the $1.25 fund?

16        MR. BORDENKIRCHER:  For the Mobile County License

17   Commission Miscellaneous Fund, like the last one we discussed,

18   for the Christmas parties.  Right now, I'm just talking

19   about --

20        THE COURT:  Okay.  I'm going to sustain on the

21   relevance.

22   BY MR. BORDENKIRCHER:

23   Q.    Now, Ms. Scott, did you review the records you received

24   at Mobile County License Commission as far as the line item

25   billing they had for their expenses?

1    A.   I did.

2    Q.   And did you review personnel costs and computer

3    consulting services?

4    A.   I did.

5    Q.   Now, is that specifically listed as it is in the line

6    item budget?

7    A.   It is.

8    Q.   I'd like to show you what's marked as Government's

9    Exhibit Number 199 (indicating).  Do you recognize that,

10   please, ma'am?

11   A.   I do.

12   Q.   And what is it, please?

13   A.   It is a summary of the personnel costs versus computer

14   consulting services costs as taken from the Mobile County

15   License Commission budget report.

16           MR. BORDENKIRCHER:  Okay.  And I'd enter

17   Government's Exhibit Number 199 as a demonstrative evidence,

18   Your Honor.

19           THE COURT:  Melanie, do you have a copy of that?

20           THE CLERK:  199?  I don't think so, Judge.

21           THE COURT:  I don't have one.

22       (Off the record discussion.)

23           THE COURT:  You said you got all of this information

24   from the Mobile County License Commission budget report?

25           THE WITNESS:  Yes, ma'am.

1       THE COURT:  The computer consultant services was on

2   the budget report?

3       THE WITNESS:  No.  That came from the contract that

4   the computer services -- computer consultant services line.

5       THE COURT:  Okay.  You can use it as a demonstrative

6   aid.

7   BY MR. BORDENKIRCHER:

8   Q.   Now, looking at Government's Exhibit Number 199, can you

9   explain where you got these, the names and what they -- how

10  they are listed on the Mobile County License budget?

11  A.   Yes.  There's account codes and descriptions that are in

12  the budget, and they included longevity pay, subsistence pay,

13  official salaries, biweekly salaries, monthly salaries,

14  retirement contributions, social security taxes, workmen's

15  compensation insurance, unemployment insurance, health,

16  dental, and life insurance, med and dental county employees.

17       And when I totaled up all of those individual account

18  codes, it equaled the total of personnel costs that was also

19  in the Mobile County Commission budget for the License

20  Commission.

21  Q.   Do you remember what percentage that was, please, ma'am?

22       MR. KNIZLEY:  Your Honor, I object to its relevancy.

23       THE COURT:  Overruled.

24  A.   It was, I want to say, about 75, 76 percent of the total.

25  BY MR. BORDENKIRCHER:

1   Q.   And so this represents the cost of actually having a

2   hired employee; is that correct?

3            MR. N. HANLEY:  Judge, it doesn't say the cost -- I

4   object to it.

5            THE REPORTER:  I'm sorry.  I'm sorry.  I didn't hear

6   you, Mr. Hanley.

7            THE COURT:  When you take that percentage, it was

8   the cost of what employee?

9            THE WITNESS:  The Mobile County License Commission

10  employees that were included in these line items.

11           MR. N. HANLEY:  I object to the relevance, Your

12  Honor.

13           THE COURT:  Sustained as to relevancy.

14  BY MR. BORDENKIRCHER:

15  Q.   And looking at these items here besides salary

16  (indicating), can you explain what the retirement contribution

17  is?

18           MR. N. HANLEY:  Judge, I object to the relevance.

19           THE COURT:  Sustained.  Move on, please.

20  BY MR. BORDENKIRCHER:

21  Q.   I'd like to show you what's been marked as Government's

22  Exhibit Number 47 (indicating).  Are you familiar with that,

23  please, ma'am?

24  A.   I am.

25  Q.   And if so, how?

1   A.   It is the bank statement that relates to the Kim Hastie

2   campaign that's maintained at BBVA Compass Bank.

3   Q.   And does this fairly and accurately represent the -- that

4   account?

5   A.   It does.

6   Q.   And did you do an analysis of the amount of funds that

7   were in that account at various times?

8   A.   I did.

9        MR. BORDENKIRCHER:  I'd enter Government's Exhibit

10  Number 47.

11       MR. N. HANLEY:  Is that a one-page exhibit?

12       MR. BORDENKIRCHER:  No.  It's actually all the

13  documents there (indicating).

14       (Brief pause.)

15       MR. N. HANLEY:  Judge, I object to the majority of

16  it, all of this stuff, on relevance grounds.

17       THE COURT:  Overruled as to relevance.  It's

18  admitted.

19       MR. N. HANLEY:  I object to the hearsay.

20       THE COURT:  No, you didn't.  You want to amend your

21  objection?

22       MR. N. HANLEY:  I'm sorry.  Yes.

23       THE COURT:  Okay.  What's your objection?

24       MR. N. HANLEY:  Hearsay.

25       THE COURT:   It's a business record, and you haven't

 1    established the exception yet.

 2              MR. BORDENKIRCHER:  We haven't -- may I approach,

 3    Your Honor?

 4              THE COURT:  Okay.

 5         (Sidebar conferences, on the record:)

 6              THE COURT:  I need a copy of the exhibit.

 7         (Brief pause.)

 8              MR. BORDENKIRCHER:  I mean, if you want, I'll get

 9    the person from BBVA and move all these bank records in after

10    lunch.

11              THE COURT:  It's not what I want; it's the rules

12    require that you expect to establish a hearsay exception.

13              MR. BORDENKIRCHER:  That's why we have a stipulation

14    to them.

15              THE COURT:  Okay.

16              MR. N. HANLEY:  Let me just look through them.

17              THE COURT:  I'm having a hard time --

18         (Brief pause.)

19              THE COURT:  You have a stipulation to the

20    authenticity.

21         (Brief pause.)

22              THE COURT:  Is there an authenticity --

23              MR. N. HANLEY:  Judge, I'm going to withdraw it.

24              THE COURT:  All right.  47 is admitted.

25         (In open court.)

1          (Government's Exhibit 47 was received in evidence.)

2     BY MR. BORDENKIRCHER:

3     Q.   Do you see that, ma'am (indicating)?

4     A.   I do.

5     Q.   And what is that, please, ma'am?

6     A.    It is the signature card for the Kim Hastie License

7     Commission -- or Kim Hastie campaign account, excuse me, at

8     the BBVA Compass Bank.

9     Q.   And did you do a review of all the records that were

10    received from the Grand Jury subpoena with regard to that

11    account?

12    A.   I did.

13    Q.   And did you do a -- all the money coming in and all the

14    money coming out?

15    A.   I did.

16    Q.   All right.  And who is the authorized signature on that

17    account, please?

18    A.    Kimberly Hastie and Julia Margaret Wilcox.

19    Q.   And on page -- let me back out.  Do you see that, ma'am?

20    A.   Yes.

21    Q.   And what does this show down here (indicating)?

22    A.    In December 2013, the beginning balance was -- can you

23    pull it up just a bit, please.

24         (Brief pause.)

25    A.   $220.76, and its ending balance was $208.81.

1    Q.   Okay.  What about this next page, please, ma'am

2    (indicating)?

3    A.   It is the description of the activity for December, and

4    it only had the monthly service charge on December 16th of

5    $11.95.

6    Q.   And on the next page (indicating)?

7    A.   I don't know what month without seeing the top.

8         (Brief pause.)

9    A.   This is January 31st, 2014, and the ending balance is

10   $196.86.  And that page is showing the January activity, which

11   is the $11.95 service charge.

12   Q.   The next page (indicating)?

13   A.   That's for February of 2014.  And can you blow it up just

14   a bit?

15   Q.   (Complies.)

16   A.   The beginning balance was $196.86, and the ending balance

17   was $109.83.

18   Q.   The next page (indicating)?

19   A.   It shows a deposit on February 5th of $1,800, and then

20   there's a debit on February 18th for $99.  There is a service

21   charge of 11.95 on February 18th.  And then there's a check of

22   -- check number 1070 on February 28th for 1,776.08, which left

23   a balance of $109.83.

24   Q.   And what is that, please, ma'am (indicating)?

25   A.   Can you bring it down?

1   Q.   (Complies.)

2   A.   It is the deposit slip for the February 5th, 2014,

3   deposit of $1,800.

4   Q.   And the next item (indicating)?

5   A.   That is the check from Bienville Rock Software, check

6   number 4713, dated January 31st, 2014, to the Kim Hastie

7   campaign, for $1,800.  And that is check 1070 to the MCREC for

8   1,776.08.

9        And that's the March 2014 statement, and it has an ending

10  balance of 94-something.  I can't read the cents.

11  Q.   Does that help you out much (indicating)?

12  A.   Yeah.  94.88.

13  Q.   The next page (indicating)?

14  A.   On March 17th, there were two service charges from the

15  bank.  One was $3 for a paper statement fee, and one was

16  $11.95 for the service charge.

17  Q.   I'd like to show you what's been marked as Government's

18  Exhibit Number 92 (indicating).  What is that, please, ma'am?

19  A.   It is the video certificate listing for Kim Hastie, and

20  the second page is for Ramona Yeager from the Alabama Ethics

21  Commission.

22  Q.   Did you receive a certified copy from the Alabama Ethics

23  Commission?

24  A.   I did.

25        MR. BORDENKIRCHER:  I'd enter Government's Exhibit

1    Number 92.

2           THE COURT:  Overruled as to relevance.

3           MR. KNIZLEY:  Hearsay.

4           THE COURT:  It is hearsay.  Is that one of the ones

5    that was stipulated to?

6           MR. BORDENKIRCHER:  It's a certified State document,

7    Your Honor, so it's an exception to the hearsay rule.

8           THE COURT:  Okay.  So it's a records exception.

9           MR. KNIZLEY:  Judge, the custodian is not stipulated

10   to.  It's not part of the stipulation, there's been no

11   custodian, as to what this document may be.  I don't think --

12          THE COURT:  It comes in under the records exception,

13   public records exception, because it's certified, so it's

14   admitted.

15       (Government's Exhibit 92 was received in evidence.)

16   BY MR. BORDENKIRCHER:

17   Q.   Okay, ma'am.  Looking at this (indicating), can you just

18   read across this line exactly what it says?

19   A.   "Kimberly Smith Hastie took the ethics training on

20   April 27th, 2011."

21   Q.   And the next page (indicating)?

22   A.   "Ramona McArdle Yeager took the ethics training on

23   April 14th, 2011."

24          MR. BORDENKIRCHER:  May I approach, Your Honor?

25          THE COURT:  You need to wrap this up.

1          MR. BORDENKIRCHER:  That's what I wanted to talk to

2     you about, Your Honor.

3          (Sidebar conference, on the record:)

4          MR. BORDENKIRCHER:  If we could just break for

5     15 minutes earlier.  I left some documents at the office.

6          THE COURT:  We're breaking at 12:30, so just go on.

7          MR. BORDENKIRCHER:  Okay.  Fine.

8          (In open court.)

9          THE COURT:  Do you have any other questions for this

10    witness?

11         MR. BORDENKIRCHER:  Yeah, I do, Your Honor.  I

12    just -- excuse me, I misplaced one of the exhibits.  My fault.

13    BY MR. BORDENKIRCHER:

14    Q.   Ms. Scott, are you familiar with the records received in

15    2010 through 2013 for the Christmas gift receipts for the --

16         THE COURT:  Is your microphone on, Mr.

17    Bordenkircher?

18    BY MR. BORDENKIRCHER:

19    Q.   Ms. Scott, are you familiar with the Christmas gift

20    receipts purchased from Victor Crawford for 2010 for Sam's

21    Club; 2011, HH Gregg, 40-inch TV; 2012, HH Gregg, 39-inch TV;

22    and then a 2013 Sam's Club 30-inch TV, as a package that's

23    Government's Exhibit Number 43-A?

24    A.   I do.

25    Q.   And were those gifts purchased by use of credit cards?

1   A.   They were.

2   Q.   And were those credit cards then sent across interstate

3   lines?

4   A.   They were.

5              MR. BORDENKIRCHER:  Just one second, Your Honor.

6        (Brief pause.)

7              MR. BORDENKIRCHER:  I think I'm done, Your Honor.

8              THE COURT:  All right.  Mr. Knizley -- Hanley?

9        (Brief pause.)

10                       CROSS EXAMINATION

11  BY MR. N. HANLEY:

12  Q.   Ms. Scott, speaking of the Strateco invoices, you

13  testified on direct examination that they became more -- it

14  was a more detailed description; correct?

15  A.   Yes, sir.

16  Q.   Now, you had a Christmas party list, and you've been

17  shown it several times as to some donors?

18  A.   Yes, sir.

19  Q.   I'm going to show you what's been marked as Government's

20  Exhibit 45.  Is that that list (indicating)?

21  A.   Yes, sir.

22  Q.   Where did that list come from?

23  A.   It came from the search of Ms. Hastie's office.

24  Q.   Now, you were asked if you saw Victor Crawford's name on

25  that; correct?

1    A.    Yes.

2    Q.    You did not.

3    A.    No.

4    Q.    Who is Jay Ross?

5    A.    He is the county attorney.

6    Q.    Have you talked to Jay Ross?

7    A.    In this case or ever?

8    Q.    In this case.

9    A.    Yes.

10   Q.    Okay.  Did you talk to him about Christmas presents?

11   A.    I don't recall if we talked about Christmas presents.

12   Q.    Well, Jay Ross regularly gave Christmas presents and, in

13   fact, gave it in 2013 -- gave Christmas presents in 2013,

14   didn't he?

15   A.    I have no knowledge.

16   Q.    Well, his name is not on there?

17   A.    I have no knowledge if he did or didn't.

18   Q.    Y'all didn't ask him?

19   A.    No, sir.

20   Q.    And he's the county attorney?

21   A.    Yes.

22   Q.    You weren't present in an interview when he told you that

23   he had obtained an informal Attorney General opinion that it

24   was okay for him to do so?

25   A.    Sir, there was, I want to say, two conference calls back

1   in the fall, and I don't recall anything about an Attorney

2   General opinion or the Christmas gifts.

3   Q.   Now, you've done a lot of work going through the

4   financial accounts of the License Commissioner; correct?

5   A.   Yes, sir.

6   Q.   Did you do any work going through the financial accounts

7   and financial records of Victor Robinson [sic]?

8   A.   Of Victor --

9   Q.   I'm sorry.  Victor Crawford.

10  A.   No.

11  Q.   Were you not asked to do any investigation into the

12  finances of Victor Crawford?

13  A.   I wouldn't say I wasn't asked.  I did not do a forensic

14  analysis of Victor Crawford's bank records.

15  Q.   As far as what he paid in employees and benefits, did

16  anybody do a search to find out what he was paying in employee

17  benefits?

18  A.   No, sir.

19  Q.   As far as the profit that he made off Katie Williamson,

20  did anybody you know of do some sort of financial search to

21  determine what his -- what he was making off of the Katie

22  Williamson overbilling?

23  A.   No, sir.

24  Q.   Did any of y'all or anybody look back to the 2002

25  situation where he was ordered to pay -- or he paid $82,000

1    back to the county because of overbilling?

2    A.   No, sir.

3            MR. N. HANLEY:  That's all.  Thank you.

4            THE COURT:  Any redirect?

5            MR. KNIZLEY:  Your Honor, I have just a couple

6    questions.

7            THE COURT:  I mean, any questions?

8            MR. KNIZLEY:  Just a couple.

9            THE COURT:  Okay.

10                       CROSS EXAMINATION

11   BY MR. KNIZLEY:

12   Q.   Ms. Scott, when you were testifying regarding the

13   Strateco billing going from Mr. Crawford to the Mobile County

14   License Commission and on to the County Commission, do you

15   recall doing that?

16   A.   Yes, sir.

17   Q.   Now, did -- you, of course, were not there.  By that I

18   mean, you weren't there when the bill got sent?

19   A.   No, sir.

20   Q.   When the bill got received?

21   A.   No, sir.

22   Q.   When the bill got passed on to the County Commission?

23   A.   No, sir.

24   Q.   You're not suggesting to the jury you have any knowledge

25   about how that transpired, are you?

1    A.   No, sir.

2    Q.   And when you used the word -- when you used the word

3    "sent," you don't really know whether it was sent; you just

4    know the bill originated in one area and arrived at another?

5    A.   Correct.

6    Q.   And you don't know who did the sending or who did the

7    receiving, do you?

8    A.   No, sir.

9    Q.   And when you used the word -- and I think in some of that

10   summary, you would say "Hastie and Yeager sent or received,"

11   you're not suggesting to the jury that you know who sent or

12   who received, are you?

13   A.   No, sir.

14   Q.   Just that the documents were at one place and they

15   arrived at another in maybe a different condition; right?

16   A.   Correct.

17   Q.   Now, when you used the word "approved a deal" or

18   "approved a document," you don't know if anybody approved or

19   disapproved anything, do you?

20   A.   I just have the signature on the bill.

21   Q.   You know there's a piece of paper that has a signature on

22   a bill, and the significance of what that signature is is not

23   something you have knowledge about?

24   A.   It's the approval of the License Commission for that

25   invoice to go --

1    Q.   Whatever the words on the document are, but you have no

2    independent knowledge of the -- what that represents, do you?

3    A.   I didn't really understand your question.

4    Q.   You have -- you're not there; you don't know what's going

5    on at the License Commission?

6    A.   No, sir.

7    Q.   All you know is the pieces of paper that you've looked

8    at; right?

9    A.   Yes, sir.

10   Q.   And you know where they started from and where they ended

11   up; right?

12   A.   Yes, sir.

13   Q.   Now, whatever they mean, the jury has just as much

14   indication of what they mean as you do?

15   A.   Yes, sir.

16          MR. KNIZLEY:  Thank you.

17          THE COURT:  Redirect?

18      (Brief pause).

19                    REDIRECT EXAMINATION

20   BY MR. BORDENKIRCHER:

21   Q.   When Mr. Knizley was asking you about the approval of the

22   bill, what were you making your judgment on that about?

23   A.   It is the invoice that was provided to the Mobile County

24   Commission for payment to APL Software, and that it contained

25   the signatures of Kim Hastie and Ramona Yeager as approval for

1   payment.

2   Q.   So you're looking at the actual document where it says

3   "approved," and there's two signatures; is that correct?

4   A.   Yes, sir.

5            MR. KNIZLEY:  Objection as to leading, Judge, and

6   mischaracterization of the bill.

7            THE COURT:  Overruled.

8   BY MR. BORDENKIRCHER:

9   Q.   Is that correct?

10  A.   Yes, sir.

11  Q.   So your analysis is based solely on the document?

12  A.   Yes, sir.

13  Q.   Now, Mr. Hanley asked you a question, saying that were

14  you familiar with the overbilling for Katie Williamson.  Are

15  you -- in your review of the bills, have you seen any

16  overbilling for Katie Williamson?

17  A.   No, sir.  She was billed at the contract rate.

18  Q.   So she's billed at the contract rate.  There's no

19  additional rate?

20  A.   No, sir.

21  Q.   So what the county bargained for, the county got?

22  A.   Yes, sir.

23  Q.   So if the county bargained for $75 an hour --

24           THE COURT:  You're leading your witness.

25           MR. BORDENKIRCHER:  Okay.  I'm sorry?

1          THE COURT:  I said you're leading your witness.

2          MR. BORDENKIRCHER:  Thank you.

3    BY MR. BORDENKIRCHER:

4    Q.   Are you familiar what the rate was for Ms. Williamson?

5    A.   $75 per hour.

6    Q.   And that's pursuant to what?

7    A.   Victor Crawford's contract with the Mobile County

8    Commission.

9    Q.   And then if she worked ten hours, what would be the

10   charge to the county for her work?

11   A.   $750.

12   Q.   So pursuant to the contract, there's no overbilling if

13   the hours are right?

14   A.   Correct.

15          MR. BORDENKIRCHER:  Just one second, Your Honor.

16        (Brief pause.)

17   BY MR. BORDENKIRCHER:

18   Q.   Now, Mr. Hanley asked you about Jay Ross.  Do you know

19   him, please, sir -- ma'am?

20   A.   Yes.

21   Q.   Does he work for Kim Hastie?

22   A.   No.  He works for the county.

23   Q.   So he works for a separate branch?

24   A.   Yes, sir.

25   Q.   And is he also a private attorney?

1    A.   Yes, sir.

2    Q.   So he doesn't work directly under her?

3         MR. N. HANLEY:  Object to the leading.

4    BY MR. BORDENKIRCHER:

5    Q.   Well, does he work directly under Kim Hastie?

6         MR. N. HANLEY:  I object to the leading.

7         THE COURT:  Overruled.

8    A.   No, sir.

9    BY MR. BORDENKIRCHER:

10   Q.   So do you have any knowledge that she had any authority

11   to fire him or discipline him?

12   A.   I don't believe she does.  He's independent.

13        MR. BORDENKIRCHER:  May we approach, Your Honor?

14        THE COURT:  Okay.

15     (Sidebar conference, on the record:)

16        MR. BORDENKIRCHER:  I'm not trying to waste time.

17   The only thing I would say, I'm ready to close, but I would

18   just like just the lunch hour to make sure I've got all my

19   documents in in case I missed something.

20        THE COURT:  Okay.  Don't have any other witnesses?

21        MR. BORDENKIRCHER:  Uh-uh.

22        THE COURT:  All right.

23     (In open court.)

24        THE COURT:  All right.  Ms. Scott, you're excused.

25   Thank you.

1       (Continued sidebar conference, on the record:)

2            THE COURT:  Are you ready to start?

3            MR. N. HANLEY:  No, ma'am.  Last night, I thought it

4    was going to be -- I'll be ready at 1:00.

5            THE COURT:  1:00.

6            MR. N. HANLEY:  1:15, 1:30, whatever.

7            THE COURT:  We are keying up here, so 1:00.

8            MR. BORDENKIRCHER:  All right.  Thank you, Your

9    Honor.

10       (In open court.)

11            THE COURT:  Okay.  We're going to take our lunch

12   break now.  If you'll be back at 1:00, we'll try to start

13   promptly at one.  Thank you.  1:00.

14       (The jury was excused for a lunch break at 12:00 p.m.)

15            THE COURT:  You want to just come up to sidebar just

16   for a housekeeping?  This doesn't need to be on the record.

17   We're in recess.  This is just housekeeping.

18       (Sidebar conference, off the record.)

19       (In open court.)

20            THE COURT:  Tell the jury not to be back until 1:15.

21   And are you going to rest?  As soon as he gets back and says

22   he's rested, then we'll take up the motions, okay?

23            MR. BORDENKIRCHER:  Yeah.  As soon as I check all

24   the documents, then I'm going to rest.

25            THE COURT:  All right.  So let's be ready at one for

1   motions.  And if you'll call the jury and tell them 1:15 if

2   she can catch them downstairs.

3          THE CLERK:  Yes, ma'am.

4      (Proceedings adjourned for a lunch recess at 12:05 p.m.)

5                          AFTERNOON SESSION

6      (1:00 p.m.)  (In open court.)  (Jury not present.)

7      (Defendants present with Counsel.)

8          THE COURT:  Okay.  Please be seated.  Does the

9   Government rest?

10         MR. BORDENKIRCHER:  Your Honor, we're having the

11  custodian of records from --

12         THE COURT:  I'm sorry?

13         MR. BORDENKIRCHER:  We're having the custodian of

14  records from Ashbury Suites and Hotel, she's here.  We can do

15  the -- move the business records through her, and then we'll

16  rest.

17         THE COURT:  All right.

18         MR. KNIZLEY:  I think we repaired that -- the

19  agreement on the stipulation, but whatever y'all want.

20         MR. BORDENKIRCHER:  I mean, if you'll agree that we

21  can move those records in, then we'll --

22         MR. KNIZLEY:  I never disagreed.

23         MR. BORDENKIRCHER:  I know you didn't.

24         MR. N. HANLEY:  I agree.

25         THE COURT:  All right.  They're in.  What's the

```
 1   number?
 2           FBI FORENSIC ACCOUNTANT KATHERYN SCOTT:   147.
 3           THE COURT:   147 has been admitted.
 4           FBI FORENSIC ACCOUNTANT KATHERYN SCOTT:   Can I
 5   check?
 6       (Brief pause.)
 7           THE COURT:   I had actually 127.
 8           FBI FORENSIC ACCOUNTANT KATHERYN SCOTT:   It's 127,
 9   exactly.
10           THE COURT:   Okay.   127 is now admitted.
11       (Government's Exhibit 127 was received in evidence.)
12           THE COURT:   Okay.   Does the Government rest?
13           MR. BORDENKIRCHER:   Government rests, Your Honor.
14           THE COURT:   Okay.   Mr. Hanley, do you have a motion?
15           MR. N. HANLEY:   Yes, Judge.   We're going to move for
16   a Rule 29 judgment --
17           THE COURT:   Okay.   You need to get in front of a
18   microphone so she can hear you.
19           MR. N. HANLEY:   Stewart is going to do it, Judge.
20           MR. S. HANLEY:   Judge, we would move for a judgment
21   of acquittal on Count 1, the conspiracy count, based on the
22   Government's failure to prove a prima facie case.   In
23   particular, the Government failed to prove a conspiracy, any
24   agreement between Kim Hastie and Ramona Yeager or Kim Hastie
25   and any other individuals to defraud the people of Mobile
```

1    County.

2         And most of this argument is also going to go through

3    Counts 2 through 9.  The Government failed to present any

4    evidence showing that the invoices in question were fraudulent

5    in any way.  The testimony was actually that the invoices were

6    always proper and correct and throughout time became more

7    detailed.  Mr. Tucker testified repeatedly that all the

8    invoices were correct, that there was no theft, there was no

9    intent to deceive, and that everything on the invoices was

10   correct.

11        Particularly concerning Strategy, there was no evidence

12   at all that anything had that -- that there was any fraudulent

13   misrepresentation whatsoever.  I believe the Government spoke

14   about that being paid out of a segregated account, but that in

15   itself would not constitute any kind of misrepresentation,

16   deceit, or misleading.

17        On Counts 10 through -- on Counts 10 through 15, these

18   are the extortion counts.  The Government -- the Eleventh

19   Circuit Jury -- Pattern Jury Instruction 70.2 that covers

20   these charges, that would be the Hobbs Act racketeering

21   charge, in the comments notes that the Eleventh Circuit has

22   knowledge that a Hobbs Act conviction for extortion under

23   color of official right requires proof of a quid pro quo.

24        Mr. Crawford throughout his testimony never stated that

25   Ms. Hastie threatened him to give -- to give him -- to

1    contribute any of the gifts to the Christmas party.  He also

2    never stated that Ms. Hastie threatened him in order to get a

3    campaign contribution.  Quite the contrary, he said that when

4    he went to Ms. Hastie that she thanked him for it.  There was

5    no allegation of threats.

6         The only thing he stated was that he had a generalized

7    fear that he may be fired.  And Judge, I would contend that

8    under case law, generalized fear or generalized expectation of

9    some future official act does not suffice.  The statute

10   specifically requires that there be some type of quid pro quo,

11   some type of demand or that some type of valuable -- something

12   of value is given in return for a specific official act.

13   Here, presumably, that official act to be withholding firing,

14   but there has been no showing at all that Ms. Hastie made any

15   type of insinuations that she would fire him or threaten to do

16   so.

17        And as far as the campaign contribution, case law holds

18   that there must be an explicit quid pro quo, specifically, an

19   explicit promise to undertake an official act.  And Judge,

20   there was none of that shown here whatsoever.

21        As far as the gifts, the Government was required to show

22   at least that Ms. Hastie knew that the gifts were being given

23   in return for some specific act, and there wasn't any evidence

24   that Ms. Hastie would have suspected that Mr. Crawford

25   expected that.

1        As far as Count 16 of the indictment, we maintain that

2   the Government failed to prove a prima facie case, and they

3   did not present sufficient evidence for a reasonable juror to

4   conclude that Ms. Hastie in any way told -- lied to Federal

5   officers.

6        And as far as Count 17 of the indictment, it's our

7   contention that the Government failed to prove a prima facie

8   case, that they failed to show that e-mail addresses fall

9   within personal information as contemplated by the applicable

10  statute or that Ms. Hastie released any e-mails.

11            THE COURT:  What count is the e-mail count?

12            MR. S. HANLEY:  17, Judge.

13            THE COURT:  All right.  Your motion as to Count 17

14  is denied.  As to Counts 1 through 9, it's taken under

15  advisement.

16       As to Counts 10 through 15, I need the Government to

17  address the motion.  Specifically, actually, the Eleventh

18  Circuit has applied the McCormick quid pro quo and requirement

19  of an explicit promise to campaign contributions -- I mean,

20  non-campaign contributions as well.  So you need to show me

21  what proof you have of any quid pro quo and explicit promise

22  to undertake an official action in return for payment.

23            MR. BORDENKIRCHER:  Well, Your Honor, the -- for

24  Counts 10 through 15, we've got the testimony of Victor

25  Crawford, we've got the testimony of Brad Bray, and Mr.

1    Foley -- or Ms. Foley.  We've got recording 156-A, 151-A and

2    -B.  Then we have the 2013 44-A note where the Defendant's

3    demanding the items.  And then we have 43-A, which is the

4    actual receipts.  Then we have 158-K and -L, which are

5    recordings that relate to that.

6            THE COURT:  Okay.  I need explicit promises.  I need

7    some evidence of explicit promises.  You said Crawford's

8    testimony.  What did Crawford say that would support a jury

9    finding beyond a reasonable doubt that there was explicit

10   promises of a quid pro quo?

11           MR. BORDENKIRCHER:  The quid pro quo --

12           THE COURT:  Let's go for each gift.  TV:  In return

13   for this TV, you get to keep your job.

14           MR. BORDENKIRCHER:  Right.

15           THE COURT:  Give me some evidence of that.

16           MR. BORDENKIRCHER:  That was his testimony, that if

17   he didn't provide them, he was going to lose his job.  It goes

18   hand in hand with the previous counts that he saw when we

19   testified and we were going through the --

20           THE COURT:  "I felt like it would have taken me as

21   being disloyal, and I would eventually lose my job."  Is that

22   sufficient?  "I was in fear of losing my job."  I'm just

23   quoting from -- I pulled out exactly what he said.

24           MR. BORDENKIRCHER:  Right.

25           THE COURT:  I know what you're arguing, but I have

1    to have proof.

2         MR. BORDENKIRCHER:  Well, the proof is that he was

3    in fear for his job and he would have lost his job if he had

4    not paid.  That's the quid pro quo.  It couldn't be any more

5    powerful than that.  If you don't give me the gift, you're

6    fired.

7         THE COURT:  But where is that explicitly?  It has to

8    be explicit.  It has -- not has to be something that just Mr.

9    Crawford might have been thinking in his mind; it has to be

10   there to be a meeting of the minds there.  It's a broad

11   contract.  There has to be a meeting of the minds, not that

12   just Mr. Crawford was fearful that he needed to be -- you

13   know, he couldn't be disloyal; otherwise, he'd lose his job.

14        I mean, the law requires -- and I'm sure you've read all

15   this as well as I have but, you know, the Hobbs Act is a very

16   serious allegation of extortion.  Extortion requires explicit

17   promise, proof of a quid pro quo.

18        And are you relying solely on what Mr. Crawford said to

19   do that?  Did I miss something?

20        MR. BORDENKIRCHER:  It's that and the actual -- the

21   demand, the written demand from her for the gifts.

22        THE COURT:  Right.  I understand that there was a

23   request for gifts or a demand, however you want to refer to

24   it.  We'll say demand since we're going to look at the

25   evidence in the light most favorable to you.  But it has to be

1    in return for not taking an action in your case; that is, not

2    firing him.  And there has to be an actual -- not that that's

3    just what he thought, but there was an actual understanding on

4    both their parts that that's what would happen if you didn't

5    do this.

6              MR. BORDENKIRCHER:  That's his testimony, that he

7    thought that if he didn't provide those, he was going to lose

8    his job.  You don't have to actually have her say, give me

9    this or you're going to lose your job.  That was the

10   understanding, Your Honor.  I mean, that's a jury issue, that

11   if you look at all the other people that lost their jobs and

12   were forced out, and we can go through them point by point by

13   point, when he's seeing them forced out and she says, here is

14   the list, give me the gifts, and he knows if he doesn't give

15   them, he's going to be fired, that is a meeting of the mind.

16   He's an at-will employee.

17             THE COURT:  I'll take that under advisement.  I need

18   you to go ahead and give your motion.

19             MR. KNIZLEY:  Mr. Darley is going to present --

20             THE COURT:  Okay.

21             MR. DARLEY:  Judge, may I approach the podium?

22             THE COURT:  Okay.

23             MR. DARLEY:  Judge, at this time, as to Ms. Yeager,

24   we would make a motion to -- for judgment of acquittal on the

25   basis of Rule 29 of Federal Rules of Criminal Procedure based

1    on the failure of the Government to make a prima facie case as

2    to each and every essential element of the allegations.

3        Specifically to Ms. Yeager, we have Counts 1, which are

4    the conspiracy; then Counts 2 through 6, which are the wire

5    fraud; and then Counts 7 through 9 are the mail fraud.

6        Judge, obviously, we are taking the light -- or the

7    evidence in the light most favorable to the Government at this

8    point.  We did file a written -- we did file a written motion

9    for judgment of acquittal just momentarily, and I did provide

10   a written copy to your staff.

11       Your Honor, if you take what is relevant as to Ms.

12   Yeager, the Government alleged in their indictment as well as

13   Mr. Crawford testified about Ms. Yeager's promotion to Deputy

14   License Commissioner, that happened in March of 2014, Your

15   Honor.  If you will take note of that, the Strateco retention

16   the Government alleged Ms. Hastie undertook was prior to that

17   March date.  It was around the January-February part of that

18   same year.  So her promotion came in about midstream of

19   Strateco's involvement with the License Commission Office.

20       If you're looking at the intent of what Ms. Yeager's

21   involvement or her involvement here, the intent that she would

22   have, the Government has not elicited any proof of any major

23   involvement.  The only thing they have elicited at this point

24   was testimony through what we would contend is their star

25   witness, Mr. Crawford.  And --

1          THE COURT:  Let me stop you.  I'm familiar with all

2     of that.  I will need to ask the Government some questions

3     about your motion.

4          MR. DARLEY:  Yes, ma'am.

5          THE COURT:  Okay.  Who is going to be addressing

6     this, Mr. Bordenkircher?  All right.  Mr. Bordenkircher, the

7     -- I was going back through the testimony the best I could.

8     It's your contention that Ms. Yeager participated in this

9     scheme to defraud by working with Strateco to have them change

10    the description on their invoices.  Is that the part that you

11    believe she took -- she did?

12         MR. BORDENKIRCHER:  No.  It's not the changing of

13    the -- changing the description is part of it.  The heart of

14    the case --

15         THE REPORTER:  I'm sorry, the what?

16         MR. BORDENKIRCHER:  The heart of it.

17         THE COURT:  Yeah.  I'm talking about what Ms.

18    Yeager's participation was.

19         MR. BORDENKIRCHER:  Ms. Yeager participated -- one,

20    she's supposed to check the invoices and make sure they go to

21    the right people.  She knows that Strateco did not do any work

22    for Victor Crawford.  So when she's getting the bills -- in

23    fact, if you -- in some of the tapes and on the videos, you

24    see her actually handing the altered invoice to Victor and

25    moving this whole process along as far as changing who's

1    actually going to pay for them.

2        The descriptions is just part of it.  The actual who is

3    going to pay the bill is the heart of the case, Your Honor.

4    It's a -- it's a sophistic argument to say, well, we changed

5    --

6            THE COURT:  All right.  So the testimony from Chad

7    was that Ms. Hastie told him to change it from Mobile License

8    Commission to APL.

9            MR. BORDENKIRCHER:  Right.

10           THE COURT:  Okay.  And so after that, your

11   contention is that because Ms. Yeager saw that and still

12   signed off on the bill, she participated in the conspiracy.

13           MR. BORDENKIRCHER:  Right.  It's just not that.

14   They were actually sending the e-mails to Ramona Yeager, who

15   was then forwarding them --

16           THE COURT:  About the --

17           MR. BORDENKIRCHER:  -- about the change of who's

18   actually going to be paid.

19           THE COURT:  About the change of who's going to

20   actually be paid?

21           MR. BORDENKIRCHER:  Yes.

22           THE COURT:  Okay.  Could you refer me to that

23   exhibit?

24       (Brief pause.)

25           MR. BORDENKIRCHER:  Well, first of all, on 423,

1   Ramona Yeager was in a meeting with Kim.

2            THE COURT: 420 --

3            MR. BORDENKIRCHER:  423.

4            THE COURT:  That's a document?

5            MR. BORDENKIRCHER:  No.  That's the audiotape, Your

6   Honor.

7            THE COURT:  Oh.

8            MR. BORDENKIRCHER:  So if you go to that audiotape

9   agreement, that's where Ramona, Defendant Hastie, and Victor

10  Crawford are in a meeting, and in that meeting Kim outlines

11  the changes in the invoice and specifically states that her

12  name needs to be taken off of it.

13           THE COURT:  Now, this -- I want a description at

14  that point.  I'm asking about --

15           MR. BORDENKIRCHER:  No, not the description; her

16  name off the bill.  That is direct evidence that Ramona Yeager

17  is sitting there and she says, we're going to take my name off

18  that and we're going to put APL.  From that point on, Ramona

19  Yeager --

20           THE COURT:  Now, which exhibit was that?

21           MR. BORDENKIRCHER:  It's 143.

22           THE COURT:  I don't have --

23           FBI FORENSIC ACCOUNTANT KATHERYN SCOTT:  It's 150-A,

24  -B, and -C recordings.

25           THE COURT:  150?

1      FBI FORENSIC ACCOUNTANT KATHERYN SCOTT:  150-A, -B,

2  and -C recordings.

3      THE COURT:  -A, -B, and -C.  Okay.

4      (Brief pause.)

5      MR. BORDENKIRCHER:  I'd also refer the Court to

6  recording 149-B where Victor Crawford is talking with Ms.

7  Yeager about the padding of the bills, and that Ms. Hastie was

8  there when she's saying he can falsify his bills, and he says,

9  "I want to know that -- do you understand this?"  And she's,

10 like, "Yeah."  And he's, like, "I'm not going to do this."

11 And she's, like, "Yes."

12      MR. DARLEY:  Judge, that's a mischaracterization.

13      THE COURT:  You can respond when he's finished.  But

14 what he's about to say is about what I -- my evaluation of it

15 too.  That's not what was going on there, but I'm going to go

16 back and review 150-A, -B, and -C because you're telling me on

17 this -- tapes it's going to support your theory that Ms.

18 Hastie and Ms. Yeager was present when they were discussing

19 changing who the bill was supposed to go to; that is, ADL or

20 APL as opposed to the License Commissioner.

21      MR. BORDENKIRCHER:  That's exactly right.

22      THE COURT:  Okay.

23      MR. BORDENKIRCHER:  151-A, 151-B, 151-C.

24      THE COURT:  Okay.  151?  Okay.  Because --

25      FBI FORENSIC ACCOUNTANT KATHERYN SCOTT:  Did I say

1    150?  There is also 151-A --

2            THE COURT:  Wait, wait, wait.  Let Mr. Bordenkircher

3    speak.

4            MR. BORDENKIRCHER:  Okay.  There's 150-A.

5            THE COURT:  Okay.

6            MR. BORDENKIRCHER:  Video recording session 1,

7    Crawford and Yeager, Hastie wants Victor to change the bill.

8    She's in there.

9        150-B, a -- sessions, Crawford and Yeager, invoices,

10   worried about Mr. Pafenback reviewing the bill.  That's Ms.

11   Yeager saying that.

12       150-C, video recording, session 1, Crawford and Yeager,

13   paying of the invoices, how the payment doesn't need to go to

14   the actual person that did the work but actually to Victor.

15   That's -- in that session, it's only Victor and Ms. Yeager.

16           THE COURT:  Let me ask you this:  You've spent a lot

17   of time trying to show that these invoices were false, the

18   ones that came from Mobi-Media -- or Strateco, rather.  But

19   your last witness testified that these invoices didn't even go

20   to the Mobile County Commission.  Did I misunderstand that?

21           MR. BORDENKIRCHER:  Well, he doesn't submit the

22   bills to the Mobile County Commission.

23           THE COURT:  Right.  He submits them to Mobile

24   License Commission.

25           MR. BORDENKIRCHER:  Right.

1            THE COURT:  And they do it.  But your whole theory
2    was that somehow or another these invoices are false and then
3    that they misled the Mobile County Commission.
4            MR. BORDENKIRCHER:  Right.
5            THE COURT:  But if they weren't submitted to the
6    Mobile County Commission, what does it matter what's on those
7    invoices?
8            MR. BORDENKIRCHER:  Because they do go to the Mobile
9    County Commission, Your Honor.
10            THE COURT:  The invoice -- your witness testified
11    that those invoices from Strateco did not go to the Mobile
12    County Commission.  She compared 78 and 79, and then she
13    compared 80 and --
14            MR. BORDENKIRCHER:  Right.  But those bills actually
15    -- okay.  In the comparing the two bills, that shows that
16    there was a conscious effort to hide the billing from the
17    Mobile County Commission.
18            THE COURT:  Okay.  I understand that.
19            MR. BORDENKIRCHER:  And so what it is is you're
20    hiding the actual description of the bill.  It actually has
21    the amount on there, which is the false billing.  So the first
22    set goes through, and it comes in, and 225, 234 get submitted
23    with APL's bill.  And those are false because it shows that
24    Victor Crawford did the work, which is false.
25        Then he turns around and submits the next series of bills

1  that go to the License Commission.  They include it on his

2  bill, but the detail of the bill is taken away.  It's not the

3  whole bill is taken away; it's the actual detail of the bill.

4       So the Mobile County Commission, when it gets the bill

5  that's actually signed by Ms. Yeager and signed by Hastie as

6  being correct, I mean, there's been no other evidence to the

7  contrary, then they alter the bills, take out the full

8  description of it, submit it on so then when the Mobile County

9  Commission gets it, they rely on, one, the representation of

10 the person, Ms. Hastie.

11      Ms. Herman was exactly on point.  She said, we rely on

12 what they sign.  Once that's signed, there is no independent

13 investigation by the Mobile County Commission.  You couldn't

14 be.  You'd have to go through and have a whole investigative

15 wing for every bill.

16      So what they have done is after the first two that went

17 all the way through, every one of them, they secreted what was

18 actually turned in, alter the bill, send it to the Mobile

19 County Commission, they see the face of the bill, think this

20 is a legitimate bill by Victor Crawford, and sign it.  And

21 then the check gets written, and the check comes back around

22 to Victor Crawford.

23      So it's a complete loop, Your Honor.  Asking the guy

24 from -- Chad Tucker about the bill, how it works, is taking

25 just one piece of it.  It's like grabbing -- a blind man

1    grabbing the nose of an elephant.  He thinks it's a snake.

2    No.  What he's not seeing is the whole elephant here, Your

3    Honor.

4              THE COURT:  Okay.  Well, the point is you make --

5    you spent a lot of time trying to show that the Strateco

6    invoices were changed a lot and they were incorrect, and my

7    question to you is those invoices, Strateco's invoices, did

8    not go to the Mobile County Commission.

9              MR. BORDENKIRCHER:  Not the full invoice but part of

10   them did.

11             THE COURT:  Okay.  The part that appeared on the APL

12   invoice is what went to them.

13             MR. BORDENKIRCHER:  And that is what's incorrect,

14   Your Honor.

15             THE COURT:  Okay.  All right.  Any other --

16             MR. DARLEY:  Yes, Your Honor.  If I may respond,

17   they cited -- and we've given this to Your Honor, it will be

18   in an appendix, 150-A, 150-B, and 150-C, Your Honor, those

19   recordings.  Number one, I think with respect to Mr.

20   Bordenkircher, he mischaracterized the content of the

21   recording that Mr. Crawford made.

22        Number one, it cited -- Mr. Crawford was talking about

23   the padding of a bill caused by a computer glitch.  It has

24   nothing to do with a Strateco bill.  And Ms. Yeager asked him,

25   well, did you pad the bill?  And he said, no, I don't do that.

1    And Your Honor --

2              THE COURT:  I understand.  I agree that that does

3    not have anything to do with what we're talking about.

4              MR. DARLEY:  Right.  So going on to the further part

5    of the meat of this argument, Your Honor, there's no question

6    Ms. Yeager was present for some of the stuff.  However,

7    there's -- the mere presence alone is not enough.  The

8    association with somebody that maybe have any guilt -- and,

9    obviously, we're not conceding that on the part of Ms.

10   Hastie -- but the association on her part is not enough.

11        Your Honor, the witness that they relied upon to tie Ms.

12   Yeager to this case was Victor Crawford.  And upon

13   cross-examination, which we've provided that to Your Honor,

14   the transcript, upon cross-examination, Mr. Knizley walked

15   Victor Crawford back through his testimony, and it was

16   evidenced, Your Honor, by his own words that she was -- that

17   she checked his bill, she did the math, and she sent it on.

18        She had a clerical involvement in this case, Your Honor.

19   And what I would relate that to is akin to the Bell case that

20   I cited there, 574 F.2d 1234, where Bell arranged for some

21   checks to be cashed for some union work, and the Court ruled

22   that the Rule 29 motion for judgment of acquittal should have

23   been granted because Bell should not have been brought within

24   the sweep of the statute based on human involvement.

25        And Your Honor, I would submit if you take a look at the

1  case, Ms. Yeager's involvement here is slight, it is ever so

2  slight, and they've presented no evidence that Ms. Yeager is

3  going to benefit in any form or fashion from any scheme that

4  may have existed.  She simply was checking the bills and

5  sending them on.

6           THE COURT:  I think your argument has some merit.

7  I'm going to take it under advisement.

8       All right.  Call the jury up.

9           MR. N. HANLEY:  Judge, is it all right if my

10  secretary, Chrissy Bingler, plays the role of Eric Day and

11  brings my witnesses in and out?

12           THE COURT:   Okay.

13           MR. N. HANLEY:  That would be all right?

14           THE COURT:  Sure.  Do you have your first witness

15  here?

16           MR. N. HANLEY:  Yes.

17           THE COURT:  Okay.

18           MR. N. HANLEY:  David.

19           THE COURT:  Have you got the jury coming up?

20           THE CLERK:  Yes, ma'am.

21           THE COURT:  Thanks.

22       (Brief pause.)

23           THE COURT:  As to Ms. Hastie's extortion count

24  motion, I need the Government to be pulling the testimony from

25  Mr. Crawford that you specifically rely on so we can talk

1   about that at the close of business today.

2            MR. N. HANLEY:  Do you want him to come up now,

3   Judge?

4            THE COURT:  He can wait for the jury to get here.

5       (Brief pause.)

6       (Jury present at 1:30 p.m.)

7            THE COURT:  All right.  Please be seated.  All

8   right.  Does the Government wish to call any more witnesses?

9            MR. BORDENKIRCHER:  No, Your Honor.  The Government

10  rests.

11           THE COURT:  All right.  Does the Defense wish to

12  call any witnesses?

13           MR. N. HANLEY:  Yes, ma'am.  David Sessions.

14           THE COURT:  Is your microphone on?

15           MR. N. HANLEY:  No.

16           THE COURT:  Mr. Sessions, if you'd come forward.

17                     DAVID SESSIONS,

18        having first been sworn, testified as follows:

19                   DIRECT EXAMINATION

20  BY MR. N. HANLEY:

21  Q.   Would you state your name, please.

22  A.   David Sessions.

23  Q.   Mr. Sessions, can you give me a little background,

24  personal background, where you grew up?

25  A.   Yes, sir.  I'm from Grand Bay, Alabama, farmed for a

1   living.  I had the opportunity roughly five years ago to run

2   for -- House District 105 seat came open, and I won that seat

3   in a special election.

4   Q.   And you say you farm?  You've farmed all your life?

5   A.   Yes, sir, in Grand Bay, all my life.

6   Q.   Family farm?

7   A.   Yes, sir, started by my father in 1947.

8   Q.   And now you're in the State Legislature?

9   A.   Yes, sir.

10  Q.   And you represent a legislative district?

11  A.   House District 105.

12  Q.   And where is that?

13  A.   It's -- covers Dauphin Island, Fowl River, St. Elmo,

14  Bayou La Batre, Grand Bay.

15  Q.   And do you know Kim Hastie?

16  A.   Just in a professional relationship since I was elected.

17  Q.   Did you know her before she was License Commissioner?

18  A.   No, I did not.

19  Q.   Now, in the winter or the early spring of 2014, did you

20  have conversations with Ms. Hastie about the idea of combining

21  the Revenue Commission Office and the License Commission

22  Office?

23  A.   There was some talk of that.

24          MR. BORDENKIRCHER:  I would object to hearsay, Your

25  Honor.

1          THE COURT:  Don't testify to what people told you

2   about it.

3   BY MR. N. HANLEY:

4   Q.   And sometime thereafter, did you begin doing a little

5   research about whether you thought that was a good idea?

6   A.   I did.

7   Q.   Okay.  And what did you do?

8   A.   Well, I agreed to sponsor legislation that would combine

9   the Revenue Office with the License Commission Office.

10  Q.   And did you do some research about how many standing

11  alone license commission offices are in the state?

12  A.   Yes, I did.  One of the first things I did was went to

13  the County Commissions Association.  They keep a handbook of

14  what counties have and the offices, and we were one of only

15  nine counties in the state that had separate offices.

16          MR. BORDENKIRCHER:  I would object as to relevancy

17  Your Honor, and I haven't received any of this information

18  prior to this.

19          MR. N. HANLEY:  Judge --

20          THE COURT:  Overruled as to relevancy.

21  BY MR. N. HANLEY:

22  Q.   You did agree to support the bill?

23  A.   I agreed to be the sponsor.

24  Q.   What does being a sponsor mean?

25  A.   Being the sponsor means you handle the legislation in the

 1    committee that it's assigned to in Montgomery.
 2    Q.   All right.  And what committee would that have been for
 3    you?
 4    A.   It was a local bill.  It was a -- we were doing a
 5    constitutional amendment to allow the people of Mobile County
 6    to decide this issue.  So it was going to the Mobile County
 7    local legislative committee.
 8    Q.   Okay.  And that's where you work, that's where you
 9    sponsored the bill?
10    A.   I was a member, and that's where the bill went to, that
11    committee.
12    Q.   And you know it's very difficult to pass -- or do you
13    know --
14             MR. BORDENKIRCHER:  Objection to leading.
15    BY MR. N. HANLEY:
16    Q.   Is it difficult to pass a constitutional amendment in the
17    State of Alabama?
18    A.   It's very difficult to pass any type of legislation, much
19    less a constitutional amendment that has to be voted on by the
20    people.
21    Q.   And why were you for this legislation?
22    A.   I felt it was a good way to conserve taxpayers' dollars
23    and efficiently serve our community and our constituentss in
24    the county.
25    Q.   And this is the type of thing your constituentss would be

1    for?

2              MR. BORDENKIRCHER:  Objection, irrelevant.

3              THE COURT:  Overruled.

4    BY MR. N. HANLEY:

5    Q.   I'm sorry?

6    A.   Yes.  My constituents would be much in favor, I believe.

7    That's why I wanted them to vote on it.

8    Q.   All right.  And so you sponsored the legislation?

9    A.   I did.

10   Q.   Now, is it common for legislation for bills to go through

11   several iterations?

12   A.   Yes, sir.

13   Q.   It happens just about every time?

14   A.   That happens more often than not.

15   Q.   And there was a document introduced earlier in this

16   courtroom that the salary of the legislator -- of the combined

17   offices would be 75 percent, combining the salaries and taking

18   75 percent; do you remember that?

19   A.   That was the initial legislation that was put in.  That

20   was initially dropped, but we knew that was not going to

21   happen, so we started working on amendments to correct that.

22   Q.   Was that just something thrown in there to get it

23   started?

24              MR. BORDENKIRCHER:  Objection, leading.

25              THE COURT:  Don't lead your witness.

1    BY MR. N. HANLEY:

2    Q.   Do you know how that was entered into the legislation,

3    that first draft?

4    A.   You know, it's very complicated to get a bill into law,

5    so it has to start somewhere.  So the people that were working

6    on the legislation with LRS had to have some numbers to start

7    with.  So that was the beginning point.  And we knew that that

8    was not going to be able to pass the county committee, so we

9    started working on adjusting that salary before we ever got to

10   any vote.

11        The bill -- may I, Judge?

12             THE COURT:  May you what?

13             THE WITNESS:  May I talk about how a bill gets

14   through county committee or --

15   BY MR. N. HANLEY:

16   Q.   How does a bill get through the county committee?

17   A.   Well, there are ten --

18             MR. BORDENKIRCHER:  Your Honor, I object to the

19   relevancy of how a bill gets through a county committee.

20             THE COURT:   Overruled.

21   BY MR. N. HANLEY:

22   Q.   Go ahead.

23             THE WITNESS:  May I answer?

24             THE COURT:   Yes.

25   A.   Oh.  You know, first you initially -- the sponsor will

1    try and get the bill on the calendar to be heard.  And then

2    you have to have a vote of the county committee, and it has to

3    pass by a majority of the county committee which, in Mobile

4    County right now, there are six Republicans, four Democrats.

5    But that's not the end of it.  If just one of the ten members

6    object to the legislation, they can contest that legislation

7    and it goes nowhere.

8        So you have to get the bill in a proper frame to pass and

9    everyone be somewhat agreeable to it or it never gets anywhere

10   other than that committee because it will have to pass the

11   county house delegation, then it has to pass the Senate

12   delegation separately.  So if you have just one senator or one

13   representative that's dead set against the legislation, it is

14   not going to pass.

15   BY MR. N. HANLEY:

16   Q.   And does it become even more difficult when it's a

17   constitutional amendment?

18   A.   Yes.

19   Q.   Why is that?

20   A.   Well, there again, on a -- you have a hundred and five

21   members of the Alabama House of Representatives.  You have 35

22   Senators.  If just one House member or one Senate member votes

23   no on the constitutional amendment, it would send it to a

24   statewide vote and, as we know from previous statewide votes,

25   that will make local legislation basically unconstitutional.

1   Q.    And that's what happened in the Prichard Water case?

2   A.    Yes, sir.

3   Q.    And it's just one person in the whole Senate or the whole

4   House --

5   A.    Yes, sir.

6   Q.    -- means it would require a statewide vote?

7   A.    Statewide instead of just Mobile County.

8   Q.    Now, how did you resolve the issue of the -- did you --

9   do you remember getting any input whatsoever from Kim on

10  salary?

11  A.    No, sir.

12  Q.    How did y'all resolve the salary issue?

13  A.    We started looking at what the other counties, their

14  license, revenue license, the combined offices made.  And I

15  think the highest paid was around 98,000.  It may have been

16  Montgomery or Jefferson County, I'm not sure which.  So we

17  knew it needed to be a little bit less than that.

18  Q.    And did you come up with 95,000?

19  A.    I can't recall the exact number, but that sounds about

20  right.

21  Q.    Do you know what Marilyn Wood is being paid right now?

22  A.    I do not recall.  I looked at it, but I do not recall.

23          THE WITNESS:  And if I may, Judge, my numbers were

24  actually from '09 that I had with my list.

25          THE COURT:  Hold on one second.  Let him ask the

1    question.

2    BY MR. N. HANLEY:

3    Q.    Your numbers, you're talking about your financial

4    numbers?

5    A.    Yes.

6    Q.    The salary numbers?

7    A.    Yes.

8    Q.    So they were old salaries?

9    A.    Yes.

10   Q.    So you actually went to the effort to go -- to look up

11   the salaries of all these offices?

12   A.    They were listed -- the County and Municipal Government

13   Association had a list of the available, but I think it was

14   either '08 or '09 the list was printed.

15   Q.    I think you mentioned that the people that were drafting

16   the bill was -- that department is called the Legislative

17   Reference Service?

18   A.    Yes, sir.

19            MR. BORDENKIRCHER:  Objection, leading.

20            THE COURT:  Don't lead your witness.

21   BY MR. N. HANLEY:

22   Q.    What do they do?  What does the Legislative Reference

23   Service do?

24   A.    They draw up legislation, draft legislation.

25   Q.    And did the draft with the 75 percent figure come from

1    them?

2    A.    Yeah.

3    Q.    I'd like to show you a document that's been marked for

4    evidence as Defendant's Exhibit 77.

5              MR. N. HANLEY:  Judge, could I approach so he can

6    look at this?

7              THE COURT:  All right.

8    BY MR. N. HANLEY:

9    Q.    Now, if I can flip this over a little bit and show you,

10   does this bill appear to be the final bill or the bill that

11   you had wanted the vote on (indicating)?  Does it have the

12   $95,000 figure in it?

13   A.    Yes, sir.

14   Q.    Does that appear to be the final bill?

15   A.    The final draft --

16   Q.    The final draft.  I'm sorry.

17   A.    -- that we had worked on.  We ran out of time in that

18   legislative session, so we actually never even come to a vote

19   on this bill in committee.  But that is the final number.

20             MR. N. HANLEY:  I would offer it, Your Honor.

21             THE COURT:  I'm sorry?

22             MR. N. HANLEY:  I would offer it.

23             THE COURT:  Any objection?

24             MR. BORDENKIRCHER:  No, Your Honor.

25             THE COURT:  It's admitted.

1          (Defendant's Exhibit 77 was received in evidence.)

2    BY MR. N. HANLEY:

3    Q.   Representative Sessions, the jury did not see this

4    because it wasn't introduced into evidence, but is that what

5    you just identified as the bill (indicating)?

6    A.   Yes, sir.  That's it.

7    Q.   And is it on this page (indicating) the proposal or the

8    draft was for the salary to be $95,000?

9    A.   Yes, sir.

10   Q.   Now, you were explaining to the jury that this bill was

11   not voted on?

12   A.   That's correct.

13   Q.   Well, tell me -- tell us what happened.  You're in the

14   committee; right?

15   A.   Yeah.  We had the original bill in committee and we had a

16   meeting set up and realized that the, you know, we needed to

17   get this in there, basically, a substitute drawn up with the

18   correct numbers.  And --

19          MR. BORDENKIRCHER:  Can we get a timeframe on this,

20   Your Honor?  I have no idea --

21   BY MR. N. HANLEY:

22   Q.   This is about when time-wise?  February, March 2014, does

23   that sound right?

24          MR. BORDENKIRCHER:  Objection, leading.

25   A.   It should have been late February.

1              THE COURT:  Of what year?

2              THE WITNESS:  Last year, of 2014.

3   BY MR. N. HANLEY:

4   Q.    So what happened with it?  What happened with the bill?

5   A.    There was a public hearing called on it, and then we had

6   a public hearing.  Normal procedure is if you have a public

7   hearing on the legislation proposed that you do not vote on it

8   that day.  So we had the public hearing, and it did not get

9   voted on, and it never -- the committee never met again during

10  the 2014 legislative session.

11  Q.    The session ran out?

12  A.    Yes.

13  Q.    Now, at the public -- what did you call it, a public --

14  A.    Public hearing.

15  Q.    -- hearing on it?

16  A.    Yeah.

17  Q.    Did people speak?

18             MR. BORDENKIRCHER:  Objection, calls for hearsay.

19             THE COURT:  Overruled.

20  BY MR. N. HANLEY:

21  Q.    Did people speak, if you know?

22  A.    Yes.  Some people testified.

23  Q.    Who is Julie Magee?

24  A.    She is the Alabama Revenue Commissioner.

25  Q.    And do you know what her duties are?

1  A.   She's in charge of collecting all the revenue for the

2  State of Alabama.

3  Q.   And is she involved in collecting car tag money?

4  A.   I'm not sure.  I know she -- you know, we set up the One

5  Spot for sales tax and all that stuff, but I'm not exactly

6  sure if she does car tags.

7  Q.   Do you know if she supported the bill?

8  A.   She did.

9  Q.   Did she support it last year?

10      MR. BORDENKIRCHER:  Objection.  It's calling for

11  hearsay.

12      THE COURT:  Overruled.

13  BY MR. N. HANLEY:

14  Q.   Now, this year, did you once again try to get this bill

15  passed?

16  A.   I did not sponsor it this year because I am the Mobile

17  County Delegation Chairman, and Ms. -- Representative Margie

18  Wilcox sponsored similar legislation.

19  Q.   And did you support it?

20  A.   Yes, I did.

21  Q.   You still think it's a good idea?

22  A.   I do.

23  Q.   And did Julie Magee again this year support it?

24  A.   Yes.

25  Q.   Publicly and vocally?

1    A.   Yes.

2    Q.   I'd like to talk to you a little bit about the practice

3    of lobbying in the Alabama State Legislature.  Very common for

4    public --

5              MR. BORDENKIRCHER:  Objection, leading.

6    BY MR. N. HANLEY:

7    Q.   Do public offices and public officials employ lobbyists?

8    A.   Yes, they do.

9    Q.   And is that perfectly legal and proper?

10   A.   As far as I know, it is.

11   Q.   And do municipalities do it?

12   A.   Yes.

13   Q.   Does Mobile County -- does Mobile County Commission do

14   it?

15   A.   Yes.

16   Q.   Have a lobbyist?

17   A.   Yes.

18   Q.   And do they spend public funds for the lobbyist?

19   A.   I guess they do.  They pay them somehow.

20             MR. BORDENKIRCHER:  Calls for speculation.

21             THE COURT:  Only testify if you know.

22   BY MR. N. HANLEY:

23   Q.   Does the City of Mobile have a lobbyist?

24   A.   Yes.

25   Q.   City of Orange Beach?

1    A.   Yes.

2    Q.   Various boards, water boards and different boards like

3    that have lobbyists?

4    A.   Yes.

5    Q.   Do you know that that is proper as long as there is a

6    public purpose?

7    A.   Yes.

8    Q.   Are you familiar with public officials sending out

9    newsletters?

10   A.   Yes, sir.

11   Q.   Is that common also?

12   A.   Yes, sir.

13   Q.   And once again, if it's for a public purpose --

14            MR. BORDENKIRCHER:  Objection, leading.

15            THE COURT:  Don't lead your witness, Mr. Hanley.

16   Ask him a question that doesn't require a yes or no.

17            MR. N. HANLEY:  Yes, ma'am.

18   BY MR. N. HANLEY:

19   Q.   Are you familiar with Bradley Byrne?

20   A.   Yes, sir.

21   Q.   Who is he?

22   A.   He's our congressman.

23            MR. N. HANLEY:  May I approach the witness, Your

24   Honor?

25            THE COURT:  Sure.  Go ahead.

1    BY MR. N. HANLEY:

2    Q.   I'd like to show you what's been marked into evidence as

3    Defendant's Exhibit 140 (indicating).  Are you familiar with

4    Mr. Byrne's newsletter, this newsletter?

5    A.   Yes.

6    Q.   Do you remember ever having a conversation with Kim about

7    what the salary ought to be?

8    A.   No, I never did.

9         MR. N. HANLEY:  One moment, Judge.

10        (Brief pause.)

11        MR. N. HANLEY:  Pass the witness, Your Honor.

12        THE COURT:  Mr. Knizley, do you have any questions?

13        MR. KNIZLEY:  No, ma'am.

14        THE COURT:  Okay.  Mr. Bordenkircher.

15                    CROSS EXAMINATION

16   BY MR. BORDENKIRCHER:

17   Q.   1157.

18        Is it Mr. Sessions?

19   A.   Yes.

20   Q.   Mr. Sessions, have we ever met before?

21   A.   No.

22   Q.   My name is Greg Bordenkircher.  I work for the United

23   States.  How are you today?

24   A.   Doing well.

25   Q.   Have you talked to Kim Hastie about this case?

1   A.   No.

2   Q.   You haven't talked to her at all?

3   A.   Not about this case.

4   Q.   You didn't -- you came here and she didn't tell you

5   anything about the case; you just showed up?

6   A.   Well, I talked to her attorneys, met with her attorneys

7   prior to the case.

8   Q.   Okay.

9   A.   I've never talked to you about the case.

10  Q.   I understand that.  Now -- but have you talked -- you

11  just said you hadn't talked to Kim ever about the case, but

12  now you seem to -- you're vacillating on that.

13  A.   I don't recall if Kim was at the meeting --

14          MR. N. HANLEY:  I object to it, Judge.

15          THE COURT:  Just ask the question.  Don't give a

16  commentary.

17  BY MR. BORDENKIRCHER:

18  Q.   Did you or did you not talk to Ms. Hastie about this case

19  before you showed up?

20  A.   I can't recall.

21  Q.   You can't recall?

22  A.   I can't recall if she was at the meeting that I spoke to

23  her attorneys or not when I met with her attorneys.

24  Q.   So you came -- how long have you known her?

25  A.   Maybe five years.

1    Q.  Five years?  And so you've known her for five years, you
2    knew you were coming down here to Federal Court, and you
3    didn't discuss this at all with her, or you just can't
4    remember?
5    A.  I can't recall discussing this at all with her.
6    Q.  Do you know who Jon Gray is?
7    A.  I do.
8    Q.  Who is he, please, sir?
9    A.  He's a political consultant.
10   Q.  And what kind of work does he do?
11   A.  He does advertising for political clients, people that
12   are running for office, and stuff like that.
13   Q.  He's a political consultant, you'd agree with that,
14   wouldn't you?
15   A.  I would.
16   Q.  Okay.  And are you familiar with the $1.25 fund?
17   A.  No.
18   Q.  You're not?  Tell me the different funds that the Mobile
19   County License Commission has.
20   A.  That's not my job, sir.
21   Q.  That's not what I asked you, sir.
22   A.  I can't tell you because I don't know.
23   Q.  How much money is the $1.25 fund?
24   A.  It's a $1.25.  You just said it.
25   Q.  So you don't know about the $1.25 fund?

1    A.    There are all sorts of fees and funds and stuff that the

2    Government operates on.  I have no clue as to what the $1.25

3    fund is.

4    Q.    Well, you stated you thought that the meeting -- that

5    combining these two offices was a good idea; did you not?

6    A.    I did.

7    Q.    So you must have done some research of the Mobile County

8    License Commission, haven't you, or did you just listen to Ms.

9    Hastie?

10   A.    Well, I was listening to our constituents.

11   Q.    No.  I'm asking you.  What do you know, sir?

12   A.    I don't know anything about the $1.25 fund.  Haven't I

13   told you that?

14   Q.    So you don't know how much money is in it or not?

15   A.    No, sir.

16   Q.    Would it surprise you to find out there's almost a

17   million dollars in there that's --

18              MR. N. HANLEY:  I object to the question.

19   BY MR. BORDENKIRCHER:

20   Q.    -- that's a discretionary fund for Ms. Hastie?

21              MR. N. HANLEY:  I object to the relevancy.

22              THE COURT:  Sustained as to relevancy.

23   BY MR. BORDENKIRCHER:

24   Q.    How much is in the -- how much is the budget for the

25   Mobile County License Commission in 2014?

1    A.   I do not know.

2    Q.   So you were sponsoring a bill and you didn't even know

3    what the budget was?

4    A.   My job is to try and pass legislation that will help my

5    constituents and the members of Mobile County, Alabama.

6    Q.   So let me get this right:  You don't -- (writing).  The

7    budget for Mobile County License Commission in 2014 when you

8    were supposedly championing this bill, you had absolutely no

9    idea what the budget was?

10   A.   I did not look what their budget was.

11   Q.   How about costs?

12   A.   No, sir.

13   Q.   Revenue?

14   A.   (Shakes head negatively.).

15   Q.   What's in the bank account?

16   A.   I don't know.  That's not my job.

17   Q.   So it would be fair to say you know really nothing about

18   the finances or the running of the Mobile County License

19   Commission, do you?

20   A.   I know they do a good job at our License Commission

21   Office.

22   Q.   Do you know anything about the budget, the costs, the

23   revenue, what's in their bank account?  How many employees do

24   they have?

25   A.   I do not know.

1    Q.    Okay.  So you don't know anything about the employees.

2    (Writing.)  Now, do you know who wrote the original bill to

3    combine these?

4    A.    The Legislative Reference Service in Montgomery, Alabama,

5    drafts all legislation.

6    Q.    Really?  Did you know that Jon Gray was the one that was

7    hired to draft this bill?

8    A.    Do you mean that he had input on what was in the bill --

9    Q.    Let me show you what --

10   A.    -- because they actually do the work.  The Reference

11   Service does the work.  He may have suggested what to write in

12   it.

13   Q.    Do you see Government's Exhibit Number 55 (indicating)?

14   Do you know Strategy is Jon Gray's business?

15   A.    Yes.

16   Q.    Do you know he was paid $10,000 to lobby for this bill?

17   A.    Is that what this says?

18   Q.    Can you not --

19            THE COURT:  You need to --

20   BY MR. BORDENKIRCHER:

21   Q.    Can you see $10,000 there (indicating), please, sir?

22            THE COURT:  Hold on.

23            THE WITNESS:  Well, he asked me if I know.

24            THE COURT:  I know, but --

25            THE WITNESS:  I don't know.

1           THE COURT:  Okay.  Then just say, I don't know, if

2    you --

3    A.   I don't know.

4    BY MR. BORDENKIRCHER:

5    Q.   So you didn't talk to Jon Gray about this?

6    A.   About the legislation?

7    Q.   Yes.

8    A.   I did.

9    Q.   And he was lobbying you on behalf of Ms. Hastie and other

10   legislature people, wasn't he?

11   A.   He was helping Ms. Hastie prepare the language that went

12   in the legislation, but he had -- I don't know that he was --

13   I don't know what he was doing as far as advertising or any of

14   that.  I mean, there's a lot of advertising that goes on.

15   Q.   That's not what I'm asking you.  So you know that Jon

16   Gray was helping, and we've seen the bill here, was paid by

17   the Defendant Hastie to help write the bill, to work on the

18   language?

19   A.   Yes.

20   Q.   Right.  Now, certainly, as a legislator, you are familiar

21   with segregated funds, aren't you?

22   A.   Yes.

23   Q.   And a segregated fund is when there's a house bill, and I

24   can show you the bill, where funds are supposed to only be

25   used for certain things.  Are you aware of that?

1    A.   Yes, sir.

2    Q.   Are you familiar with House Bill 117?

3    A.   Not off the top of my head.

4    Q.   You see Government's Exhibit Number 49 (indicating)?

5    A.   (No audible response.)

6    Q.   Can you see that, please, sir?

7    A.   Yes.

8    Q.   "Relating to the Mobile County, authorizing Mobile County

9    to impose an additional issuance of fee, or a tax, in the

10   Office of the License Commissioner to provide for the use and

11   proceeds from the issuance fee for upgrading and maintaining

12   records, equipment, technology within the Office of the

13   License Commissioner."  Do you see that, please, sir?

14   A.   Yeah.

15   Q.   Do you see where it says "draft a bill"?

16   A.   Where is it at?

17   Q.   You see that bill?  That's a segregated fund just for

18   technology (indicating).

19   A.   Yes, sir.

20   Q.   Doesn't say anything about hiring a lobbyist in there,

21   does it?

22   A.   Not there.

23   Q.   So if that bill was just for technology, it should be

24   spent on that; you would agree with that, wouldn't you?

25   A.   I suppose so.

1   Q.   You wouldn't write a check out of that for yourself,

2   would you, if you were running that account, would you?

3   A.   No, sir.

4   Q.   And you wouldn't hire a lobbyist out of that, would you?

5   A.   No.

6   Q.   And if someone did, they would be violating the bill,

7   wouldn't they?

8   A.   Yes.

9   Q.   And you would never do that, would you, sir?

10  A.   No.

11  Q.   Are you familiar -- let me show you Government's Exhibit

12  Number 55 -- 55-B (indicating).  Can you read that, please,

13  sir?

14  A.   It says, "Total, $10,000."

15  Q.   Right here (indicating).

16  A.   "Gerald, please pay this out of $1.25 fund."

17  Q.   What's that say (indicating)?

18  A.   I'm assuming it says, "Thanks, Kim."

19  Q.   And if that was Kim Hastie's signature and she ordered

20  her employee to pay the money out of the $1.25 fund for

21  technology, to pay Jon Gray, the political consultant, that

22  would be wrong, wouldn't it?

23  A.   Yes.

24  Q.   Mobile Revenue Commission (indicating), are you aware of

25  their budget?

1   A.   No.

2   Q.   How about their revenue?

3   A.   No.

4   Q.   How about what money they have in the bank?

5   A.   Don't have a clue.

6   Q.   How about their employees?

7   A.   No.

8   Q.   Did you even talk to Ms. Wood, whether she thought the

9   combining of the two offices would be appropriate?

10  A.   Ms. Wood was retiring.

11  Q.   That wasn't my question, sir.  Did you talk to her?

12  A.   I can't recall.

13  Q.   You can't recall.

14  A.   I don't think I did, but I can't say that I did and I

15  can't say that I did not.

16  Q.   Well, Mr. Sessions, you were sponsoring this bill to

17  combine the two offices.  You've already admitted you have

18  absolutely no physical knowledge about the License Commission.

19  Wouldn't it make sense that you would do some investigation on

20  the Mobile Revenue Commission to see if they could actually

21  meet?

22  A.   Like I said, she was retiring so, evidently, I did not.

23  Q.   So the answer to that would be no?

24  A.   No.

25  Q.   Are you familiar with the Mobile County Commission?

1    A.   Yes.

2    Q.   Are you familiar with their rules on hiring individuals?

3    A.   Not -- no, not their exact rules.

4    Q.   Well, you just stated on direct that you knew that they

5    could use public funds to pay for a political consultant,

6    didn't you?

7    A.   I know the Mobile County School System and Baldwin County

8    School System have used public funds to lobby for things that

9    they wanted.

10   Q.   We're going to get to that.  Right now, I'm talking about

11   the Mobile County Commission.  Are you familiar or are you

12   not?

13            THE COURT:  With what?

14   BY MR. BORDENKIRCHER:

15   Q.   With how the Mobile County Commission hires political

16   consultants?

17   A.   No.

18   Q.   Are you aware that in Mobile County, you cannot hire an

19   individual professional --

20            THE COURT:  We don't want you to testify, Mr.

21   Bordenkircher.  He says he's not familiar with it.

22   BY MR. BORDENKIRCHER:

23   Q.   Do you know whether Mr. Jon Gray and the Defendant had a

24   written contract?

25   A.   I do not know.

1    Q.   Do you know a company by the name of Strateco, Chad
2    Tucker?
3    A.   I've heard of it.  I do not know him.
4    Q.   Do you know if Chad Tucker --
5              MR. N. HANLEY:  Judge, I object.  It's beyond the
6    scope of direct.
7              THE COURT:  Sustained.
8    BY MR. BORDENKIRCHER:
9    Q.   So you have no knowledge how the budgetary process works
10   for Mobile County Commission; is that correct?
11   A.   That's correct.
12   Q.   Do you know a Ms. Herman, Michelle Herman?
13   A.   No.
14   Q.   Who's the finance director there?
15   A.   If you say so.  I don't know her.
16   Q.   And you're not familiar with their process for voting on
17   contracts in the Mobile County Commission?
18   A.   No.
19   Q.   So if their rule was that all contracts had to be in
20   writing --
21              MR. N. HANLEY:  Object to that, Your Honor.
22              THE COURT:  Sustained.  I've already ruled on that
23   one time, Mr. Bordenkircher.
24   BY MR. BORDENKIRCHER:
25   Q.   Now, how many meetings did you have with Mr. Gray?

1   A.   Pertaining to this legislation?

2   Q.   Yes, sir.

3   A.   What would you call a meeting?

4   Q.   Talking.

5   A.   Talking on the phone or meeting face-to-face or --

6   Q.   Both.

7   A.   I think I had two phone conversations with Mr. Gray.

8   Q.   Did he come up to Montgomery?

9   A.   I did not see him, no, sir.

10  Q.   Do you know how he was being paid?

11  A.   I did not -- or I do not.

12  Q.   So when you made the statement that it would be all right

13  for the Mobile County Commission to pay -- use public funds to

14  pay for political consultants, you just really have no idea if

15  that's true or not, do you?

16  A.   I think they do it all the time.  I don't know if that's

17  true or not.

18  Q.   Well, do you know whether that's true or not?

19  A.   In my mind, it's true, sir.

20  Q.   Well, tell me your knowledge of that then.

21  A.   Well, the Mobile County School System --

22  Q.   I'm talking about Mobile County Commission.

23  A.   They're part of the County, sir.

24  Q.   Are we having a hard time understanding?  Mobile County

25  Commission --

1    THE COURT:  Mr. Bordenkircher, do not speak to the
2    witness that way.
3    BY MR. BORDENKIRCHER:
4    Q.   Perhaps I'm not clear.  Forgive me.  Right now, I'm only
5    talking about the Mobile County Commission.
6    A.   Okay.
7    Q.   You stated on direct that they could hire a political
8    consultant.  Tell me the basis of your knowledge.
9    A.   They have political lobbyists in Montgomery.
10   Q.   How do they hire them?
11   A.   I do not know how they pay her or how they hire her, but
12   it is a female lobbyist that goes to Montgomery.
13   Q.   Do you know whether she has a written or an oral
14   contract?
15   A.   I do not know, sir.
16   Q.   Do you know whether that was voted on?  You know it's an
17   open -- there's an open law in Alabama where all those
18   committee meetings have to be -- if there's a vote for a
19   contract, it has to be out in the open?
20   A.   That's good.
21   Q.   Is that a yes or a no, please?
22   A.   You asked me if I know.  Yeah.
23   Q.   Yes, sir.  So if you were going to vote on a budget of
24   something, it has to be in the open, doesn't it?
25   A.   Yes.

1    Q.   And if you were to vote on a contract for something like

2    that, it would have to be in the open, wouldn't it?

3    A.   I'm assuming that it would have to be, but I think

4    there's some stipulations on the dollar amounts on some type

5    of contracts, but I'm not certain of that, sir.

6    Q.   So that is a yes or a no, you just don't know?

7    A.   I don't know.

8    Q.   Okay.  Now -- so it's your understanding that would be a

9    good thing if it was a public and open hearing?

10   A.   Sure.

11   Q.   That way, everyone would know?

12   A.   Uh-huh.

13   Q.   So if, like, if Kim Hastie wanted to hire a political

14   consultant and pay him $10,000, then that should be out in the

15   open where everybody can see that; isn't that correct?

16   A.   Yes.

17   Q.   Where the County Commission could see and people could

18   come to the hearing and they would vote on it and they'd see

19   it; isn't that correct?

20   A.   That's correct.

21   Q.   And you would want clear and unambiguous billing of that,

22   wouldn't you?

23   A.   Yes.

24   Q.   You wouldn't want the bill to go to a third party company

25   that nobody knows, would you?

1    A.   I wouldn't.

2    Q.   So that you wouldn't even know who's actually paying for

3    the service; right?  You want to be --

4    A.   Yeah.  I would want to know, I mean --

5             MR. N. HANLEY:  Your Honor, that's outside the scope

6    of direct also.

7             THE COURT:  Overruled.

8    BY MR. BORDENKIRCHER:

9    Q.   You would want to know who's actually paying the bill?

10   A.   Yes.

11   Q.   Providing service?

12   A.   Right.

13   Q.   Because you're for free and open, unambiguous legislation

14   and contracts, aren't you, sir?

15   A.   Yes, sir.

16   Q.   Because you want the taxpayers to know what they're

17   paying for?

18   A.   Taxpayers need to get their money's worth.

19   Q.   And they need to know what their money is being spent

20   for, don't they?

21   A.   Yes.

22   Q.   And that goes back to the $1.25 fund.  Once this

23   legislation passes, you want the person who's spending the

24   money to spend it for what's on the bill; right?

25             MR. N. HANLEY:  Judge, I object to it --

1          THE COURT:  Sustained.  It's outside the scope --

2          THE REPORTER:  I'm sorry, I'm not hearing you.

3          THE COURT:  Excuse me.  Outside the scope of the

4    direct.  I've already ruled on that.

5          MR. BORDENKIRCHER:  Just one second, Your Honor.

6       (Brief pause.)

7          MR. BORDENKIRCHER:  No further questions.

8          THE COURT:  Any followup?

9                    REDIRECT EXAMINATION

10   BY MR. N. HANLEY:

11   Q.   You talked to people about this bill; correct?

12   A.   Sir?

13   Q.   You talked to other people about this bill; correct?

14   A.   Yes.

15   Q.   And this was not a bill to combine the offices, was it?

16          MR. BORDENKIRCHER:  Objection, leading and calling

17   for hearsay.

18   BY MR. N. HANLEY:

19   Q.   Was this a bill to combine the office, or was this a bill

20   to let the people of Mobile County vote on it?

21   A.   This was a bill to allow the people of Mobile County to

22   vote on.

23   Q.   And plenty of people had input on this; correct?

24   A.   Yes.

25          MR. BORDENKIRCHER:  Objection, leading.

1    BY MR. N. HANLEY:

2    Q.   Did you have open meetings, hearings?

3              THE COURT:  Don't lead your witness.

4              MR. N. HANLEY:  Yes, ma'am.

5    A.   As I stated before, we had a public hearing on the

6    legislation that was proposed.

7    BY MR. N. HANLEY:

8    Q.   Did you have a public hearing last year?

9    A.   Yes.

10   Q.   Did you have a public hearing this year?

11   A.   Yes.

12   Q.   Did you have people that --

13             THE COURT:  These have already been asked and

14   answered.

15   BY MR. N. HANLEY:

16   Q.   Okay.  Now, Beth Marietta Lyons is the -- who is the

17   lobbyist for the County Commission?

18   A.   As far as I know, it's Beth Lyons.

19   Q.   You've been in Montgomery for the past few weeks?

20   A.   Yes.

21   Q.   Has Beth been up there?

22   A.   Yes.

23             MR. BORDENKIRCHER:  Objection, beyond the scope of

24   cross.

25             THE COURT:  Overruled.

1    BY MR. N. HANLEY:

2    Q.   And has she been lobbying?

3    A.   Yes.

4    Q.   Now, you don't know anything about this $1.25 fund, do

5    you?

6    A.   I recall when we passed that legislation, but that's, you

7    know, I don't know anything about it.

8    Q.   And you don't know that if Kim paid Jonathan Gray out of

9    this whether she did it knowingly or it was just a mistake?

10             MR. BORDENKIRCHER:  Object.  Object.  I would

11   object.  That's a leading question.

12             THE COURT:  Sustained.

13   BY MR. N. HANLEY:

14   Q.   Do you know whether she made a mistake or not?

15             MR. BORDENKIRCHER:  Objection, leading question.

16             THE COURT:  Overruled.

17   BY MR. N. HANLEY:

18   Q.   Do you know whether or not she made a mistake by paying

19   it out of this fund?

20   A.   I'm sure she made a mistake.

21   Q.   And do you know that when the mistake was uncovered --

22             MR. BORDENKIRCHER:  Objection, leading, calls for

23   information that's not covered in the direct or cross.

24             THE COURT:  I've sustained your objection.  Sit

25   down.

1    BY MR. N. HANLEY:

2    Q.   Do you know that Jonathan Gray paid it back?

3            MR. BORDENKIRCHER:  Objection.

4            MR. N. HANLEY:  That's in evidence.

5            THE COURT:  Overruled.

6    BY MR. N. HANLEY:

7    Q.   Did you know that Jonathan Gray paid the money back?

8    A.   I had heard he paid it back.

9            MR. N. HANLEY:  That's all.

10           THE COURT:  Thank you, sir.  Call your next witness,

11   please.

12       (Brief pause.)

13           THE COURT:  What's your witness' name?

14           MR. N. HANLEY:  Margie Wilcox.  Call Margie Wilcox.

15           THE WITNESS:  My legal name is Julia Margaret

16   Wilcox.

17           THE COURT:  Okay.

18           THE CLERK:  Ma'am, if you'd please raise your right

19   hand.

20                   JULIA MARGARET WILCOX,

21       having first been sworn, testified as follows:

22           THE CLERK:  You may be seated.

23                   <u>DIRECT EXAMINATION</u>

24   BY MR. N. HANLEY:

25   Q.   Would you state your name, please.

1    A.    Julia Margaret Wilcox.  And my nickname is Margie.

2    Q.    May I call you Margie?

3    A.    Please, sir.

4    Q.    Could you give me a little background to your background?

5    A.    Born and raised in Theodore, Alabama.  I own Yellow Cab

6    and Mobile Bay Transportation.  And I was elected to the House

7    District 104 last year.

8    Q.    Now, do you know Kim Hastie?

9    A.    I do.

10   Q.    And how do you know Kim Hastie?

11   A.    I've known Kim for most of my life.  We went to high

12   school.  She graduated with my brother.  When my brother was

13   in a nursing home, she helped us take care of him before he

14   died of MS.

15   Q.    So you are friends with her?

16   A.    Yes, sir.

17   Q.    Now, did there come a time last year that you began

18   talking to Kim about a bill, a proposed bill that would merge

19   the offices of the Revenue Commission and the License

20   Commission?

21   A.    Yes, sir.  I knew that that bill was something that she

22   was strongly considering.

23   Q.    All right.  And did there come a time when it got -- when

24   it got to Montgomery and there was actually some bills

25   drafted?

1    A.   Right.  I became a co-sponsor of the bill last year.

2    Q.   All right.  You were a co-sponsor of it?

3    A.   I was a co-sponsor last year, and I'm a sponsor this

4    year.

5    Q.   Now, did you educate yourself as best you could about

6    whether it was a good idea or not a good idea?

7    A.   Oh, I thought it was a great idea.  Anytime you can

8    consolidate and save the taxpayers money, that's basically

9    what we should do.

10   Q.   All right.  And is that something that your constituents

11   want you to do?

12   A.   Yes, sir.  My constituents are very much favor in less

13   government and less taxes.

14   Q.   And in your opinion, would this bill have brought less

15   government and less taxes?

16        MR. BORDENKIRCHER:  Objection.  It's calling for an

17   opinion.

18        THE COURT:  Overruled.

19   BY MR. N. HANLEY:

20   Q.   Would this bill have brought a more efficient and cheaper

21   government?

22   A.   Yes, sir.

23   Q.   And do you know a lady named Julia Magee?

24   A.   I do.  She is the Alabama State Department of Revenue.

25   She's on the Board of the -- the Governor's board of

1    directors -- or his cabinet.  Excuse me.

2    Q.    Do you know what she does?

3    A.    She handles basically the combined offices.  She does

4    both offices but at the state level.

5    Q.    And when you mean combined offices, you mean Revenue and

6    License?

7    A.    Yes, sir.

8    Q.    She does that at a state level?

9    A.    Yes, sir.  And it's a combined office at a state level.

10   Q.    This past year when it was going through the legislative

11   process, did you have public hearings?

12   A.    We did.  Our local committee met, and Ms. Magee came over

13   and spoke in favor of the bill to help answer any questions

14   that any of the other delegation members would have had.

15   Q.    Did she appear knowledgeable about the combined office --

16   A.    Very knowledgeable, yes, sir.

17   Q.    Okay.  And you say she has the combined office up in the

18   state --

19   A.    That was one of the points that she made.  When people

20   were saying that it couldn't be done, she was saying --

21              MR. BORDENKIRCHER:  Objection.  This is a consistent

22   hearsay from an out-of-court statement by a witness that's not

23   here.

24              THE COURT:  Don't say what Ms. Magee stated.  You

25   can only say that she spoke in favor, but don't say specifics

1    of what she said.

2              THE WITNESS:  Yes, Judge.

3    BY MR. N. HANLEY:

4    Q.   Okay.  Did that bill pass?

5    A.   The bill came out of committee with a favorable report,

6    and it was contested.  It was a six to four vote, and it was

7    contested by Representative Buskey, so it's not come up for a

8    vote on the house floor -- or I guess we're talking this year.

9    Q.   Now, I assume you talked -- you talked to your friend,

10   Kim, about the bill and how it was progressing; correct?

11   A.   Oh, yes, sir.

12   Q.   Did she ever have an opinion as to what the salary should

13   be?

14              MR. BORDENKIRCHER:  Objection if it calls for

15   hearsay, a statement from her.

16              THE COURT:  Overruled.

17   BY MR. N. HANLEY:

18   Q.   Did she ever give you an opinion as to what the salary

19   ought to be?

20   A.   No, she didn't.

21   Q.   Now, I understand the first -- do you understand what the

22   first iteration of the bill called for as far as salary goes?

23   A.   It was a percentage of the combined two, but that was --

24   that was something that even when -- it was coming up even

25   before committee -- prior to the committee meeting,

 1    Representative Buskey said, you know, he wanted that changed,

 2    so that was amended right away.

 3    Q.    Do you remember what the final draft, the salary was in

 4    it?

 5    A.    It was comparable to an officer in Montgomery.  And

 6    actually, it's Representative Buskey's niece, and she's the --

 7    she's the tax assessor or the revenue person in Montgomery.

 8    Q.    Did y'all do some research on various offices in the

 9    state and what they were paid?

10    A.    Right.  And that was about average.

11    Q.    That was about -- that's how you came up with that?

12    A.    Yes, sir.

13    Q.    I'd like to show you what's been marked for

14    identification -- or no -- into evidence as Defendant's

15    Exhibit 74 (indicating).

16              MR. N. HANLEY:  May I approach, Your Honor?

17              THE COURT:  Use the stand.  I said use the stand, if

18    you can.

19              MR. N. HANLEY:  Oh.

20              THE COURT:  I'm sorry.  Speak up.

21    BY MR. N. HANLEY:

22    Q.    Margie, I'm going to show you the front page of this

23    exhibit, which is Defendant's Exhibit 74 (indicating).

24              MR. N. HANLEY:  And is this in evidence?

25              THE CLERK:  I know that document is, but it's not 74

1   on your list.

2           MR. N. HANLEY:  Oh, no.  I'm sure it's not 74, but

3   70 --

4           THE CLERK:  77?

5       (Brief pause.)

6           THE CLERK:  I think it's 77, isn't it?

7   BY MR. N. HANLEY:

8   Q.   77.  Let me show you the front page (indicating).

9   A.   Can you show me the top of the front page too?

10  Q.   All right.

11  A.   Okay.

12  Q.   And I'm going to show you part of the body in which the

13  salary is discussed.  Do you see that (indicating)?

14  A.   Yes, sir.

15  Q.   Does that appear to be the final draft of the bill?

16  A.   It does.  The only thing I was looking for is at the top,

17  sometimes there's dates and numbers that show you at what

18  point that was.

19  Q.   But the final draft of the bill was a salary of 95,000?

20  A.   Yes, sir.

21  Q.   Do you know what Marilyn Wood is making right now?

22  A.   I think I've heard it's 90,000.

23  Q.   Just for the Revenue Commission?

24  A.   Correct.

25  Q.   And this year, was the bill also in consideration in

1    Montgomery?

2    A.   Well, that's what I was referring to.  I might have

3    gotten you confused.  I do have the bill introduced this year,

4    and it made it through the local house committee, the

5    delegation, but it was voted on six to four in favor in

6    committee.  But then Representative Buskey contested it, so

7    it's unable to come up on the house floor until he withdraws

8    his contest, but it's virtually dead.

9    Q.   Okay.  But it was voted six-four, but it's dead because

10   someone from one of the local delegations killed it?

11   A.   Right.  Local --

12              MR. BORDENKIRCHER:  It's leading.

13              THE COURT:  Don't lead your witness, please.

14   A.   In a local delegation meeting, you have to have -- you

15   know, one person can kill a bill in a local bill.

16   BY MR. N. HANLEY:

17   Q.   Now, Margie, is this a local bill or a constitutional

18   amendment?

19   A.   It's a local constitutional amendment, so it's both.

20   Q.   And as a constitutional amendment, will it require the

21   vote of the people?

22   A.   Yes.  It has to -- a constitutional amendment has to go

23   through a bunch of hoops, but the final, the final thing is a

24   vote of the people, and it has to be voted on by the majority

25   of the registered voters.

1    Q.   And what are the other pitfalls of a constitutional

2    amendment as opposed to just a local bill?

3    A.   Well, when you get out of your -- the body or the house,

4    one person can vote against it and send it statewide.  But

5    there's about 50 ways you can kill a bill, and a

6    constitutional amendment is one of those that it has to have,

7    I think, three-quarters of the house -- no, excuse me,

8    two-thirds of the house is the first body that it goes

9    through.  If one person votes no, that totally messes it up.

10   You have to make sure it comes out of committee.  One person

11   out of the local delegation can kill it.  And then it has to

12   go to the other body, and it can be left in the basket, it can

13   be killed in the Senate committee, it can be -- it has to have

14   two-thirds of that vote.  So it takes quite a bit to get a

15   constitutional amendment passed.

16   Q.   And did you know that the -- there could have been a bill

17   passed combining the offices, or do you know, just by a local

18   act?

19   A.   Yes.

20   Q.   And that would have been very much easier; correct?

21            MR. BORDENKIRCHER:  Objection, leading.

22   BY MR. N. HANLEY:

23   Q.   Would that have been easier or harder than a

24   constitutional amendment?

25   A.   Easier, because ultimately it wouldn't have had to go to

1  the vote of the people and it wouldn't have had the

2  requirements of so many people having the option of killing

3  it.

4  Q.  Do you know what Kim's position was on a vote?

5  A.  She felt very strongly that she wanted to know how the

6  voters of Mobile County felt, so she wanted a vote of the

7  people.

8  Q.  Were you aware that the first proposal by the Legislative

9  Reference Service was a local bill and it was rejected by Kim?

10  Did you know that?

11  A.  I didn't have firsthand -- I came up two weeks into the

12  session, but I knew all along that she wanted it to be a vote

13  of the people.

14          MR. N. HANLEY:  That's all, Your Honor.

15          THE COURT:  Mr. Knizley?

16          MR. KNIZLEY:  No questions.

17          THE COURT:  Mr. Bordenkircher?

18                    CROSS EXAMINATION

19  BY MR. BORDENKIRCHER:

20  Q.  Good afternoon, Ms. Wilcox.  How are you?

21  A.  I'm fine.  Thank you, sir.  And you?

22  Q.  Good.  My name is Greg Bordenkircher.  I'm with the

23  United States Attorney's Office.  We haven't met before, have

24  we?

25  A.  No.  Surprisingly, we haven't.

1   Q.   Now, an elected official cannot receive a pay raise while

2   they're in that position unless there's a constitutional

3   amendment; is that correct?

4   A.   I think that an elected official can't receive a pay

5   raise while it's in their -- in other words, if they're

6   elected to that spot, they can't get the pay raise until the

7   next go around.

8   Q.   Or if there's a constitutional amendment, they can get a

9   pay raise at that time; isn't that correct?

10  A.   I wouldn't be able to agree or disagree with that.  I

11  just have always thought that you couldn't get it unless --

12  until your next go around.

13  Q.   Now, you and the Defendant are close friends; is that

14  correct?

15  A.   Yes, sir.

16  Q.   In fact, she was your campaign manager in 2014, wasn't

17  she?

18  A.   No, sir.  My mom was.

19  Q.   She wasn't on your campaign?

20  A.   She was -- she supported me but, no, she was not part of

21  my campaign committee.  My mom was my campaign chair, and then

22  Teresa Horton Herrington and Karen Peacock Hoof were the

23  little deputies.

24  Q.   And do you remember when Ms. Hastie ran in 2008, don't

25  you?

1   A.   Yes, sir.

2   Q.   And you helped run her campaign at that time, didn't you?

3   A.   I did.  I was her campaign finance chair.

4   Q.   I show you what's been marked as Government's Exhibit

5   Number 47 (indicating).

6   A.   That would be my signature, yes, sir.

7   Q.   So in 2008, you were helping her with her campaign?

8   A.   I did.  I was very much for 10-minute tags.

9   Q.   Okay.  And do you know who actually wrote the software

10  for 10-minute tags?

11  A.   I know that Victor Crawford is the IT guy.

12  Q.   Did you know that he developed that?

13  A.   Did he develop what?

14  Q.   The 10-minute tag program.

15  A.   No, he did not.  Kim did that.

16  Q.   Oh.  Then Kim did the -- she did the computer work for

17  the 10-minute tag?

18  A.   No.  She's the one that came up with the campaign slogan.

19  She's the one that ran on the campaign of 10-minute tags.

20  That's why the voters elected her, and that's what she did.

21  Q.   Now, I know she's saying she came up with the slogan, but

22  I'm asking you was she the person that developed the program

23  to do that?

24  A.   As I understand, Mr. Crawford had been there for almost

25  20 years, and 10-minute tags only came after Kim was elected.

1    Q.   I guess my question to you is:  Do you know did she do

2    the software?

3    A.   Kim is not a programmer, no, sir.

4    Q.   Did she work -- so she didn't write the program.  We can

5    agree on that?

6    A.   Yes, sir.

7    Q.   And she didn't do the technology work on it.  We can

8    agree on that, can't we?

9    A.   We can agree on that if we both can agree that it doesn't

10   just take software to implement that.

11   Q.   Well, that brings up an interesting point.  You said that

12   you were in favor of your friend merging the two offices

13   together; is that correct?

14   A.   Yes, sir.

15   Q.   So --

16   A.   I felt like she had done so well with the 10-minute tags

17   that she could bring in pretty much to the Revenue Office as

18   well.

19   Q.   So you're familiar with the Revenue Office?

20   A.   Yes, sir.

21   Q.   So tell me what their budget is.

22   A.   Oh, I wouldn't be able to tell you their budget, but I

23   can tell you their customer service.

24   Q.   So do you know the amount of revenue they take in every

25   year?

1    A.   No, sir.

2    Q.   Do you know what's in their bank account?

3    A.   No, sir.

4    Q.   Do you know how many employees they have?

5    A.   No, sir.

6    Q.   Do you know what kind of computer system that they have?

7    A.   I know they just upgraded their online payment system, so

8    I know that they're going through some sort of an upgrade now.

9    Q.   So tell me what that is, please.

10   A.   When you can pay your taxes online.

11   Q.   The One Stop?

12   A.   Yes, but --

13   Q.   That was developed in the State of Alabama, wasn't it?

14   A.   I don't know because when I pay my property taxes in

15   Florida, it's much easier online.  And then in Mobile, I know

16   one time -- I just have firsthand knowledge that my own

17   personal housenote went up over a thousand dollars a month,

18   and it was due to an error in the Revenue Commissioner's

19   Office.  And I found that they were not in a hurry to help me.

20   It took me all day on the phone to convince them of their

21   error.  And not until I called the County Commission, I don't

22   know if y'all know what it's like to have your home mortgage

23   go up a thousand dollars a month, but that's a big deal in a

24   family budget.

25   Q.   I'm sure it is.  So -- to get back to my question:  Do

1  you know what the budget is for the Mobile County License

2  Commission?

3  A.   No, sir.

4  Q.   What was their 2000 -- you were supporting this bill in

5  2014?

6  A.   Yes, sir.

7  Q.   Then you must have done research comparing the budget for

8  one and the budget to the other; right?

9  A.   Well, the knowledge that I used was, number one, Kim had

10  lived up to what she said on the License Commission --

11  Q.   I'm asking you.  I'm asking do you know the budget --

12         THE COURT:  Wait.  Let her finish answering her

13  question.

14  A.   And then my other experience is that I merged two of my

15  offices and saved quite a few monies, so it wasn't unrealistic

16  to me that by combining offices you would -- number one, you'd

17  have the person at the top, the manager, which would be the

18  Revenue or the License Commissioner, with their salary and

19  benefits and car, that would be, I would think, about

20  $200,000.  You'd have your IT, your law.  So there was a bunch

21  of departments that I could see right off the top going to --

22  the exact figure?  I assumed Ms. Hastie would be the one to

23  come up with that.

24      But no, sir, I didn't delve down into their everyday

25  budget.  Like I said, she had done what she said she was going

1   to do with the License Commission.  That very much gave her

2   the benefit of the doubt she would do it with this.

3   BY MR. BORDENKIRCHER:

4   Q.   Well, you -- so you brought up an issue of an employee at

5   the Mobile County Commission, and you said their total costs

6   would be $200,000.  It's just not what the salary they'd get.

7   Actually, an employee is more expensive than just their

8   salary, isn't it?  Isn't he -- or she?

9           MR. N. HANLEY:  I don't think that's what Ms. Wilcox

10  testified to.

11          THE COURT:  Overruled.

12  A.   Salary and benefits.

13  BY MR. BORDENKIRCHER:

14  Q.   Right.  And so it's salary plus benefits?

15  A.   Right, and then car.

16  Q.   Right.  So your -- if I was paid $10 an hour and I worked

17  for you, and I was a W-2 employee, it's just not the $10 I

18  get, is it?  I'm more expensive to you as a business owner

19  than that.  You used to own a business, didn't you?

20  A.   I still do.

21          MR. N. HANLEY:  Judge, I object.  That's about three

22  questions that he asked her.

23          THE COURT:  Just limit it to one question at a time.

24  BY MR. BORDENKIRCHER:

25  Q.   So when you hired an employee -- you own a business now;

1   isn't that right?

2   A.    I do.

3   Q.    And what business is that, please, ma'am?

4   A.    I own Mobile Bay Transportation and Yellow Cab.

5   Q.    Okay.  And so if you have a W-2 -- do you know the

6   difference between a W-2 employee and a contract employee?

7   A.    Yes, sir, I do.

8   Q.    And if it's -- you're a W-2 employee, if you're paying me

9   $10 to drive the cab, but I'm on -- working for your company

10  and I get a full benefits package, am I -- only cost you $10

11  or do I cost you more?

12  A.    Are you -- we were talking about the Revenue Commission's

13  Office.

14  Q.    I'm just asking you a question.  Do you know?

15         MR. N. HANLEY:  I object.  This is beyond the scope

16  of direct.

17         THE COURT:    Sustained.

18  BY MR. BORDENKIRCHER:

19  Q.    So do you know -- are you aware of the -- you're not

20  aware of the budget at the Mobile County License Commission,

21  are you?

22  A.    No.

23  Q.    So we don't get confused.  And you're not familiar with

24  the costs, are you?

25  A.    No, sir.

1    Q.   Or the revenue that's taken in, are you?

2    A.   No, sir.

3    Q.   What's in the bank?

4    A.   The knowledge that I have of both of those offices is

5    it's their responsibility to take the money in and pay it out.

6    So I don't know that they actually have a --

7    Q.   So is it your understanding that all the money for the

8    Mobile County License Commission has got to go back to the

9    Mobile County Commission?

10   A.   It generally gets paid out, yes, sir.

11   Q.   Are you aware of their segregated funds?

12           MR. N. HANLEY:  I object to it, beyond the scope.

13           THE COURT:  Overruled.

14   A.   I'm sorry?

15   BY MR. BORDENKIRCHER:

16   Q.   Are you aware of their segregated funds?

17   A.   I would assume that there would be.  I would --

18   Q.   I'm sure in your research of this, you're familiar with

19   House Bill 117, the $1.25 fund, where the taxes were raised

20   for the people of Mobile County to pay for technology at the

21   Mobile County License Commission.  You're familiar with that,

22   aren't you?

23   A.   Yeah.  When was that passed?

24           MR. N. HANLEY:  Your Honor, I object to the --

25           THE COURT:  Wait just a minute.  Sustained.

1    BY MR. BORDENKIRCHER:

2    Q.   Are you or are you not familiar with that?

3            THE COURT:  I sustained the objection.  Move on from

4    the $1.25 fund, please.

5    BY MR. BORDENKIRCHER:

6    Q.   So are you aware of the segregated funds?

7            MR. N. HANLEY:  I object to it, Your Honor.

8            THE COURT:  She's already answered that question.

9    Move on.

10   BY MR. BORDENKIRCHER:

11   Q.   Do you know who Jon -- Jonathan Gray is?

12   A.   I do.

13   Q.   And who is he, please, ma'am?

14   A.   Jon Gray runs a company called Strategy, and he was my

15   professional campaign manager.  I had my volunteer, and he was

16   my campaign manager strategist.

17   Q.   So did you pay him?

18   A.   I did.

19   Q.   How did you pay him, please?

20   A.   By check.

21   Q.   And of what fund?

22   A.   Out of my campaign fund.

23   Q.   You paid him out of your campaign fund?

24   A.   Yes, sir.

25   Q.   Would it be proper for you --

1          MR. N. HANLEY:  I object.  This is beyond the scope

2    of direct.

3          THE COURT:  Sustained.

4          MR. BORDENKIRCHER:  It goes to impeachment, Your

5    Honor.

6          THE COURT:  Whether she paid out of the campaign

7    fund?  And your next question is what's appropriate.  How is

8    that impeachment?

9          MR. BORDENKIRCHER:  No.

10   BY MR. BORDENKIRCHER:

11   Q.   Did you pay it out of the campaign fund?

12   A.   Out of my --

13          MR. N. HANLEY:  I object as being beyond the scope,

14   Your Honor.

15   BY MR. BORDENKIRCHER:

16   Q.   Did you pay Jon Gray out of your campaign fund?

17          THE COURT:  I overruled your objection.  Let her

18   answer this question.

19   A.   What was the question again?

20   BY MR. BORDENKIRCHER:

21   Q.   You said that Jonathan Gray was a professional consultant

22   that you hired; am I correct in that?

23   A.   Yes, sir.

24   Q.   Now, did you pay him -- did he charge you?

25   A.   Yes, he did.

1  Q.   Did you pay him out of your campaign fund, or did you pay
2  him out of taxpayers' funds?
3  A.   I would have no access to taxpayers' funds.  He was
4  specifically hired for my political campaign.  He does
5  campaigns for a lot of different people and a lot of different
6  strategies, and he also does work for the DOT.  He does work
7  for a bunch of entities.
8  Q.   So is it your testimony here it would be improper to pay
9  him out of taxpayer funds?
10  A.   Well, it's done every day by the DOT.
11  Q.   Do they have a -- do you know how the Mobile County
12  Commission works?
13  A.   Yes, sir.  Well, I mean, I have a general knowledge of
14  the County Commission.
15  Q.   Do you know how the -- their budgetary process works?
16  A.   I do -- I am not well versed on their budget, so please
17  don't fire me with questions about that.
18  Q.   Are you aware that they require a contract for services?
19  A.   Yes, sir.
20          MR. N. HANLEY:  I object.  This is beyond the scope
21  of direct.
22          THE COURT:  Sustained.
23  BY MR. BORDENKIRCHER:
24  Q.   Now, were you aware that Jonathan Gray worked on the
25  legislation we were just talking about?

1    A.   Yes, sir.

2    Q.   On behalf of Defendant Hastie?

3    A.   On behalf of the License Commissioner's Office, yes.

4    Q.   On behalf of the License Commissioner's Office.  Now, are

5    you aware how Jon Gray was paid?

6              MR. N. HANLEY:  Judge, it's beyond the scope.

7              THE COURT:  Overruled.

8    A.   Only what I've read.  So, yes, I understand he was paid.

9    BY MR. BORDENKIRCHER:

10   Q.   How?

11             MR. N. HANLEY:  If she's only heard it, it's

12   hearsay, Your Honor.

13             THE COURT:  Sustained.

14   BY MR. BORDENKIRCHER:

15   Q.   Did you -- were you in flyers?  Were you and Kim Hastie

16   in flyers together for your run in 2014?

17             MR. N. HANLEY:  I'm sorry, I didn't hear it, Your

18   Honor.  I'm sorry.

19   BY MR. BORDENKIRCHER:

20   Q.   Flyers, handouts, pictures of you two together?

21   A.   For my campaign?

22   Q.   Yes, ma'am.

23   A.   Oh, yes, sir.  Her and Connie Hudson did a flyer for me.

24   Bess Rich did a flyer for me.  So I was very appreciative of

25   the girl power during my campaign.

1   Q.   I'd like to show you what's marked as 212, which purports

2   to be a photostat copy of the flyer that you and the Defendant

3   were in.

4   A.   Can you crank down a little bit more on that?  I cannot

5   read it but --

6   Q.   Sure.

7   A.   All right.  Yeah.  Okay.  There you go.  Yeah.  "Working

8   Together For Our Community."

9   Q.   Is that correct?  That's a flyer y'all did?

10  A.   Yes, sir.

11  Q.   And the other one there too (indicating)?

12  A.   Yes, sir.

13  Q.   Is that a fair and accurate representation of that?

14  A.   Yes, sir.

15          MR. BORDENKIRCHER:  I'd enter Government's Exhibit

16  Number 212.

17          MR. N. HANLEY:  I object to it; beyond the scope,

18  plus relevance.

19          THE COURT:  Overruled.  It's admitted.

20      (Government's Exhibit 212 was received in evidence.)

21  BY MR. BORDENKIRCHER:

22  Q.   Now, has your business -- you said a taxi cab company?

23  A.   And Mobile Bay Transportation.  I founded Mobile Bay

24  Transportation in 1991, and then I bought Yellow Cab in 2007.

25  It's been in business since 1922.

1   Q.   Did you have an agreement with the Defendant Hastie where

2   you could come to the back door and wouldn't have to wait in

3   line to get your revenue -- your tags done?

4   A.   Well, what I liked about what Kim did was -- and if

5   you'll allow me --

6   Q.   Well, first just answer that question.  You know, when

7   you normally walk in --

8   A.   Uh-huh.

9   Q.   -- like everybody else, you walk in, you have your tags,

10  and you run through.  Did you do that, or did you get -- have

11  a different treatment?

12  A.   Well, if you'll allow me --

13  Q.   Yes or no.  Did you go in the front like everybody else

14  or --

15        THE COURT:  You'll be able to explain your answer.

16  BY MR. BORDENKIRCHER:

17  Q.   -- did you go in the back?

18  A.   Yes, sir.  I went in the back door.

19        THE COURT:  You may explain your answer.

20  A.   Thornton Price-Williams, when he was the License

21  Commissioner, he had a lady down there named Ms. Daisy.  And

22  anytime you had to buy multiple tags, you had multiple

23  transactions, Thornton Price-Williams would have you drop off

24  everything with Ms. Daisy, you'd leave a blank check, and Ms.

25  Daisy would call you and tell you how much she made the blank

1  check out to because there was, in his opinion, or at least in

2  my experience in doing business with him, he did not want the

3  line to be held up if somebody was just coming to buy one tag

4  with somebody like me, who was buying multiple tags.

5       So when we had Ms. Norris in there, she did away with all

6  that.  So then, yes, sir, me or one of my staff would have to

7  sit down there all day, but then it would also keep a clerk

8  half of a day, if not all day, holding up the line.

9       So I was -- I welcomed the efficiency to not hold up the

10 other people, but I was never allowed to drop off a check.  I

11 had to sit there -- I do have to sit there and wait while they

12 process it.

13 BY MR. BORDENKIRCHER:

14 Q.  Now, do you know anyone else who had this backdoor

15 policy?

16       MR. N. HANLEY:  I object to the term "backdoor

17 policy."

18       THE COURT:  Overruled.

19 A.  Do I know anybody else that has a --

20 BY MR. BORDENKIRCHER:

21 Q.  That can go in the back door like that.

22 A.  I have no firsthand knowledge of anybody because --

23 Q.  So as far as you know, it was just you?

24 A.  Oh, no.  I mean, I've heard that other people that have

25 multiple tags or they have a special problem or something that

1    sometimes she's -- you know, Kim, even when she was in the

2    bathroom one time, somebody told her about a problem with a

3    tag, she writes it down and she takes care of it.  So I was --

4    I've seen her take care of a bunch of people in a sweet and

5    very good manner and that she cared about how they were

6    treated.

7    Q.   My question, I guess, to you was:  From your firsthand

8    knowledge, do you know anyone else that had -- would go in the

9    back door like you?

10   A.   I think I know one friend that has told me that he did,

11   that he goes in the back door.

12   Q.   And who is that?

13   A.   That was a guy that used to work with me, Mark Barlow.

14   Q.   So it's still for your company?

15   A.   No.  This is his own personal stuff.  I mean, he used to

16   do it for me back when he used to work for me, but he doesn't

17   anymore.

18   Q.   Are you familiar with this case?

19   A.   Yes, sir.

20   Q.   Have you talked to the Defendant Hastie about it?

21   A.   Oh, yes, sir.

22   Q.   And what she's told you about -- has she told you about

23   what's gone on in the trial?

24   A.   What do you mean?  No.  I mean, I know Kim.  I know this

25   trial is going on.  I've been knowing for a year that this

1    trial was going on.  I was more shocked that the FBI never

2    came and questioned me because I was one of the co-sponsors of

3    the legislation.  So if they wanted to know about that, why

4    wouldn't they have come and interviewed the people that

5    introduced it?

6    Q.    But that legislation never got passed, did it?

7    A.    No.  But, I mean, I'm still introducing it.  If you want

8    to know the history of it, I would have thought somebody would

9    have come and checked the origin.

10   Q.    Are you familiar with how the company Stratego was paid

11   in this case?

12             MR. N. HANLEY:  I object to Stratego, Your Honor.

13   It's beyond the scope.

14             THE COURT:  Sustained.

15   BY MR. BORDENKIRCHER:

16   Q.    Has Ms. Hastie told you about the specific elements of

17   this case?

18             MR. N. HANLEY:  I object to it, Judge.  It's beyond

19   the scope also.

20             THE COURT:  Overruled.

21   A.    I've read more in Lagniappe than I have, I guess, been

22   told directly, I'd say.

23   BY MR. BORDENKIRCHER:

24   Q.    I guess my question is:  Has she told you directly things

25   about this?

1   A.   We've talked about it.

2   Q.   Lately?

3   A.   No, sir.

4   Q.   So when was the last time you talked about it?

5   A.   What do you mean?  Like how are things going?

6   Q.   No, about the actual case, not about -- just about the

7   case.  I'm not asking --

8   A.   Well, I was down here a few weeks ago during the tax

9   case.  I was down here showing my support for Kim.

10  Q.   Did you talk about that with her?

11  A.   No.  I mean, I don't know anything about her taxes.  I

12  was down here in support, to show love and support like

13  friends do.

14  Q.   She's a good friend of yours?

15  A.   She is.  I spoke out on the steps of the courthouse, you

16  know.

17  Q.   You've spoken in public, and you don't want anything bad

18  to happen to her, do you?

19  A.   No, because I think she's one of the most servant elected

20  officials that we have.  You know, she really does -- it

21  really does -- like I said, we've -- any time we've been

22  anywhere and somebody has a question, she tells them, I want

23  to hear good, bad.  I see her take out a piece of paper, write

24  it down.  I mean, she really cares about the experience that

25  people have when they come to her office.

1   Q.   Have you -- you haven't sat in on any of this case, have
2   you?
3   A.   Oh, no, sir.  I've been in Montgomery.
4   Q.   You haven't seen any of the evidence?
5   A.   No, sir.
6   Q.   Haven't heard what any of the witnesses said?
7   A.   No.  Well, I read in Lagniappe.  Is that bad?  And I read
8   in al.com.
9   Q.   Have you talked to anybody -- besides what you read.  So
10  you've read about the case in the newspaper, but besides that,
11  has Ms. Hastie told you about this?
12  A.   No.  All I've done is basically said, you know -- called
13  and said, I love you, I'm thinking of you, I support you, you
14  know.
15  Q.   So would it be fair to say that really all you know about
16  this case is what Ms. Hastie's told you and her attorneys?
17  A.   And what I've read.
18  Q.   And what you've read.  So you don't actually have any
19  knowledge of the contracts or the bills or who signed what or
20  any audio or videotapes, do you?
21  A.   Well, once again, Jason, I keep bringing up Lagniappe.
22  They had the audios in a Lagniappe article one time.  So,
23  yeah, I listened to those.
24  Q.   But other than that, would the answer be yes or no,
25  ma'am?

1    A.   No.  Other than Lagniappe and al.com and just the

2    generalities, I have not.

3              MR. BORDENKIRCHER:  Okay.  Thank you very much.

4              THE COURT:  Any redirect?

5              MR. N. HANLEY:  No, thank you.

6              THE COURT:  Thank you, ma'am.  Call your next

7    witness.

8         (Brief pause.)

9              THE CLERK:  Sir, if you'd please come forward.

10             MR. N. HANLEY:  Call Jonathan Gray.

11             THE CLERK:  Mr. Gray, if you'd please raise your

12   right hand.

13                       JONATHAN GRAY,

14        having first been sworn, testified as follows:

15             THE CLERK:  You may be seated.

16                     <u>DIRECT EXAMINATION</u>

17   BY MR. N. HANLEY:

18   Q.   Would you state your name, please.

19   A.   Jonathan Gray.

20   Q.   Is your -- is that microphone on?

21   A.   No.  Jonathan Gray.

22   Q.   Mr. Gray, could you please give me a little bit of your

23   background?

24   A.   Professionally?

25   Q.   Well, just where did you grow up?

1    A.   Here in Mobile.

2    Q.   And you attended school here?

3    A.   Yes, sir.

4    Q.   Where?

5    A.   St. Paul's.

6    Q.   And did you attend college?

7    A.   Yes, sir.

8    Q.   Where did you attend college?

9    A.   University of Alabama.

10   Q.   Did you get a degree?

11   A.   I did.

12   Q.   What was your major?

13   A.   Entertainment management.

14   Q.   And for -- what did you do after you got out of college?

15   A.   I worked for Walt Disney Company.  I was a producer in

16   the entertainment business.  We produced shows at parks; also

17   half time shows.  I was part of the team for Euro Disney;

18   number of different projects for the Walt Disney Corporation.

19   Q.   When did you graduate from college?

20   A.   '94.

21   Q.   And how long did you work in the entertainment business

22   with Disney?

23   A.   It preceded my finishing college.  Four years, I believe,

24   off and on.

25   Q.   So you worked with them while you were going to college

1    or in gaps?

2    A.    Yes, sir.  My degree became part of that work experience.

3    It was -- I was entered into honors college there, what they

4    call the New College Division, where you could set your own

5    degree program.  And so I did that while working with the Walt

6    Disney Company.

7    Q.    And you worked for them for how many years?

8    A.    Approximately two years after college.

9    Q.    Where did you -- what did you do after that?

10   A.    I moved to New York City and got into the music business.

11   I went to work in artist management, managing a number of

12   multi-platinum artists from John Mellancamp all the way to

13   Pearl Jam and Motley Crew.  And the Cranberries were

14   particular artists that, I guess, in the way of the -- like

15   the artist management business works, you have responsible

16   artists that you're responsible for their day-to-day

17   activities, but then you also collaborate as part of a team in

18   management.  My particular artists that I was responsible for

19   at least in North America were the Cranberries.

20   Q.    How long did you do that?

21   A.    For about two-and-a-half, three years.

22   Q.    And then what did you start doing?

23   A.    My father passed away, I moved back home, went to work

24   for Steve Windom, who was running for Lt. Governor, through a

25   long range of decisions in my life of where I wanted to go and

1   what I wanted to do.

2   Q.   Well, how did you -- is that the start of your public

3   relations business of your PR or marketing experience?

4   A.   Well, I mean, in the music industry, it's kind of based

5   on public relations and marketing.  I've made the joke to many

6   people that there's not a lot of difference between the music

7   business and the political business.  There's a cycle

8   difference.

9        One of my clients threatened the IRA, the lead singer for

10  the Cranberries, so I kind of had a little political disaster.

11  But in Alabama, the beginning of my political work was in

12  1997.

13  Q.   And that was for Mr. Windom?

14  A.   Yes.

15  Q.   And did you work that campaign?

16  A.   Yes.

17  Q.   And where did you end up after that?

18  A.   Working for Governor Windom's office.

19  Q.   Working for him while he held political office?

20  A.   Yes, sir.

21  Q.   And what were the nature of your duties -- and when was

22  that?

23  A.   1999, we were sworn in.  Transition started November of

24  '98, I believe, and we would have been sworn in around

25  January 27th-ish.

1   Q.   And what was your position, or what was your title?

2   A.   Administrative assistant.  I think there's, like, three

3   different titles there.  Depends if it was the transition

4   period, I was the chief during the transition period.

5   Q.   Chief what?

6   A.   Just chief.  There wasn't a particular title one way or

7   the other.  And as we went into the legislative session once

8   he was sworn into office, there were three of us, we were

9   administrative assistants.

10  Q.   And how long did you work there?

11  A.   A little less than a year, the first legislative session.

12  Q.   What were your duties?

13  A.   Day-to-day operations of the office, the media

14  communications, strategic planning.  We all kind of shared

15  responsibilities.  Administrative assistant in the political

16  world has a different title or meaning than it does in what we

17  would call the corporate world.  Whereas it's not a

18  secretarial function, it's more of a management function in

19  the delivery of policy and development of legislation.

20  Q.   And what did you mean when you said there's a media

21  function?

22  A.   Well, we had a lot of press.  Lt. Governor Windom was the

23  first Republican elected in a hundred years, and we were

24  adverse to Democratic Governor Don Siegelman.  And there were

25  many battles that ensued during that time period, and we dealt

1    a lot with the media.

2    Q.   Did you do any marketing work then?

3    A.   Not really.

4    Q.   Did you deal with the Legislature?

5    A.   I did.

6    Q.   And what were your -- what did you do as far as the

7    Legislature goes?

8    A.   Review bills, policy, helped set agenda, develop rules

9    for the Senate.  In that particular time, we developed several

10   series of rules.  There was an attempt by the Republicans to

11   take back control of the Legislature from the Democrats.  The

12   Republicans had not secured a majority of senators, and so

13   there was an attempt to try and take away power from the

14   Democrats, so we had several developments of the rules.  The

15   rules are what the body operates by.  It's essentially the law

16   within the law of how something is developed, and we spent a

17   tremendous amount of time on that.

18        Lt. Governor Windom was sued during that period.  We had

19   probably one of the most controversial constitutional trials,

20   and there was a lot of preparation work for that as well.

21   Q.   Okay.  Did you begin to be familiar with the workings of

22   the Legislature during that period of time?

23   A.   I did.

24   Q.   And you say you worked there for a year?

25   A.   Yes, sir.

1    Q.   And then what did you do?

2    A.   I ran as quickly as I could.  I came back home and got

3    into the public relations and marketing business.

4    Q.   Okay.  And what year would that have been, approximately?

5    A.   '99-2000-ish.  I want to say maybe September of '99, end

6    of the year.

7    Q.   And what form did that work take?  I mean, did you form

8    your own company?  Did you go work with somebody?  Did you

9    take up a partner or what?

10   A.   I went to work for a company named Denson Reed, who was

11   located in Mobile.

12   Q.   And are they still here?

13   A.   I don't believe so, not by name anyway.

14   Q.   Okay.  And what did Denson Reed do?

15   A.   Advertising and marketing, public relations work once I

16   came on board.

17   Q.   Public relations was your forte then?

18   A.   Yes, sir.

19   Q.   Can you -- how long did you work for them?

20   A.   Two years, year-and-a-half.

21   Q.   Did you have -- what kind of clients did you have?  Who

22   did you work for?

23   A.   I had kind of sworn off political clients; very

24   controversial past in the Lt.  Governor's race in 1998, so I

25   wanted to do other things.  I worked on a couple of

1    telemarketing clients, tourism clients, dealt a little bit

2    with corporate crisis work, branding campaigns, that kind of

3    stuff.

4    Q.   And how would you describe it, public relations?

5    A.   Yes, sir.

6    Q.   Marketing?  What would be the term?

7    A.   There are all kind of art of terminology, so to speak.

8    The real difference is public relations is really the more

9    crafting of a message, whereas advertising and marketing are

10   delivery or persuasion of the message.

11   Q.   So what did you do after you worked there?

12   A.   I started my own company, Strategy Public Relations, in

13   2001.

14   Q.   So for the past approximately 14 years, that's what you

15   have done?

16   A.   Yes, sir.

17   Q.   And starting out at Strategy Public Relations, what kind

18   of clients did you have?

19   A.   We took a lot of the same clients from the company.  The

20   company that I was with, the owner there had actually

21   encouraged me to start my own business.  Another partner from

22   a competitive firm had wanted to do this, and so we got

23   together, so we were allowed to bring some of our clients with

24   us.  So it would have been the same, technology, industry,

25   tourism.  And I'm lumping really big sectors together.

1   Q.    And the same type of work that you described to the jury

2   that you were doing, the same type?

3   A.    Yes, sir.  Yes, sir.

4   Q.    Public relations type of things?

5   A.    Yes, sir.

6   Q.    And you -- tell me again the difference between public

7   relations and advertising?

8   A.    Well, can I give you an example?

9   Q.    Yes.

10  A.    In the public relations business, if a client comes to me

11  and they say, we have a problem getting our name out there, I

12  might recommend putting yard signs in front of their business,

13  or I might recommend putting out literature to people at, you

14  know, convenient locations.

15       Someone in the advertising business would want you to buy

16  a billboard or they would want you to go on television because

17  the essence of their business is driven by commissions through

18  ad sales.  So for me, it's more about how you craft a message,

19  looking at all the different tools available, how do you

20  communicate this to the public.

21       People that are in the advertising and marketing

22  business, they are usually driven to a point and they are

23  trying to actually figure out a methodology that they usually

24  use to communicate that message.  So for public relations, I'm

25  less interested in the delivery method.  I'm more interested

1    in the message itself.

2    Q.    And did you continue working with private companies and

3    corporations and businesses?

4    A.    No.  I wouldn't have labeled any of them in any of the

5    instances either private or public.  I mean, we've worked with

6    public and governmental groups for years as far back as I can

7    remember, at least through Denson Reed.

8    Q.    Okay.  After Denson Reed, what type of public offices

9    have you worked for?  Who have you worked for?  What public

10   offices have you done public relations for in the past?

11   A.    Yes, sir.  The governor's office, attorneys general,

12   elected officials within the Legislature, county commissions,

13   school boards, Department of Justice, probably others that I'm

14   not thinking of right now, different boards and entities that

15   come about.  Grant funding as well, I guess, would essentially

16   be called governmental.

17   Q.    And you would be doing public relations for these

18   governmental bodies; correct?

19   A.    Yes, sir.

20   Q.    And you would be paid by them; correct?

21   A.    Yes, sir.

22   Q.    And that would be taxpayer money?

23   A.    Yes, sir.

24   Q.    And there's nothing wrong with that; correct?

25   A.    No.

1              MR. KALAYOGLU:  Objection, Your Honor, leading.

2              THE COURT:  Overruled.

3    BY MR. N. HANLEY:

4    Q.   It's not only done by you, but it's done by political --

5    I mean, advertiser -- public relations people all over the

6    country, if you know; is that right?

7    A.   "It" being what?

8    Q.   Doing public relations work for government?

9    A.   Oh, absolutely.  There's a -- political consultants are a

10   very large industry, yes, sir.

11   Q.   And it has been specifically approved that as long as --

12   is it specifically okay as long as it's for a public purpose;

13   is that right?

14   A.   Well, there's different types of work.  If you're

15   referring -- there's -- it could not be for a personal purpose

16   but for a public purpose, yes.

17   Q.   It could not be for a personal purpose?

18   A.   Yes.

19   Q.   And I think at some time, anyway, you got back into the

20   campaign business?

21   A.   Yes, sir.

22   Q.   Okay.  And when you run campaigns, you don't get paid by

23   the public body, do you?

24   A.   No, sir.

25   Q.   How do you get paid?

1    A.   By the candidates who are running for office.

2    Q.   So is there a clear distinction between those two?

3    A.   Oh, yes, sir, very much so.

4    Q.   Would you take public taxpayer money to run a political

5    campaign?

6    A.   For a person seeking public office?  No.

7    Q.   Now, somewhere in 2014, did you -- were you hired by the

8    License Commissioner of Mobile County to do something for

9    them?

10   A.   Yes, sir.

11   Q.   Okay.  And did you talk to her?  Did you have discussions

12   with her about the bill?

13   A.   Yes, sir.

14   Q.   And eventually, you were hired; correct?

15   A.   Yes, sir.  After several conversations, we came around to

16   an agreement, yes, sir.

17   Q.   And what was the agreement?  What were you going to do?

18   A.   I was going to help her craft a strategy to develop a

19   bill and eventual adoption by the voters of Mobile County to

20   combine the offices of License Commissioner with Revenue

21   Commissioner.  Through that strategy, we would adopt

22   legislation and communicate to the people of Mobile County

23   what the intentions and benefits of that would be.

24   Q.   Now, how much were you paid?

25   A.   $10,000.

1   Q.   Was this an exorbitant fund, not enough money, or about

2   right, if you can give me your opinion on that?

3           MR. KALAYOGLU:  Objection, Your Honor, leading.

4           THE COURT:  Overruled.

5   BY MR. N. HANLEY:

6   Q.   Was it a fair fee?

7   A.   Yes, sir.

8   Q.   And tell me why.

9   A.   Well, I was hired Friday at $2,500 a month for six months

10  from another company.  There's no real formula to how we set

11  retainers.  It's kind of based on how much time you think

12  you're going to have invested in something.  And time in my

13  business is a risky item because if you make the wrong

14  decision, you can spend a lot of time on something and get

15  paid not very much money.

16          We were talking about something that was going to

17  traverse approximately a year.  The Legislature is a very

18  difficult place to navigate.  The bill we were talking about

19  was proposed to be in, quite frankly, the most complicated

20  fashion you could propose it, and then we were going to have a

21  vote for the people, and I was going to be on board for the

22  whole ride.

23  Q.   And you say this was going to take you a year?

24  A.   Well, the election would have been the presidential

25  preference so, yes, sir.

1  Q.   Now, could you have helped her, and could a bill have

2  been drafted, a local bill that would not --

3  A.   I'm sorry, I said presidential preference, and I meant

4  the general of '14.  I'm sorry.

5  Q.   Could a bill have been drafted, just a local bill, that

6  would not require the vote of the people?

7  A.   Yes.  I recommended that.

8  Q.   And did she agree?  Did Kim agree?

9  A.   No.

10  Q.   Why not?

11  A.   Kim wanted the people to vote on the bill.  It was

12  unusual but she, you know, felt very strongly about it.  I

13  tried to talk her into a different way.  It would have been

14  cheaper, it would have been quicker, but she wasn't

15  interested.

16  Q.   The cheaper way would have been what?

17  A.   To do a local bill.  It doesn't require a vote of the

18  people.

19  Q.   And the faster way would have been what?

20  A.   To do a vote -- a local bill that would -- it would be a

21  very different methodology.

22           THE COURT:  Okay.  We're going to take a break here.

23  If you'll take them downstairs for a 20-minute break, please.

24        (Proceedings adjourned for a brief recess from 3:10 p.m.

25           to 3:30 p.m., then resumed.

1          THE COURT:  Please be seated.

2                CONTINUED DIRECT EXAMINATION

3    BY MR. N. HANLEY:

4    Q.    All right.  Jon, I think we were talking about the work

5    that you hired on to perform for the License Commissioner's

6    Office, correct --

7    A.    Yes, sir.

8    Q.    -- when we stopped.  And I think we stopped when you told

9    me you thought it would take close to a year to perform?

10   A.    Yes, sir.

11   Q.    Let me show you what's been marked as -- it's in evidence

12   as Government's Exhibit 55-B (indicating).  Is this your bill?

13   A.    43 just hit me.  Yes, sir.  It is, yes, sir.

14   Q.    Okay.  What is the -- what is the description of that?

15   A.    "Mobile County Combined Office and Cost Reduction

16   Legislative Strategy, communications consulting, management of

17   bill drafting, meeting with legislators, coordination of

18   political efforts.  Review of research and delivery of

19   legislation for introduction.  Services billed as flat fee for

20   January through May 2014."

21   Q.    It says just January to May 2014.  Would you have carried

22   on after that?

23   A.    It was.  They had asked me to revise the invoice because

24   the original invoice that I sent had a contract for services

25   per agreement, which is pretty standard for us.  But they said

1    due to the audit provisions that they go through with Mobile

2    County, they need more of a description.  So this was done

3    after our services had been completed, so I actually knew the

4    end date.

5    Q.   Okay.  Now, from your description and the way you have

6    described your work, the advertising work or the public

7    relations work, how would you describe that, the work that you

8    were going to do for the Mobile County License Commissioner's

9    Office?

10   A.   As I described it here?

11   Q.   Well, just what -- was it marketing?  Was it --

12   A.   I understand.  Kim came to me with an idea.  Essentially,

13   she wanted to combine the offices.  She thought it would save

14   money.  She had needed some help putting together a strategy.

15   She wanted to obviously codify legislation to get that done,

16   pass a law, and she wanted to get the people to vote on it.

17        There was a real specific reason for her why she -- she

18   was running for election at that time period.  And I guess I

19   should back up a little bit.  Kim was running for Revenue

20   Commissioner, and the qualifying period ended in January.

21        Kim had approached me prior to -- sometime at the end of

22   the year, maybe in '13 somewhere, and had told me this idea

23   about combining these offices and that she thought she could

24   save money with it, and then wanted to know if I would help

25   her if we got to the point that she needed help doing that.

1       I said, sure, you know, you'll have to pass a law.  And

2   we had just some general conversations about it.  Kim is not a

3   political strategist, and so I kind of walked her through the

4   process of getting something to the Legislature and what you

5   would need to accomplish.

6       She was adamant about the people voting on it, and she

7   thought for certain somebody was going to run against her in

8   that race.  So it was going to kind of be her hallmark, if you

9   will, her, you know, campaign theme.  Previously, she had run

10  on a campaign theme of 10-minute tags, and it had been a

11  really big deal for her to want to accomplish that.  And I

12  think this was going to be her accomplishment was to try to

13  combine the offices and save money.

14      Well, she didn't have anybody run against her.  I would

15  never say that's an unfortunate set of circumstances but, in

16  this case, it was for Kim because there was no way to have a

17  mandate.  There was no way to put the matter before the people

18  and see if the people would adopt it.  So it created a

19  problem, a unique problem.

20      That brings me to where your question was, which is what

21  was I supposed to do for her, which was help her figure out a

22  way that she could put this before the people to let them

23  determine whether or not this was a good idea.  And the only

24  way to do that was through a constitutional amendment.

25  Q.   Did she know that?

1    A.    Did she know --

2    Q.    That the only way to do it was by a constitutional

3    amendment?

4    A.    Yes.  I told her.

5    Q.    Before that, did she know it?

6    A.    Oh, no, no, sir.

7    Q.    She didn't even know that a constitutional amendment was

8    required for a vote?

9    A.    I'm certain she knew the people had to vote on a

10   constitutional amendment.  I don't believe she knew -- I know

11   for a fact she didn't know which way she wanted to go with it.

12   I mean, her question to me was:  How can I get the people to

13   vote on this:  She questioned -- we have in some states what's

14   called initiative and referendum, and we're familiar in

15   Alabama with referendums.  I mean, it seems like we vote on

16   something every couple of months, but we don't.  Actually,

17   Alabama only allows very, very few things on the ballot.  We

18   do not allow initiative and referendums.  We do not allow

19   referendums at all that are binding.  We do not allow binding

20   referendums.  So in this particular case, we would have to

21   have a constitutional amendment, and we discussed the ups and

22   downs of that.

23   Q.    And what were the downs?

24   A.    Takes a long time.  There's a lot higher burden to get

25   through.  Legislative Reference, which is the service that

1   drafts the bills for legislators, they are kind of the keys to

2   the castle, you have to get it through them first.  They are

3   very opposed to allowing constitutional amendments that are

4   not required as constitutional amendments.  We have a very

5   long constitution in Alabama, it's filled with amendments, so

6   Legislative Reference is very protective of it.  And we kind

7   of had to move things around to let them do this as a

8   constitutional amendment because it wasn't required.

9   Q.   Now, on this same document is a reference to the $1.25

10  fund.  Do you see that (indicating)?

11  A.   Yes, sir.

12  Q.   Now --

13  A.   I didn't catch -- got it.  Thank you.

14  Q.   You see that note from -- apparently from Kim:  "Please

15  pay this out of the $1.25 fund"?

16  A.   Yes, sir.

17  Q.   Did Kim explain to you that she was going to pay out of

18  the $1.25 fund?

19  A.   She did.

20  Q.   Did she tell you that she had the authority to do that?

21  A.   She did.  She referred to it as a discretionary fund.

22         MR. KALAYOGLU:  Objection, Your Honor, hearsay.

23         THE COURT:  Sustained.

24  BY MR. N. HANLEY:

25  Q.   Okay.  So what happened after you were retained, and what

Case 1:14-cr-00291-KD-N   Document 300   Filed 12/09/15   Page 241 of 301

JONATHAN GRAY - DIRECT BY MR. N. HANLEY                    1208


1    did you do to meet this goal that you had started out or that

2    you had signed up for?

3    A.    Well, the first thing that we had to do was contact a

4    couple of legislators to see if we had a sponsor for the bill.

5    She talked to Rusty Glover, who's the senator from northeast

6    Mobile County.  She talked to David Sessions, who's the House

7    member from south -- excuse me, northwest and southwest Mobile

8    County.  Both of them agreed to sponsor the bill.  Her and I,

9    we had a couple of meetings with other people, Chad Tucker and

10    Joe Ruffer and a couple of other people that had kind of been

11    a think tank, if you will, for Kim.

12        You see, laws are -- laws are easy when they start out

13    because they're just an idea.  I mean, it's just, you know, we

14    decide that we want all soft drinks to be free.  We have an

15    idea.  Unfortunately, what complicates it is the process by

16    which it has to be drawn out, and you have to close the

17    loopholes and you have to meet certain burdens.

18        So we had a couple of meetings to discuss what were the

19    different options and how we would get there.  So you take a

20    policy and you turn it into law.  And through that strategy,

21    we developed -- we came up with the plan that we could do this

22    as a constitutional amendment.  It would eventually go before

23    the voters, and whatever the voters decided, that will be the

24    end of it.

25    Q.    Now, are you a lobbyist?

MARY FRANCES GIATTINA, CCR, RDR, CRR, FCRR, OFFICIAL COURT REPORTER
P. O. BOX 3021, MOBILE, ALABAMA  36652-3021  (251) 690-3003

1   A.   No, sir.

2   Q.   And you don't have a lobbying firm?

3   A.   Who?

4   Q.   You don't have a lobbying firm?

5   A.   No, sir.

6   Q.   Y'all don't lobby?

7   A.   No, sir.

8   Q.   And in this case, you didn't lobby, did you?

9   A.   No.

10  Q.   What's the difference?

11  A.   Well, lobbying is exerting influence.  I mean, you're

12  persuading to one degree or another.  People walk the halls of

13  Montgomery, you have a little badge, you register, you're

14  actually taking people to dinner, you're persuading people how

15  they're going to vote for a bill one way or another.

16       My involvement here was to help her take a thought and a

17  policy and develop it into a strategy that accomplished her

18  goals.  We contemplated hiring a lobbyist, but that wasn't me.

19  Q.   So what did you do?  What's the first thing you do?

20  A.   Contacted the house member and the senator.  They wrote a

21  letter to Legislative Reference allowing me to confer with the

22  Legislative Reference Service on the drafting of the bill was

23  the first official step.

24  Q.   Tell me what the Legislative --

25  A.   I'm sorry, yes, sir.  Legislative Reference Service.

1   Q.    -- Reference Service, what is the Legislative Reference

2   Service?

3   A.    They draft the vast majority of bills for the Alabama

4   Legislature.  It is a group of lawyers that are essentially

5   the center of the keys to the kingdom.  If you want to get

6   something introduced to the Legislature, they have to sign off

7   on it.

8   Q.    They're lawyers?

9   A.    Yes, sir.

10  Q.    Okay.  And you say you -- had somebody --

11  A.    Lawyers and paralegals and -- yes, sir.

12  Q.    And did you say somebody contacted them on your behalf?

13  A.    Yes, sir.  They don't work for the general public.  They

14  work for the Legislature.  So a legislator or senator has to

15  send a letter authorizing their involvement with a particular

16  citizen.

17  Q.    And in that case, was that done for you?

18  A.    Yes, sir.

19  Q.    All right.  Do you remember which legislator?

20  A.    Rusty Glover, Senator Glover.

21  Q.    And he was a supporter of the bill?

22  A.    Yes, sir.

23  Q.    A sponsor?

24  A.    Yes, sir.

25  Q.    So what did you do?  What's the first thing you did?

1    A.    I got on the phone with Legislative Reference and we

2    began talking about the concept of the bill and what we wanted

3    to do.  They wanted to do it as a local bill.  I told them

4    that my client didn't want to do it as a local bill.  We kind

5    of downloaded all the particulars about it.  She said this was

6    going to be pretty easy because about 50 of the 67 counties in

7    Alabama had already combined offices, so I told her that --

8              MR. KALAYOGLU:  Objection, Your Honor, hearsay.

9              THE COURT:  Sustained.

10   BY MR. N. HANLEY:

11   Q.    Okay.  So did you come up -- so you were talking to the

12   Legislative Reference Service?

13   A.    Yes, sir.

14   Q.    Who drafts the bill?

15   A.    Yes, sir.

16   Q.    You don't draft the bill?

17   A.    No, sir.

18   Q.    And you were providing ideas; correct?

19   A.    Yes, sir.

20   Q.    And providing what Kim wanted, that's the constitutional

21   amendment?

22   A.    I'm kind of bridging two gaps.  I'm taking what a person

23   who's not a lawyer, who's not a politico, wants to happen and

24   bridging it with a group of people who are going to find a way

25   to make it happen.  I mean, the Code is --

1   Q.   Someone's not a lawyer and not -- you're bridging the

2   gap, somebody who's not a lawyer and not a politico.  Who are

3   you talking about?

4   A.   Well, I'm bridging the gap between Kim and the

5   Legislative Reference Service because, again, I mean, the Code

6   is voluminous.  It's dozens of books.  And they have the

7   people that know where to put it, what title it gets, what

8   section it gets.  They are the people that make it all, as I

9   said earlier, complicated.  They codify it so that the

10  Legislature can adopt it and put it in the right place.  I'm

11  bridging that gap with them so that the original idea and

12  intent doesn't get lost.  It happens sometimes.

13  Q.   And was Kim well versed in this process?

14  A.   No, sir.  I mean, she's -- as a county official, you

15  don't have a lot of work with the Legislature.  She had, I

16  think, worked on passing one bill previously, but when we

17  talked about the constitutional amendment process, for

18  instance, she thought that it would require a special election

19  to adopt a constitutional amendment --

20          MR. KALAYOGLU:  Objection, Your Honor, hearsay.

21          THE COURT:  Overruled.

22  A.   She thought that it would require a special election to

23  do the constitutional amendment, and I had to kind of play

24  back history to show her how many elections we had had and

25  what kind of things were on the ballot.  So, no, sir, this was

1   not an area that I would say she has expertise in.

2   BY MR. N. HANLEY:

3   Q.    All right.  Did you get a first iteration out from the

4   Legislative -- I don't know why I have trouble saying that --

5   Legislative Reference Service?  Did you get an iteration out?

6   A.    I did.  They sent me a local bill which I re-presented to

7   Kim again as an option, and that's not the route she wanted to

8   go.

9   Q.    She wanted a vote?

10   A.    Yes, sir.  And a local bill does not require a vote.

11   Q.    Okay.  So then what did you do?

12   A.    Contacted Legislative Reference Service and explained to

13   them that due to constraints, we were going to have to go for

14   a constitutional amendment to get them on board with us.  And

15   to do that, we had to change a few things in the bill.  It's

16   not a lot.  You change the title of the bill.  It will

17   eventually become an act, and then you essentially add a

18   section at the bottom where the people will vote on it yea or

19   nay with a ballot description.

20   Q.    Now, in that first -- let me talk to you about the salary

21   for the -- if this bill would have passed, or let me talk

22   about the salary of the person for the combined offices.  Did

23   Kim ever give you a figure that she wanted in there as a

24   salary?

25   A.    No, sir.

1   Q.   Did you start -- did you talk to other legislators about

2   what the appropriate salary should be?

3   A.   Yes, sir.

4   Q.   Could you get any answer from them?

5   A.   No, sir.

6   Q.   There is a provision in that first iteration, that first

7   local bill, that the salary would be 75 percent of the

8   combined salaries of the two offices; correct?

9   A.   Yes, sir.

10  Q.   Okay.  Who came up with that?

11  A.   I did.

12  Q.   And how did you come up with that?

13  A.   I couldn't get anybody else to give me a number.  I mean,

14  this is a difficult process because, as I said, I'm bridging a

15  gap between people, and everybody has their own priorities.

16  And so it was never one of the things we discussed about how

17  much the money was going to be.  And so when the original bill

18  was being drafted, we were talking about the combining of

19  offices, we were talking about the combining of budgets, we

20  were talking about the combining of resources, and I was

21  afraid that it was going to be inferred that we were combining

22  the salary of the offices.

23       So I talked to Kim and I asked her, you know, what kind

24  of salary are you looking for?  And she said she hadn't

25  thought of it.

1          MR. KALAYOGLU:  Objection, Your Honor, hearsay

2    again.

3          THE COURT:  All right.  Don't testify to what Ms.

4    Hastie told you, okay?

5          THE WITNESS:  Yes, ma'am.

6    BY MR. N. HANLEY:

7    Q.   And in your discussions with other legislators, did

8    anybody else come up with a salary before you?

9    A.   No, sir.  I put forward what I thought was the best

10   compromise because double seemed to be too much.  The same

11   salary didn't seem to be fair because she was going to be

12   doing the job of two people.  So I literally split the baby.

13        At that time, I didn't even know what the salaries were;

14   otherwise, I would have put a number in there because -- I

15   don't remember if it was Helen or who it was at LRS was asking

16   me, well, what's the number?  I said, I don't know.  And we

17   were in a rush to get it in for Tuesday for introduction.  And

18   I said, just make it 75 percent of the combined offices.

19        So it's very unusual where you don't see percentages set

20   for salaries.  It's usually a hard number.  But we didn't have

21   a number, and I couldn't get anybody to give me a number, so I

22   just threw something out there, knowing that the Legislature

23   was going to do whatever the heck they wanted to anyway.

24   Q.   There are almost always several drafts of legislation

25   before it becomes a bill; isn't that correct?

1   A.   At least, yes, sir.

2   Q.   Okay.  Kim rejected the local bill; correct?

3   A.   Yes, sir.

4   Q.   The one that contained 75 percent of the combined

5   salaries; correct?

6   A.   (No audible response.)

7   Q.   Now, so do you know how the final draft of the bill, the

8   salary and the final draft of the bill was arrived at?

9   A.   Yes, sir.

10  Q.   And how was that arrived at?

11  A.   A lot of conversations.

12  Q.   With whom?

13  A.   Well, the first process was, we were told -- I was told

14  specifically that that was not going to pass at that pay rate.

15  And I said I had no problem with that, didn't really intend

16  that it would, I just need a number back, put in what you

17  want.

18       The legislators would not put in a number.  They

19  contacted me and wanted me to put in a number.  We need a

20  number from you to put in the revision.  I didn't have one, so

21  I offered yet another --

22            MR. KALAYOGLU:  Objection, Your Honor, hearsay as to

23  what the legislators say.

24            THE COURT:  All right.  Well, he's past that.  Go

25  ahead.  Tell us what you did.

1   A.   So I offered them another example where we made the

2   salary $95,000, but I put in several, essentially, bonuses or

3   premiums, if you would call it, for earmarks for things that

4   she would accomplish in the bill.

5        We've done a lot of polling and, you know, people really

6   want results from their elected officials, and especially in

7   Republican politics, which is what I do, we try and tie it

8   almost to a results-based-type organization where we can

9   deliver the people something they want.

10       So I thought, well, why not put this in the legislation.

11  It's something I had just heard in a conference call.  So I

12  suggested --

13             MR. KALAYOGLU:  Your Honor, it goes beyond the scope

14  of the question.

15             THE COURT:  Overruled.

16  A.   So I suggested to them, why don't we make it 95,000 and

17  put some incentives in there for her to cut the money; in

18  other words, she would get more money in some ratio of how

19  much spending she cut.  So that was a draft that was made for

20  the Legislature.

21       It went over like a box of lead bricks.  So they came

22  back to me and wanted another iteration.  I had a conversation

23  with David Sessions, and I suggested to David --

24             MR. KALAYOGLU:  Objection, Your Honor.  There's been

25  no question.  It's just a narrative.

1          THE COURT:  Well, the question was to explain how he

2    came up with the 95,000, and I think that's what he's trying

3    to explain.

4    A.    I had a conversation with David Sessions, and I suggested

5    to David -- excuse me, Representative Sessions that maybe we

6    could find out what other people who have combined offices are

7    paid and try to structure it that way.

8          David came back to me, and I conferred with Kim and

9    others, and we determined that the gentleman -- the

10   representative who was actually objecting to the pay raise,

11   Representative Buskey, his niece was the License Commissioner

12   of combined offices in Montgomery County, and her salary was

13   $95,000.  So I suggested to them that maybe that should be the

14   number.  Kim agreed, Sessions agreed, and that's how we went

15   from there.  It sometimes really is kind of backwards, but

16   that's how it came about.

17   BY MR. N. HANLEY:

18   Q.    And do you know how much Marilyn Wood is making right now

19   under a single revenue office?

20   A.    Somewhere around a hundred thousand, but I don't know the

21   number.

22   Q.    And there was an issue raised about whether Kim could

23   have even gotten any raise that she got under the law of

24   Alabama; correct?

25   A.    Well, yes, sir.  There's a section or provision of the

1   Constitution that an elected official cannot have their pay

2   changed during the term of office.  The discussion therein,

3   and I had this discussion during my interview with the FBI,

4   that it depends on when you determine the term of office.  And

5   the reason for it goes back -- in the Civil War, people were

6   literally zeroing people's budgets to make them noneffective

7   to leave office.  And so they made it so that when you run for

8   office, you know what you're going to get paid.  Nobody ever

9   contemplates anybody raising your pay.  It's a prohibitive

10  measure of them cutting your pay.

11       In this particular instance, though, it actually works

12  both ways.  The County Commission has the same problem.  You

13  can't give a pay raise during the term.  The question is:

14  Does the term start at qualifying or does the term start when

15  elected?

16       So I told Kim that without an Attorney General's opinion,

17  there would be no way of knowing whether or not this would

18  apply to her, even if we got it on the ballot.

19  Q.   Even if you got it on the ballot; correct?  And even if

20  there was a raise?

21  A.   Yes, sir.  The first opportunity to put it on the ballot

22  was November of '14.  Her name was on the ballot in November

23  of '14.  Even though she was unopposed, she still has to run.

24  In that particular instance, the ballot would be carrying both

25  the constitutional amendment and it would be carrying her

1  name.  So someone would be likely to object and/or it has to

2  be certified after the vote and the Attorney General has to

3  issue an authorization.  It was likely that would not have

4  happened.

5  Q.    Pay raise would not come into effect?

6  A.    Yes, sir.  And we talked about that at length.

7  Q.    And the bill that you proposed wouldn't have any effect

8  on that, on the constitutional issue you're talking about?

9  A.    It wouldn't.  And again, just to be clear, it could have

10  gone both ways.  We don't know.  But there was a chance that

11  it wasn't going to happen; there was a chance that it would

12  have been fine.  It's just hard to answer that question

13  because there's not a precedent for it.

14  Q.    And what happened after you've got this final draft of

15  the bill?

16  A.    It died in committee.

17  Q.    And do you know how?

18  A.    You know, it never received favorable votes.  I don't

19  believe it was ever brought for a vote after we --

20  Q.    Brought for a vote?

21  A.    Yes, sir.  We went through all that work, and they never

22  voted on it.

23  Q.    Were you at all involved in this year's bill?

24  A.    No, sir.

25  Q.    Was the fee you charged appropriate for the work you did?

1   A.   Yes, sir.  Well, let me say this:  Under the

2   circumstances and the purview that I have at the time that I

3   made the deal, yes, sir, it was.

4   Q.   Okay.  Was it appropriate work for a -- to be providing a

5   government official?

6            MR. KALAYOGLU:  Asked and answered, Your Honor.

7            THE COURT:  Sustained.

8   BY MR. N. HANLEY:

9   Q.   Was it appropriate work to be provided for a government

10  official?

11  A.   It is, yes, similar work I have provided for dozens of

12  others.

13  Q.   Other public officials and public departments?

14  A.   Yes, sir.  Federal Government, state government, local

15  government, yes, sir.

16  Q.   How many times?

17  A.   For me?

18  Q.   Yes.

19  A.   A couple of dozen.

20  Q.   Now, was there an occasion where you actually refunded

21  the $10,000?

22  A.   Yes, sir.

23  Q.   And how did that come about?

24  A.   I wrote them a check.

25  Q.   Okay.  And how were you made aware that -- or asked that

1   the check be written?

2   A.   I'm sorry, I didn't understand part of your question.  It

3   came about, the FBI came to interview me.  During that

4   interview, Off. Kelley, or Agent Kelley had said to me that, I

5   know about the account that Kim had paid me from, was she

6   authorized to pay me from that account.  It was the first

7   mention I had heard about it, and it caught me by surprise.

8   So I contacted the county lawyer and I asked him, you know,

9   was this authorized?  I think I've learned I can't say what he

10  said, but I'll infer to say that it concerned me.

11  Q.   Did he give you a definite answer that it was or it

12  wasn't?

13  A.   He did give me a definite answer that it was not allowed.

14  Q.   Okay.

15  A.   He thought that that's what he had been told but was

16  looking into it.  And so during that conversation, initially

17  he said that it wasn't, but then he said that they were

18  looking into it and that this concern had been raised.

19  Q.   Okay.

20  A.   I told him that I was in receipt of the payment and that

21  the FBI had come by and asked me about it and that, you know,

22  if Kim wasn't authorized to pay me the check, she sure thought

23  she was, and I'd just return the money but I needed to talk to

24  my partner about it.

25       So Jay said, give me a couple of days, we're looking into

1    it, I can't give you a definitive answer right now, let me

2    find out.

3    Q.   When you say "Jay," that's the county attorney?

4    A.   I'm sorry, county attorney, yes, sir.  So I waited.  I

5    guess it was maybe less than a week later, I got a text

6    message from Jay saying, you'll be getting something shortly.

7         Sometime after that, maybe within the same day, I got an

8    e-mail from a law person with the county, maybe his office,

9    had sent me a copy of the original local bill.  And I read the

10   local bill and determined that, you know, I was not a

11   technology or a technology technological development and that

12   the $1.25 fund that had been previously described as

13   discretionary was not.

14        And so I talked to my partner about it and told him what

15   was going on and I said, you know, this is troublesome, you

16   know.  I don't know what you think, but I may want to return

17   the money.  He said, well, then let's think about it and see

18   what happens.  I mean, it's a lot of money and there was a lot

19   of work, and at that particular time, you know, we still have

20   to pay our bills.

21        So it was about a week later that I got a phone call from

22   a gentleman that was working with Ms. Hastie, and he wanted to

23   ask me if I had deposited the check and if I had taken receipt

24   of the check and, you know, I told him at that time that we

25   had.  And he wanted to tell me that there were some concerns

1    about the check.  And I'm kind of a wordy person, so I cut him

2    off and just told him that I know that and that I understand,

3    you know, what the problem is is that, you know, we're already

4    discussing returning it.  And he said, well, that's kind of

5    what I was hoping you would do is that you would return it.

6         So I went and talked to my partner.  We went out of town

7    on a trip.  I don't remember exactly when it was, but I had

8    told him that I'd make the decision and give it back.  Either

9    before I left or right when I got back, I had contacted Kim's

10   lawyer to -- excuse me, the lawyer for the License

11   Commissioner's Office who had written the check to find out

12   how I needed to make the check back to return it, and would he

13   come by my office and pick it up.  And that kind of takes you

14   through the whole thing.

15   Q.   And you returned the check because?

16   A.   It's blood money.  I mean, I don't think -- I'm not -- I

17   don't want somebody to go to prison because they wrote me a

18   check out of an account that they shouldn't have and didn't

19   know it.

20   Q.   And in your conversation, Kim didn't know it?

21   A.   No.

22            MR. N. HANLEY:  Thank you, Mr. Gray.

23            THE WITNESS:  Yes, sir.

24            THE COURT:   Mr. Knizley?

25            MR. KNIZLEY:  I have no questions, Your Honor.

1    THE COURT:   All right.  Cross?

2                    CROSS EXAMINATION

3    BY MR. KALAYOGLU:

4    Q.   Good afternoon.

5    A.   Hi.

6    Q.   Now, you earlier testified that you had an agreement with

7    Kim Hastie; correct?

8    A.   The License Commissioner's Office, yes, sir.

9    Q.   And that was to provide consulting services for the

10   merger?

11   A.   Yes, sir.

12   Q.   And you had testified that you reached that agreement

13   sometime in the beginning of 2014; was that correct?

14   A.   Yes, sir.  We had had initial talks at the end of '13,

15   and then when it became clear that she was not going to have

16   any opposition, that she wanted to try to find a way to let

17   this be voted on.  So I don't know the specific date but,

18   obviously, the first of '14.

19   Q.   Did you have a written contract?

20   A.   No, sir.

21   Q.   Did Kim Hastie ever indicate to you that she wanted to

22   have a written contract?

23   A.   No.  I don't have very many written contracts.

24   Q.   Did you ever provide her with a written contract at all?

25   A.   No, sir.

1   Q.   Now, you're familiar with legislation in general; right?

2   A.   Yes, sir.

3   Q.   As part of your job, you review various bills and prepare

4   bills, and you're generally aware of Alabama law?

5   A.   Yes, sir.

6   Q.   Let me go ahead and show you what's been marked as

7   Government's Exhibit 88, which is just Alabama Ethics Law --

8   A.   Uh-huh.

9   Q.    -- the 2014 edition (indicating).

10           MR. KALAYOGLU:  And I'll just use for demonstrative

11  purposes only, Your Honor.

12           MR. N. HANLEY:  Judge, I object to it.

13           MR. KNIZLEY:  Judge, I object.  It's outside the

14  scope of direct examanation.

15           MR. N. HANLEY:  Direct examination --

16           THE COURT:  I haven't heard the question yet.

17           MR. N. HANLEY:  For some reason, it's not coming up

18  on our --

19           MR. KALAYOGLU:  I haven't put it up yet.

20           MR. N. HANLEY:  Oh.  That's the reason.

21  BY MR. KALAYOGLU:

22  Q.   This is just for demonstrative purposes only.  Just take

23  a minute and have a look at that section right there

24  (indicating).

25  A.   Yes, sir.

1  Q.   Could you read the title?

2           MR. N. HANLEY:  I object to it, Your Honor.  It's

3  beyond the scope.

4           MR. KALAYOGLU:  It's just offered for demonstrative

5  purposes only, Your Honor.

6           THE COURT:  It's not demonstrative.  You want him to

7  read it.  You can ask him a question about it.

8           MR. KALAYOGLU:  Sure.

9           THE COURT:  Not read it out loud.  You can read it

10 to yourself, and then he's going to ask you a question, I

11 guess.

12 BY MR. KALAYOGLU:

13 Q.   Sure.  Go ahead and read it to yourself.

14 A.   I did.

15 Q.   Okay.  So based on this, is it your understanding that

16 contracts are required when government funds are in the

17 equation?

18 A.   No.

19 Q.   No?

20 A.   No, sir.

21 Q.   No.  So you don't think that you needed to have a written

22 contract with Kim Hastie in order for county funds to be used

23 by Kim Hastie to pay for those consulting services?

24 A.   No.

25 Q.   So you would take the opposite position of what the

1  County Commission believes with respect to written contracts;

2  is that correct?

3          MR. N. HANLEY:  Judge, I object to what the County

4  Commission believes.

5          THE COURT:  Sustained.  No evidence of that.

6          THE WITNESS:  I'm not trying to be argumentative, I

7  promise.

8          MR. N. HANLEY:  It was sustained.

9  BY MR. KALAYOGLU:

10  Q.  So just to be clear, you don't think that you needed a

11  written contract at all in order for Kim Hastie to pay you out

12  of county funds?

13  A.  No, sir.  On line ten, it says only for contracts which

14  are bid.  It's a professional service, which does not require

15  a bid, so this would not apply.

16  Q.  But you're aware of the law for bidding that requires

17  contracts in greater than $15,000 or more; isn't that correct?

18  A.  Not for professional services, no, sir.

19  Q.  So you believe that your services fell under the

20  exception that your contract was permitted to be paid out of

21  county funds?

22  A.  In fact, it is.  The times that I've worked for the

23  County Commission, there's never been a contract.

24  Q.  Okay.  So Mr. Hanley showed this to you earlier.  This is

25  Government's Exhibit 55 (indicating).  Do you recall seeing

1    that?

2    A.   Yes, sir.

3    Q.   Okay.  That's invoice 2106, dated February 1, 2014?

4    A.   February 1st, 2014, yes.  It's a revision to it, as I had

5    said earlier.

6    Q.   The revision -- so let me show you the original one.

7    A.   Yes, sir.

8    Q.   This is Government's Exhibit 175 (indicating).

9    A.   Yes, sir.  That's what I was referring to earlier that it

10   had just our typical per agreement line item on there.

11   Q.   And why the revision?

12   A.   I don't remember whom, but someone from Kim's office had

13   told her that the auditors needed more detail than a single

14   line item like that, so they just asked me to put some more

15   detail about what all I was doing.

16   Q.   Okay.  Now, let me go ahead and show you what's been

17   marked as Government's Exhibit 181.

18        MR. KALAYOGLU:  I believe this is in evidence, Your

19   Honor.  Is that correct?

20        THE CLERK:  No, sir.  It is -- oh, I'm sorry, yes,

21   it is.

22        MR. KALAYOGLU:  It is?  Okay.  Great.

23   BY MR. KALAYOGLU:

24   Q.   Are you familiar with this document (indicating)?

25   A.   Yes, ma'am.

1    Q.   Sir?

2    A.   I'm sorry.  Yes, sir.  I'm sorry.  I read the initials.

3    It was Ms. Haygood.  I'm so sorry.

4    Q.   That's okay.

5    A.   I'm so sorry.

6    Q.   And then under section D (indicating)?

7    A.   It is a --

8    Q.   I'll zoom in.

9    A.   If you don't mind.  I'm so sorry.  I'm, like, really

10   close to this thing, and I'm getting used to glasses, and it's

11   not working.

12   Q.   That's okay.

13   A.   Yes, sir.  Section D, beginning October 1st, yes, sir.

14   Q.   Okay.  So that's that 75 percent increase that we had

15   talked about earlier?

16   A.   Yes, sir, that is.

17   Q.   And do you know how much -- had that bill passed in that

18   current version, do you know how much of a salary increase Kim

19   Hastie would have gotten exactly?  Roughly?

20   A.   Can I answer that I do now?

21   Q.   Sure.

22   A.   I do now, yes.

23   Q.   How much?

24   A.   Roughly $50,000.

25   Q.   And then you were talking with Mr. Hanley about how that

1   bill got watered down; correct?

2   A.   Changed, yes, sir.

3   Q.   Changed.  And it got changed partly because that figure

4   was disagreeable to certain people; correct?

5   A.   Absolutely.  It was too high in their point of view.

6   Q.   So just to show you that, and this is for demonstrative

7   purposes only, Government's Exhibit Number 213 (indicating),

8   just take a second to look at that and familiarize yourself

9   with that.

10  A.   (Witness complies.)

11  Q.   I'll zoom out slightly.  Does that look familiar?

12  A.   It does, yes -- well, it doesn't look familiar at all.  I

13  have no idea what the document is but --

14  Q.   Sure.

15  A.   -- taking that you took some items and kind of made it

16  simple to read.

17  Q.   Right.  What we're getting at here is just the different

18  versions regarding the salary.  So if you look at this table

19  here (indicating), and I realize that you didn't create this

20  table, it's just for demonstrative purposes only --

21  A.   Got it.

22  Q.   -- but here's the breakdown for the Revenue Commission

23  salary and the License Commissioner salary.  If you take

24  75 percent of the combined salaries, you get to an increase of

25  $46,250.  Does that sound right?

1   A.   Yes, sir.

2            MR. N. HANLEY:  I object.  First of all, I'm going

3   to object to it even as a demonstrative piece of evidence.  It

4   has information in here that there's no --

5            THE COURT:  It's not before the jury.  He just

6   answered the question.

7   BY MR. KALAYOGLU:

8   Q.   That seems accurate?

9   A.   I'm sorry?

10  Q.   That appears accurate?

11  A.   Which part?

12  Q.   The table that I just referred to.

13  A.   The 46,250, you asked me if that was correct, and I had

14  said 50,000 earlier.  I'll acquiesce.  It's as close as I

15  would happen to know.  I don't know the specifics.

16  Q.   Okay.  And then just one more question about it here.

17  And then later it got decreased, as you had earlier mentioned,

18  correct, the number, the salary?

19  A.   Are you pointing at 3-B for me to look there or --

20  Q.   Well, just based on your knowledge.

21  A.   I'm sorry.

22  Q.   Let me ask --

23  A.   There's several different pieces here.  Are you at the

24  3-6-14 portion down here (indicating)?

25  Q.   Yeah.

1    A.   Okay.

2              THE COURT:  Just ask the question.  Don't have him

3    read.

4    BY MR. KALAYOGLU:

5    Q.   All I'm trying to get at, Mr. Gray, is the salary got

6    decreased later on; is that correct?

7    A.   Yes, sir.

8    Q.   Okay.

9    A.   Yes, sir.

10   Q.   Okay.  Now, earlier we talked about the $1.25 fund, or

11   Mr. Hanley asked you some questions about the $1.25 fund; is

12   that correct?

13   A.   Yes, sir.

14   Q.   And you referred to -- or he may have referred to the

15   House Bill 117 regarding the $1.25 fund.  Does that ring a

16   bell?

17   A.   No, sir.

18   Q.   All right.  Let me go ahead and show you what I believe

19   is already in evidence, Government's Exhibit 49 (indicating).

20   This is the first page (indicating).  You said that you had

21   read the local law, the Mobile County resolution, authorizing

22   the $1.25 fund; correct?

23   A.   Yes.  That would be what Counsel Ross sent to me through

24   his office.  I believe that is what this is.

25   Q.   Right.  This is the actual state law from which the local

1    law came from.  And so if you can go ahead and read Section 2,

2    and I'll turn the page.

3              MR. N. HANLEY:  Judge, I object.  It's been read

4    time and time again.

5              MR. KALAYOGLU:  Not by this witness.

6              THE WITNESS:  I read it.

7    BY MR. KALAYOGLU:

8    Q.   Okay.  Could you go ahead and read for the jury?

9              THE COURT:  Overruled.

10   A.   "The issuance fees collected pursuant to this Act shall

11   be deposited in a segregated account at the Office of the

12   License Commissioner and expended by the License --" page turn

13   -- "Commissioner for the preservation and storage of records

14   relating to motor vehicle registration, boat registration, and

15   business licenses as prescribed by the Department of Examiners

16   of Public Accounts and for the purchases, installation,

17   improvement, development, upgrading, and maintenance of

18   equipment and technology in the Office of the License

19   Commissioner of Mobile County."

20   BY MR. KALAYOGLU:

21   Q.   Okay.  Thank you.  And that has nothing to do with this

22   (indicating)?

23   A.   Absolutely nothing.

24   Q.   Zero correlation.  You did no work for technology?

25   A.   Less than zero.

1    Q.   Less than zero.  Okay.  Now, I believe you testified that

2    Kim Hastie told you that she'd be paying you out of the $1.25

3    fund.  Did I hear that correctly?  On direct examination with

4    Mr. Hanley, I wrote down that Kim Hastie told you she'd be

5    paying you out of the $1.25 fund.  Is that accurate?

6    A.   Well, she referred to it as a discretionary fund, but I

7    wasn't supposed to say that, so --

8    Q.   When did she tell you that?

9    A.   Numerous times.  I don't think Kim ever referred to it

10   with me as a $1.25 fund.  I think when we were at a lunch

11   meeting, she had mentioned it, and it rang a bell.  When Agent

12   Kelley had mentioned it, I knew what he was talking about.

13   Q.   Tell me exactly what she said, to the best of your

14   recollection.

15            THE COURT:  You may now say.  You can ask the

16   question.  You may say what she said.

17   A.   Okay.  She had said to me in conversations -- because we

18   were talking about how to pay for this, and we talked about a

19   lot of aspects.  The campaign itself would -- could be

20   expensive depending upon how you were going to operate it, so

21   we talked about raising money and how it would be paid for.

22            And she said that she had a little bit of money in a

23   discretionary account that she could pay for the legislative

24   development strategy and getting things going for the campaign

25   and developing a strategy to get it before the voters, and she

1    wanted to know how much it was going to be.

2          So we talked generally about how much it would cost and,

3    you know, she explained to me that the voters and the

4    taxpayers were paying for this, and so we arrived at a figure

5    that was probably less than what I would do normally for

6    campaign work, a lot less than I would do for a constitutional

7    amendment, but it was something that we were agreeable to.

8          In those conversations, she referred to it as a

9    discretionary fund.  I don't remember particular conversations

10   about $1.25 or where it came from.

11   BY MR. KALAYOGLU:

12   Q.   Would that have been in the spring of 2014 or maybe even

13   the winter of 2014?

14   A.   '13.

15   Q.   20 --

16   A.   It would have been in that December or January timeframe

17   where we had discussed what to do.  You see, when I testified

18   earlier that we were approaching the closure for the

19   qualifying, I don't remember if it was in -- where in January

20   or February it was, but it was right within the first month of

21   the year.  And so you've got a 12-month window to qualify --

22   Q.   Right.

23   A.   -- and it became pretty obvious that nobody was going to

24   qualify.  And I think that's why Kim, at least when she came

25   to me, that's why she told me she was coming to me because it

1   was relatively obvious no one was going to run against her.

2   So sometime, as I said, at the end of '13, we had some initial

3   conversations, and then we had some other conversations in

4   January.

5   Q.   So I just want to make sure I'm getting this down

6   correctly.

7   A.   Yes, sir.

8   Q.   So she told you sometime in late 2013 or maybe early 2014

9   that she had a discretionary fund that she was going to pay

10  you from; is that correct?

11  A.   Yes, sir.

12  Q.   So looking at just this again -- this is Government's

13  Exhibit 55 (indicating), where it says "Services billed as

14  flat fee for January to May 2014," it's your understanding

15  that she was going to be paying you out of a discretionary

16  fund for those $10,000?

17  A.   Yes, sir.

18  Q.   Did she say anything else?

19  A.   A lot.  I mean, in relation to what?

20  Q.   In relation to how she was going to pay you.

21  A.   Like in a check or --

22  Q.   Did she say she was going to be using county dollars?

23  Did she say she was going to be paying you out of a segregated

24  account at any time?

25  A.   You know, we may have had a discussion about whether or

1   not it would go before the County Commission because we had

2   some concerns there with regards to -- she has some political

3   foes.  And I questioned whether or not it would have to go to

4   the County Commission for approval, and she said that it

5   wouldn't.  I'm not certain.  As I said, the $1.25 may have

6   been mentioned.  It wasn't a hallmark to me until Agent Kelley

7   had mentioned it.  But there was a distinction that this was

8   not an accrual of funds that had to go to the County

9   Commission for approval.  This was a separate set of funds

10  that she had discretion over.

11  Q.   Well, at any time -- I'm just trying to figure out how

12  the County was going to learn about this.  Did you at any time

13  send any paperwork to the County?

14  A.   Did I submit paperwork to the County?

15  Q.   Right.

16  A.   Well, she submits paperwork to the County.

17  Q.   But do you know if this invoice ever got submitted to the

18  County, invoice 2106?

19  A.   Do I know?

20  Q.   Yes.

21  A.   I have no earthly idea.

22  Q.   Did she ever indicate to you that she was going to submit

23  it to the County?

24  A.   Well, when they called me about the audit question,

25  that's what I inferred is that the auditors would have to have

1    the correct description on it.

2    Q.   Who's "they" when you say "they called"?

3    A.   The county auditors and the state auditors who go through

4    all the expenditures.

5    Q.   No, no, no.  You said "they called me."  Who called you?

6    A.   Oh, I'm sorry.  Kim Hastie's office had called about the

7    description on the invoice.  Remember the one you showed me

8    earlier that had the one-line item?

9    Q.   Right.

10   A.   And then I said that that's kind of standard for us, but

11   it wasn't good enough for them.  They wanted more description

12   for the auditors, so I inferred from that that it would be

13   reviewed by somebody, but that's the only intimation I had.

14   Q.   Was it Ramona Yeager who had called you, do you recall?

15   A.   I don't recall.  I'm sorry.

16   Q.   Shirley Byrd Wade?

17   A.   (No audible response.)

18   Q.   Okay.  So they called you --

19   A.   And to be honest, I'm not sure I ever spoke to them.

20   They may have left me a message or even sent me an e-mail.  I

21   honestly don't know.  I just know that I needed to revise it.

22   Q.   And it got revised, but my point is, did you think that

23   your invoice was actually going to be submitted to the County?

24   A.   Yes.  For a vote by the County Commission?  No.

25   Q.   But just submitted in general?

1   A.   Sure.

2   Q.   And you based that understanding on the fact that they

3   called you, "they" being the License Commission called you,

4   and the fact that they wanted you to change your invoice?

5   A.   Right.  Well, if it is going to be audited, I assumed it

6   would be by somebody other than themselves.  I just assumed it

7   would be the County, the state, or some other entity like

8   that.  I mean, I'll be honest with you, it was never

9   anything -- I've spent more time with you thinking about it

10  than I did in that instance, so . . . .

11  Q.   Now, did the invoice actually get submitted to the

12  County, to your knowledge?

13  A.   I don't know.

14  Q.   And this description here, it's accurate (indicating)?

15  A.   Yes, sir.

16  Q.   And you had lots of correspondence with Kim Hastie and

17  the License Commission with terms of back and forth about the

18  bill; is that fair to say?

19  A.   Kim is not a big e-mailer.  Most of our discussions were

20  on the phone.  Things were moving very quickly.  So while

21  there were lots of discussions, I wouldn't categorize them as

22  written form.

23  Q.   But calls?

24  A.   Yes.

25  Q.   And some e-mails?

1    A.   Some; more with people other than her for my part.

2    Q.   You mentioned a minute ago foes at the County Commission.

3    Who were you referring to in particular?

4    A.   Jerry Carl would be one.  County Commissioner Carl and

5    Kim had had kind of an ongoing feud.  It really was kind of

6    hot at the particular point in which this was taking off.

7    Throughout the legislative process, Jerry opposed the merger,

8    worked behind the scenes to lobby against it and was very

9    influential and vocal.

10        I ran a campaign against Commissioner Carl.  Fair to say,

11   he does not like me.  I don't think that he would have voted

12   for me to get -- become a dog catcher.  So that was my

13   question as to this going before the County Commission.

14   Political activity would have seen sure that I did not get any

15   kind of payment, and they wouldn't have allowed her to do that

16   for me.

17   Q.   But all this work here was certainly all political.  It

18   was overtly political; would that be fair to say?

19   A.   Depends on what definition of political you want to use.

20   Q.   Political in the sense that there's a political process,

21   there's legislation.  There's bills being drafted.  It's going

22   to be a vote.

23   A.   Yes.  Not campaign-oriented, but the essence -- it's

24   quasi because it's going to be on the ballot.  So we refer to

25   it as political efforts, not in the sense of you running for

1    office but in the sense of the people voting on it, yes, sir.

2    Q.   Do you have any knowledge as to why she -- when you found

3    out she paid you out of the $1.25 fund, do you have any

4    firsthand knowledge as to why she paid it out of that fund?

5    A.   I don't -- I mean, other than what we've discussed

6    already, I can -- you know, there was a discussion about what

7    we were going to do in terms of funding a real campaign.  I

8    mean, we weren't going to pay for a hundred thousand dollars

9    worth of advertising from the taxpayers.  I mean, it's been

10   done, it's judged to be legal by the Attorney General, but

11   it's not something that I think she had any source of funds to

12   do that with.

13        So through those kinds of conversations, this fund came

14   up, but she had limited funding in the account.  I don't

15   remember why.  I think as I'm sitting here thinking about it,

16   maybe it had recently become active or she had recently begun

17   getting money from it, so there wasn't a lot of balance in it.

18   I don't -- I mean, I could sit here and reach for more

19   details.  I don't know that I have exactly what you're looking

20   for in an answer

21   Q.   Okay.  Let me go ahead and show you what's been marked as

22   Government's Exhibit 56.  I believe this is already in

23   evidence.  And in particular, I want to show you page 25.  Do

24   you recognize that (indicating)?

25   A.   Yes, sir.  I mean, I recognize it to be a check, but I

1    don't get the checks at my office, but I recognize it to be a

2    check written to me for $10,000 on May 29th.

3    Q.   And that got deposited; correct?

4    A.   It appears so.  Yes, sir, it does.

5    Q.   And that was May 29th?

6    A.   Yes, sir.

7    Q.   Okay.  Now, let's fast-forward to July.  Kim Hastie did

8    an interview with the Lagniappe in early July --

9    A.   Yes, sir.

10   Q.   -- correct?

11   A.   Yes, sir.

12   Q.   And you read that article in the Lagniappe July 7, 2014?

13   A.   Sure.

14   Q.   In that article, she's referring to you and Chad Tucker

15   and services that you and Chad Tucker performed; do you recall

16   that?

17   A.   I'm not sure she ever acquiesced that I did any services

18   for her but, in general, she was discussing services being

19   performed to her, yes.

20   Q.   Well, why do you say that?  What do you mean she didn't

21   acquiesce?  What do you mean?

22           MR. N. HANLEY:  Judge, I object to reference to a

23   hearsay document, attorney talking about an article.

24           THE COURT:  Overruled.

25   BY MR. KALAYOGLU:

1   Q.   You can answer the question.  You said "acquiesce."  What

2   do you mean by that, why didn't she acquiesce?

3   A.   Oh, she didn't acquiesce to us.  I don't know why.  I

4   have no idea why.

5   Q.   Were you bothered by what was written in that article?

6           MR. N. HANLEY:  I object to whether he was bothered

7   by it, Your Honor.

8           THE COURT:  Sustained.

9   BY MR. KALAYOGLU:

10  Q.   Did you disagree?

11          MR. N. HANLEY:  I object to whether he disagreed.

12          THE COURT:  Are we talking about the article or the

13  interview?

14          MR. KALAYOGLU:  Both, Your Honor.

15          THE COURT:  Well, the article is not in evidence;

16  correct?  Isn't that correct?

17          MR. KALAYOGLU:  Correct, Your Honor.

18  BY MR. KALAYOGLU:

19  Q.   Let me ask you about the recording.  There was a

20  recording from that article.  Have you had a chance to listen

21  to that at all?

22  A.   No.

23  Q.   Okay.  Let me go ahead and play the Lagniappe clip,

24  Exhibit 159.

25          THE COURT:  He said he hadn't heard it.

1    BY MR. KALAYOGLU:

2    Q.   But you have read the article from which the clips came

3    from?

4    A.   I've read the article, but I didn't listen to the

5    recording.  I honestly didn't know it was out until a friend

6    of mine sent me a message and asked me if I had listened to

7    it, and I told him that I hadn't.  And then I was traveling.

8    By the time I got back, I guess I just forgot about it and

9    didn't really care.

10   Q.   Okay.  Did you make an agreement with Kim Hastie to work

11   with her for free?

12   A.   Did I what?

13   Q.   Did you make an agreement with Kim Hastie to work with

14   her for free?

15   A.   Well, she had asked me if I would work and provide the

16   services for free to do it, and I told her that I couldn't

17   because this thing could stretch out a long time, there could

18   be a lot of hours involved in it, and that, you know, it was

19   part of our negotiation, as we said, that the fact that the

20   taxpayers were going to pay for it, I agreed to a low rate

21   but, no, I never agreed to do it for free.

22   Q.   Well, do you have any knowledge that -- of Kim Hastie

23   denying that you were -- she was paying you?

24          MR. N. HANLEY:  Well, I object to it, if he had any

25   knowledge, if it came from hearsay or --

1              THE COURT:  You need to rephrase it.

2    MR. KALAYOGLU:

3    Q.    Do you know that Kim denied paying you?

4    A.    I just want to make sure.  Do I know that Kim denied

5    paying me?

6    Q.    The Defendant, Kim Hastie, do you know --

7    A.    Yes.  I read that in the Lagniappe article.

8    Q.    And did you have a reaction?

9              MR. N. HANLEY:  I object to what his reaction was,

10   Your Honor.

11             THE COURT:  Sustained.

12   BY MR. KALAYOGLU:

13   Q.    Now, Mr. Hanley talked on direct examination with you

14   regarding when the FBI came and interviewed you.  Do you

15   recall that?

16   A.    Yes, sir.

17   Q.    And the FBI brought to your attention the fact that you

18   were paid out of the $1.25 fund; correct?

19   A.    Yes, sir.

20   Q.    And then you explained to the jury how you had a

21   conversation with Jay Ross, the county attorney; is that

22   correct?

23   A.    Yes, sir.  He had asked me about it, yes, sir.

24   Q.    And Jay Ross had contacted you a few days later and told

25   you that you were not to have been paid out of that $1.25

1    fund.  Did I get that right?

2    A.    No, sir.  He sent me a text message telling me I was

3    going to get a message from his office, and they sent me a

4    copy of the bill.  And after I read the bill, I called Jay.

5    And I don't think I testified to that earlier, but what I -- I

6    told Jay, I said, Jay, I'm looking at this, and I don't think

7    she can pay me out of this.  And Jay goes, yeah, that appears

8    to be the point.  And I said, well, I have a problem with that

9    because I've got the check and we've already deposited it.

10          And Jay told me at that time, he said, well, it's your

11   money, you know, you did a service, you rendered a service,

12   you've been paid.  And I said, well, you know, I've got a

13   problem with it.  And I kind of went through the discourse

14   with him about, you know, my feelings about what was going on

15   and that, you know, I don't believe that Kim knew that she

16   couldn't pay me out of the account and I, you know, wanted to

17   know if I could return the funds.  And he said, it's your

18   money, you can do anything you want with it.

19          If there was a question of the legality of where the

20   funds were written from -- excuse me -- a technicality as to

21   whether or not I would write a check back to the County

22   Commission or the Treasurer, because when I asked Jay about

23   it, I don't think anybody knew, like, the checking account

24   that it was written on.  And I'm looking at the check, and it

25   says "Motor Vehicle" here, and that kind of helps me

1    understand part of that conversation I had with him, that he

2    needed to look into it and find out who I would be paying.

3    Q.   Now, you testified about this matter before the Grand

4    Jury; correct?

5    A.   Yes.

6    Q.   That was actually with me; do you recall that?

7    A.   You were one of the people, yes.  Vicki was actually

8    questioning me too.

9    Q.   And that was back in November of 2014; do you recall?

10   A.   I will agree with you.  I don't know for sure.

11   Q.   And you testified under oath --

12   A.   Yes, sir.

13   Q.   -- correct?

14   A.   Sure.

15   Q.   And there was a court reporter there taking down your

16   testimony; correct?

17   A.   Yes, sir.

18   Q.   Let me just go ahead and read to you what you said in

19   Grand Jury about the payment.

20          MR. N. HANLEY:  Judge, I object to him reading his

21   Grand Jury testimony.

22          THE COURT:  Put it down for me first.  What lines

23   are you wanting to read from?

24          MR. KALAYOGLU:  Starting line 11.

25          MR. N. HANLEY:  What page?

1          MR. KALAYOGLU:  This is page 33 of the Grand Jury.

2     (Brief pause.)

3          THE COURT:  If it's not inconsistent with what he's

4     testified to, so why is it not hearsay?

5     (No audible response.)

6          THE COURT:  What part are you contending that's

7     inconsistent?

8          MR. KALAYOGLU:  Just to bolster the timeframe and

9     the sequence of events regarding what he knew regarding the

10    $1.25 fund, Your Honor.

11         THE COURT:  Okay.  That's not an appropriate use of

12    that testimony.

13         MR. KALAYOGLU:  Okay.

14    BY MR. KALAYOGLU:

15    Q.   So you testified here that you returned the money because

16    you thought it was blood money?

17    A.   Sure.

18    Q.   That's what you said; right?

19    A.   Here in this courtroom?

20    Q.   Correct.

21    A.   I mean, I absolutely think that's what it would be.

22    Q.   And actually in Grand Jury as well?

23         MR. N. HANLEY:  I object to what he testified in

24    Grand Jury --

25         THE COURT:  Sustained.

1            THE WITNESS:  Do I answer?

2            THE COURT:  No.

3            THE WITNESS:  Okay.  I'm confused.

4    BY MR. KALAYOGLU:

5    Q.   So you returned the payment because you had to; correct?

6    A.   Morally, ethically, yes.  I mean, nobody -- I mean, Jay

7    told me it was my money, I could do what I want to with it,

8    and we chose to return it.  I mean, I guess, in fact, I could

9    have not returned it too.  It's just I don't -- I don't think

10   that Kim intended to break the law in writing me that check.

11   Now, that's my opinion, but I'm not going to take money from

12   somebody that they didn't intend to give to me.  I mean, if I

13   find a wallet on the street, it's the same principle.  I just,

14   I don't think it was right, and so I chose to return the

15   money.

16   Q.   So nobody ever asked you to return the money?

17   A.   Well, I know that I had a conversation with Agent Kelley

18   about this about specifically who to ask and not ask, and one

19   of Kim's lawyers had called me about that and wrote me a

20   letter about it.

21   Q.   And who's that?

22   A.   A gentleman by the name of Buzz Jordan, I think it's

23   Buzz, Buzz Jordan.  Buzz had contacted me about that, and our

24   discussion --

25   Q.   When did he contact you?

1          MR. N. HANLEY:  Judge, he was finishing his -- he

2     was answering.

3          THE COURT:  What was your question?

4     BY MR. KALAYOGLU:

5     Q.   When did he contact you about that?

6     A.   Well, Buzz had contacted me -- all of this ran within

7     probably two weeks of each other.  With Agent Kelley leaving

8     my office, I contacted Jay.  Sometime within that same week,

9     that took place because when Buzz called me, I told him that I

10    had already talked to Jay about this and had already brought

11    it up to my partner, and we were in the process of returning

12    it.  As a matter of fact, it's kind of funny because he wrote

13    me a letter, and I had already, I think, either sent the check

14    back or we had already written the check when I got a letter

15    from him essentially just synopsizing what we had talked about

16    on the telephone.

17    Q.   But let me go ahead and show you the letter.  It's what's

18    marked as Government's Exhibit 143 (indicating).

19    A.   Okay.

20    Q.   Take a minute and look at that.

21    A.   (Witness complies.)  Okay.  Yes, sir.  That looks to be

22    the letter that I got, I think.

23    Q.   You were cc'd below; correct?

24    A.   Yes, sir.

25    Q.   And you received a copy of this?

1    A.   Yes, sir.

2    Q.   And does Government Exhibit 143 fairly and accurately

3    represent what you received from Mr. Jordan?

4    A.   Sure, yes, sir.

5            MR. KALAYOGLU:  I'd like to go ahead and offer

6    Government's Exhibit 143 in evidence.

7            MR. N. HANLEY:  No objection.

8            THE COURT:  It's admitted.

9        (Government's Exhibit 143 was received in evidence.)

10   BY MR. KALAYOGLU:

11   Q.   Now, the date here is August 5th, 2014; correct?

12   A.   Yes, sir.

13   Q.   Do you recall when you returned the money?  Was it before

14   or after that date?

15   A.   I don't.  And that's what I was saying.  My birthday is

16   on August the 1st, and we went to Disney World for my

17   birthday.  And so I think I wrote the check before I left, and

18   then they were going to come by and pick it up, but I --

19   Q.   Who's "they"?

20   A.   I'm sorry.  Tyler Pritchett, who's the lawyer for the

21   License Commissioner.  I'm sorry.  When we had decided to

22   return the check, I had to find out who to make the check out

23   to because I had asked Jay Ross earlier about that.  And so I

24   never got an answer back as to who I should make the check out

25   to in terms of returning it.  So I contacted Tyler Pritchett,

1   who was the legal counsel for the License Commissioner's

2   Office, and I asked Tyler who I needed to make the check out

3   to, that we were going to return the check, and would he mind

4   coming by my office and picking it up.  I don't know when he

5   came by to pick the check up.  I just know that before I left,

6   we had issued the check

7   Q.   So let me go ahead and show you that check.  It's what's

8   been marked as Government's Exhibit 57 (indicating).

9   A.   Okay.

10            MR. KALAYOGLU:  I believe this is already in

11   evidence, Your Honor.

12            THE CLERK:  (Nods head affirmatively.)

13   BY MR. KALAYOGLU:

14   Q.   Okay.  Let me go ahead and show you page three, a picture

15   of the check (indicating).

16   A.   Okay.  Yes, sir.  And that's -- yeah, that's what I was

17   talking about.  On 7-26, before we left to go to Disney World,

18   I had filled out the check and had everything signed, but I

19   don't know when it was picked up.

20   Q.   So that's July 26; right?

21   A.   Yes, sir.

22   Q.   And then here the letter is August 5th (indicating);

23   right?

24   A.   Right.

25   Q.   Okay.

1    A.   That's what I had said earlier.  I think I got the letter

2    even after I had already tendered the check back to them.

3    Q.   Right.  But you had said that you had actually spoke with

4    Mr. Jordan before you got the letter; did I hear that

5    correctly?

6    A.   Yes.  He called me on the telephone sometime prior to

7    when we wrote the check.  And I had said earlier that, you

8    know, he was going through this whole back story about she

9    couldn't authorize it, and I said, Buzz, let me just go ahead

10   and short-circuit this:  I've already talked to my partner.

11   I'm aware of the fact that I don't think she could have

12   written the check, and we're probably not going to keep it,

13   but I need to go talk to my partner and make sure we get a

14   check written.  And Buzz said, well, that's what I was calling

15   you about.  I just want to make sure that you understand that

16   that would be her wishes, that she didn't know she could pay

17   you.  Would you return the funds?  I agreed to return them.  I

18   don't know exactly day by day when that took place, though.

19   Q.   But your returning of the payment, it wasn't a donation,

20   was it?  It wasn't a donation back to the License Commission?

21   You were returning it because --

22   A.   Technically, they can call it whatever they want to, but

23   it was me giving back the funds that she didn't think she

24   could pay me from.  I mean, I don't know how they codified it

25   when they got it.

1    Q.   I just want to be really clear:  You returned it because

2    you thought it was blood money, your words; correct?

3    A.   Yeah.  Well, yeah, absolutely.

4    Q.   Not a donation; right?  It wasn't that you were giving it

5    because you just felt charitable; right?

6    A.   No.

7    Q.   You didn't -- right.  Well, let me go ahead and show you

8    -- well, in September of 2014, did you have another interview

9    with the Lagniappe -- or did you have an interview with the

10   Lagniappe in September of 2014?

11   A.   At some point in time, they asked me about the return of

12   the money.  I don't remember how it went down specifically,

13   but I think I sent them a text message, a statement by text

14   message.  I don't believe it was a Q and A.

15   Q.   You prepared a prepared statement and gave it to the

16   Lagniappe; correct?

17   A.   Well, I had had another reporter call me from another

18   station, actually, from a TV station, who had asked me about

19   it, and I told them that, you know, I'll send them something

20   to put on but that I wasn't going to go on camera to talk

21   about it.  And so I sent them something, and then at some

22   point later, Jason sent me a message and asked me if he could

23   get a statement about the returned money, and so I sent him

24   the same statement.

25   Q.   And was the statement -- I'm just going to read this, and

```
 1  tell me if I'm getting this right, quote:  "I get paid well
 2  for what I do --"
 3            MR. N. HANLEY:  Your Honor, I object to this.  I
 4  don't know what he's reading from.
 5            THE COURT:  Put it down so I can see, please.
 6            MR. KALAYOGLU:  Sure.
 7            THE COURT:  Which paragraph?
 8            MR. KALAYOGLU:  The bottom here, Your Honor.
 9       (Brief pause.)
10            THE COURT:  Okay.  You can ask him if he said that.
11  BY MR. KALAYOGLU:
12  Q.   Take a minute to read that.
13  A.   Yes, I did.  I said, "But if this is my donation to help
14  a good cause, then I'm good with that too."
15  Q.   And then keep reading.
16  A.   "I do want to be clear, however, that no one asked me,
17  approached me, or even suggested anything to me about
18  returning this.  It just felt like the right thing to do to
19  help her."
20  Q.   "I do want to be clear, however, that no one asked me,
21  approached me, or even suggested anything to me about
22  returning this"?
23  A.   Yes.
24  Q.   Did I read that right?
25  A.   Yes.
```

1   Q.   So you were never approached by the FBI?

2   A.   About returning the money?  No.

3   Q.   About this payment?

4   A.   Off. -- Agent Kelley never asked me to return the

5   payment.

6   Q.   You were never asked by Jay Ross, the county attorney?

7   A.   To return the payment?  No.

8   Q.   You were never asked by Buzz Jordan about returning the

9   money?

10  A.   Well, as I said, I kind of cut Buzz off and told him that

11  we were planning on returning it.  I mean, I won't disagree

12  with you that that was clearly the point of his phone call to

13  me, but we had already kind of gone through the road of where

14  we were going.  There wasn't any implication.

15       And Chad, again, you have to remember that I sent him a

16  message that I had prepared from a discussion with another

17  reporter.  And the other reporter was asking me had anybody

18  strong-armed me or tried to persuade me to do this.  And so I

19  was answering the fact that this was our own decision to do

20  it.  So he's got a quote that essentially was coming from

21  someone else's story.

22  Q.   Just getting back to the $1.25 fund for a second, are you

23  aware that Kim Hastie was the champion of that bill?

24  A.   Well, it benefited her office, yes, sir.

25  Q.   Well, do you know that she championed that bill?

1    A.   Oh, champion, like -- I'm sorry, I thought you meant,

2    like, the champion, like the winner.

3    Q.   Supported?

4    A.   Yes, sir.  She supported the bill, yes, sir.

5    Q.   And the bill did become law; correct?

6    A.   Yes, sir.

7    Q.   The law that I showed you earlier?

8    A.   The one that we read, the local bill, yes, sir.

9    Q.   Right, right, right.

10   A.   Or maybe local -- a state bill, local application,

11   whichever.

12   Q.   But that bill was endorsed supported by Kim Hastie;

13   correct?

14   A.   As far as I know.  I didn't have a professional

15   relationship with her at that time.

16   Q.   And I don't know if you're aware, are you aware of Kim

17   Hastie going before the County Commission in August 2013,

18   going before the commissioners and endorsing that piece of

19   legislation?

20   A.   I'm not.  I mean, it wouldn't surprise me.

21          MR. KALAYOGLU:  Just one minute.

22        (Brief pause.)

23          THE WITNESS:  Can I amend one piece of testimony

24   that I gave you just a minute ago?

25   BY MR. KALAYOGLU:

1    Q.   Go ahead.

2    A.   In the paragraph two above that one, I apologize, I was

3    reading where it had the quotes at the bottom.  In the

4    paragraph a couple up, it explains what I was saying about

5    Chad Petrie, who was the reporter from WKRG, he had asked me

6    about why we returned the payment.  And up there, I put about

7    being in the business of helping clients, pick what accounts

8    we get paid or paid from.

9         Clearly, the payment came under questions from the media

10   about whether or not the account we were paid from was

11   appropriate.  He was asking me if somebody had pressured me

12   from it, and so I guess you have to kind of take all that in

13   the big picture in terms of my answer.  I just didn't see that

14   quote before.  I didn't want to leave that out.  It was a

15   bigger concept than just the one you and I were talking about.

16   Q.   That's fair.  Just one more thing.  Do you remember a few

17   minutes ago -- excuse me.  Do you remember a few minutes ago

18   you were talking about the revision to the invoice and how you

19   were contacted by someone, you can't exactly recall who, and

20   saying that there was a concern about the auditors because

21   there wasn't enough detail on the invoice?  Do you recall

22   that?

23   A.   Yes, sir.

24   Q.   Would it refresh your recollection if I were to state

25   that in your Grand Jury transcript on page --

1             THE COURT:  Put it down for me, please.

2             MR. KALAYOGLU:  Sure.  It's right here, Your Honor.

3             THE COURT:  You can have him read it and ask him if

4    that refreshes his recollection.

5    MR. KALAYOGLU:

6    Q.   Sure.  Can you go ahead and just read --

7             THE COURT:  Read it to yourself.

8    A.   I did.

9    BY MR. KALAYOGLU:

10   Q.   Okay.  Does that refresh your recollection?

11   A.   Yes, sir.

12   Q.   So it would have been Shirley or Ramona?

13            MR. N. HANLEY:  Judge, I object to it.  It's

14   hearsay.  It's not impeachment because it's basically what he

15   said.

16            THE COURT:  Overruled.

17   A.   I mean, I certainly will take the testimony because it

18   was a little more recent, but as I said earlier, someone had

19   called me from the office, and I think I said I didn't even

20   know if I talked to them or an e-mail, but this is what I said

21   at the time, and that was eight months prior to where I am

22   today.  So, I mean, I'll certainly agree with this, yes, sir.

23   Do I need to read it or --

24   BY MR. KALAYOGLU:

25   Q.   No.  That's okay.

1    A.    Okay.

2    Q.    And Shirley is -- do you know who Shirley is?

3    A.    I said in here I think it was Shirley or Ramona, and I'm

4    not a hundred percent sure which one.  And to be honest, I

5    don't, because I really don't know either one of them.

6    Q.    And who is Ramona?  Is that Ramona Yeager?

7              MR. KNIZLEY:  I object.  He said he didn't know

8    either one of them.  It's 602, it's not within his knowledge.

9              THE COURT:  Overruled.

10   BY MR. KALAYOGLU:

11   Q.    You can answer the question.  Do you believe it's Ramona

12   Yeager?

13   A.    I don't know.  I mean, I'm not a fool, and I've read the

14   newspapers, and I know that Ramona is in this room --

15             THE COURT:  No, no.  The question is:  Do you know?

16             THE WITNESS:  I don't know.  Yes, ma'am.  I don't

17   know.

18   BY MR. KALAYOGLU:

19   Q.    You testified a little while ago about Tyler Pritchett?

20   A.    Yes, sir.  Well, that I had spoken with him, yes, sir.

21   Q.    In July of 2014; correct?  Do you recall having any

22   conversations with Mr. Pritchett earlier than that?

23   A.    Sure.  I mean, I talked to Tyler maybe a dozen times.  I

24   think I met him after the legislative process had begun.  I

25   don't know if he was on board and not involved or if he had

1   just come on board, but he after we did the legislative

2   process called me and kind of wanted a debriefing about the

3   legislative process, what we had done, why we had made certain

4   decisions.  Kim was going to send him to meet with

5   Commissioner Ludgood to discuss with her how it may or may not

6   impact other local legislation that had been adopted regarding

7   the License Commissioner's Office, so Tyler and I kind of had

8   a debriefing over a period of time about the bill.

9   Q.   So he was involved in the drafting process; is that fair

10  to say?

11  A.   No, sir.  After the legislative session, he contacted me,

12  wanting kind of a debriefing because he was going to go have a

13  communication with Merceria Ludgood about the bill and whether

14  or not it impacted local bills.  There had been a problem with

15  the District Attorney's Office where a bill had been passed

16  and it was in conflict with some local bills, and it was

17  likely to cause the County Commission a lot of money.  And

18  Commissioner Ludgood was very particular about the fact that

19  she did not want this bill to run afoul of other local bills

20  that had been passed.

21       Tyler was talking to me about whether or not we had done

22  that research on those bills.  I told him I deferred to LRS on

23  it.  There were a lot of conversations just about why we chose

24  what path we chose and what language we chose and essentially

25  all the things I testified to here today.  I don't remember

1    when it was.  It was just some point after the legislative

2    process.

3    Q.   And did you have a chance to review Kim Hastie's

4    newsletter that went out?

5    A.   I did.

6    Q.   Let me go ahead and show you what's been marked as

7    Government's Exhibit 148 (indicating) --

8            MR. KALAYOGLU:  Which is not in evidence, Your

9    Honor.  And Your Honor, I'm just going to show page eight,

10   which is Bates number 00093.

11           THE COURT:  Mine goes from 973 to 997.  Exhibit 148?

12           MR. KALAYOGLU:  Correct, Your Honor.

13           THE COURT:  All right.  Now put down the page you

14   would like for me to see on the screen.

15           MR. KALAYOGLU:  It is on there, Your Honor.

16           THE COURT:  Okay.

17       (Brief pause.)

18           THE COURT:  All right.  What's your question?

19   BY MR. KALAYOGLU:

20   Q.   Have you seen this before (indicating)?

21   A.   Yes, sir.  It looks familiar.

22   Q.   And what is it?

23   A.   An e-mail.

24   Q.   And who's it from?

25   A.   Tyler Pritchett.

1          MR. KALAYOGLU:  I'd offer just this page,

2    Government's Exhibit 148, into evidence.

3          MR. N. HANLEY:  Object to relevance, Your Honor.

4          THE COURT:  Just relevancy only?

5          MR. N. HANLEY:  Relevance and I don't think there's

6    a proper foundation.

7          THE COURT:  Overruled as to relevance.

8          MR. N. HANLEY:  I don't think there's a proper

9    predicate, foundation.

10          THE COURT:  He received the e-mail.  Overruled.

11   It's admitted.

12       (Government's Exhibit 148, page 8, was received in

13         evidence.)

14   BY MR. KALAYOGLU:

15   Q.   Was this the constitutional bill that you were talking

16   about a few minutes ago, the revised version?

17   A.   I have no idea.  I'm not -- it's just an e-mail page, so

18   I don't know.  It has an attachment entitled "Kim's

19   Bill.docx," but it was sent from Tyler to me, and I don't --

20   as I said, he was going to meet with Commissioner Ludgood, and

21   we were discussing.  So I don't know if this was the old bill

22   or if this was the new one that he was drafting to take back

23   to the County Commission that would address some of the other

24   concerns about how it may impact local legislation.

25       Is there an attachment with it?

```
 1   Q.   There is.  And I'm going to show you -- actually, I won't
 2   go ahead at this time.  It's not too important.
 3          MR. KALAYOGLU:  Nothing further from this witness,
 4   Your Honor.
 5          THE COURT:  All right.  We've got that down as just
 6   page 000983.
 7                      REDIRECT EXAMINATION
 8   BY MR. N. HANLEY:
 9   Q.   Jon, the prosecutor asked you several times if you had
10   described this $10,000 as blood money?
11   A.   Yes, sir.
12   Q.   Explain what you mean when you say that it's blood money.
13          MR. KALAYOGLU:  Asked and answered, Your Honor.
14          THE COURT:  Overruled.
15   BY MR. N. HANLEY:
16   Q.   Take your time.  What do you mean when you say it's blood
17   money and why you felt you had to give it back?
18   A.   Well, in a lot of movies, they kind of classify blood
19   money as things that happen from people when they do something
20   wrong.  And I didn't want to be the one that would, you know,
21   essentially, me keeping the money that she didn't intend to
22   give me, by returning it, I may be responsible for something
23   that she didn't intend to do.  And I didn't want that blood on
24   my hands.  I just felt like that it was the right thing to do.
25   She didn't obviously intend to pay me out of an account she
```

1   couldn't have.  I had the money --

2              MR. KALAYOGLU:  Objection, Your Honor, hearsay.

3              THE COURT:  Overruled.  Go ahead.

4   A.   I just felt the best thing to do was to return the money.

5              MR. N. HANLEY:  That's all.

6              THE COURT:  Thank you, sir.  Okay.  We'll let you go

7   home for the day.  If you'll be back in the jury room at 9:30

8   in the morning.  We have some things I need to do, so I'll see

9   you at 9:30.  Again, do not do any research.  Do not discuss

10  this case.  And if you'll take your personal items with you.

11  Thank you.

12       (The jury was excused at 4:57 p.m. this date.)

13              THE COURT:  Okay.  Anything the Prosecution needs

14  to take up before we go home tonight?

15              MR. BORDENKIRCHER:  No, Your Honor.

16              THE COURT:  Mr. Knizley?

17              MR. KNIZLEY:  No, ma'am.

18              THE COURT:  And Mr. Hanley?

19              MR. N. HANLEY:  Yes, ma'am.

20              THE COURT:  Is this the 212 or whatever it is?

21              MR. N. HANLEY:  I continue to give Mr. --

22              THE COURT:  Okay.  What's the exhibit number?

23              MR. N. HANLEY:  112.

24              THE COURT:  112.  Is there an objection to 112?

25              MR. BORDENKIRCHER:  There is, Your Honor.

```
 1            THE COURT:  And what is it?
 2            MR. BORDENKIRCHER:  It's an improper way to do a
 3    summary exhibit under 1006 because you can't -- you can't do a
 4    1006 exhibit through a defendant that as their witness, as
 5    they're going through, is saying, no, that's not right, no,
 6    that's not right.
 7        What he's doing is trying to build an exhibit based upon
 8    his testimony and what he thinks it is and try to get the
 9    person to agree to it.  And on its face, it's a
10    mischaracterization of what actually occurred because it
11    doesn't actually address what the actual W-2 income is and
12    what he was paying and withholding --
13            THE COURT:  But, you know, Mr. Bordenkircher, you're
14    the king of coming up with exhibits that show the part of the
15    evidence that you want to show.  How is this different than
16    what you've been doing?
17            MR. BORDENKIRCHER:  Well, you haven't been letting
18    me do it.  You have restricted me in every way, Your Honor.
19            THE COURT:  All right.  It's admitted, 112.
20        (Defendant's Exhibit 112 was received in evidence.)
21            THE COURT:  Anything else to take up?  Let's talk
22    about housekeeping, we don't need this on the record, at the
23    sidebar, please.
24        (Sidebar conference, off the record.)
25        (Proceedings adjourned at 5:00 p.m. this date.)
```

1                                 <u>CERTIFICATE</u>

2

3     STATE OF ALABAMA)

4     COUNTY OF MOBILE)

5

6          I do hereby certify that the above and foregoing

7     transcript of proceedings in the matter aforementioned was

8     taken down by me in machine shorthand, and the questions and

9     answers thereto were reduced to writing under my personal

10    supervision using computer-aided transcription, and that the

11    foregoing represents a true and correct transcript of the

12    proceedings upon said hearing.

13         I further certify that I am neither of counsel nor

14    related to the parties to the action, nor am I in anywise

15    interested in the result of said cause.

16         I further certify that I am duly licensed by the Alabama

17    Board of Court Reporting as a Certified Court Reporter as

18    evidenced by the ACCR number following my name found below.

19

20

21                              <u>s/Mary Frances Giattina</u>
                                Mary Frances Giattina, CCR, RDR, CRR
22                                 FCRR, ACCR #181
                                Official Court Reporter
23                              U.S. District Court
                                Southern District of Alabama
24                              P.O. Box 3021
                                Mobile, Alabama  36652-3021
25                              (251) 690-3003

MARY FRANCES GIATTINA, CCR, RDR, CRR, FCRR, OFFICIAL COURT REPORTER
    P. O. BOX 3021, MOBILE, ALABAMA  36652-3021  (251) 690-3003